1  Kathleen Bliss, Esq. (NV Bar 7606)
2  Kathleen Bliss Law PLLC
3  170 South Green Valley Parkway
4  Suite 300
5  Henderson, NV 89012
6  (702) 318-7375
7  kb@kathleenblisslaw.com
8
9  Michael Volkov, Esq. (DC 367348)
10  *Pro Hac Vice (pending)*
11  The Volkov Law Group PC
12  1015 15th Street, N.W., 6th Floor.
13  Washington, D.C. 20005
14  (240) 505-1992
15  mvolkov@volkovlaw.com
16
17  *Attorneys for Plaintiffs*
18
19
20                IN THE UNITED STATES DISTRICT COURT
21                    FOR THE DISTRICT OF NEVADA
22
23

24  ROBERT J. CIPRIANI, and              )
25  JAMES RUSSELL                        )
26  Plaintiffs,                          )        CASE NO.
27                                       )
28                                       )
29                                       )        JURY TRIAL DEMANDED
30  GENTING BERHAD                       )
31  RESORTS WORLD LAS VEGAS, LLC         )
32  TAN SRI LIM KOK THAY, aka KT LIM     )
33  SCOTT SIBELLA                        )
34  DAVID CHESNOFF                       )
35  MATTHEW FORBES                       )
36  DONI TAUBE                           )
37  JOSEPH TATONETTI                     )
38  TONYA HENDERSON                      )
39  ELIE SAMARANI                        )
40  BRANDON SATTLER                      )
41                                       )
42  Defendants.                          )
43
44

1

1    <u>**COMPLAINT**</u>

2    Plaintiffs Robert J. Cipriani, aka "R.J." and "Robin Hood 702", and James Russell

3    (hereinafter separately referenced as "Plaintiff Cipriani" and "Plaintiff Russell," respectively, or

4    collectively "Plaintiffs Cipriani and Russell" or "Plaintiffs"), by and through their undersigned

5    counsel, file the following Complaint against Defendants Genting Berhad ("Defendant Genting"),

6    Resorts World Las Vegas LLC ("Defendant Resorts World" and, for convenience referred to as

7    "Resorts World"), Tan Sri Lim Kok Thay, aka "KT Lim" ("Defendant KT Lim"); Scott Sibella

8    ("Defendant Sibella"), David Chesnoff ("Defendant Chesnoff"), Matthew Forbes ("Defendant

9    Forbes"), Doni Taube ("Defendant Taube"), Joseph Tatonetti ("Defendant Tatonetti"), Tonya

10   Henderson (Defendant "Tonya Henderson"), Elie Samarani, ("Defendant Samarani") and Brandon

11   Sattler ("Defendant Sattler"), collectively "Defendants," seeking monetary damages as well as

12   attorneys' fees, litigation expenses, and other relief, and in support thereof alleges the following:

13   <u>**Introduction**</u>

14   *"The fish rots from the head down -- leadership sets the moral climate" --*
15   *Transparency International*
16
17   *Those are my principles, and if you don't like them . . . well, I have others." --*
18   *Groucho Marx*
19
20   *Corporate fraud does not occur in a vacuum.  It starts at the top and trickles down*
21   *when those at the top tolerate or encourage misconduct."- Judge Jed Rakoff*
22   *(SDNY)*
23
24   1.    Genting Berhad, a large Malaysian conglomerate, and Resorts World think of

25   themselves as major players in the casino, resort and hospitality industry.  Beginning in on or about

26   2018, , Genting Berhad and Resorts World planned a new casino and hotel complex in Las Vegas,

1    the grand opening of which launched on June 24, 2021. It was the first new casino on the Vegas

2    strip since the early 2010s.[1]

3         2.    Since its celebrated Las Vegas opening in 2021, Resorts World has proven beyond

4    question that it is unfit and incapable of operating a casino and hotel complex in compliance with

5    the law.  In fact, since opening Resorts World in 2021, Genting Berhad and Resorts World have

6    proven their *bona fides* as a corrupt racketeering enterprise that operates with complete disregard

7    of basic governance, corporate ethics and the law.

8         3.    In 2025, after a multi-year regulatory investigation, the Nevada Gaming

9    Commission Board ("NGCB"), reached a settlement pursuant to which Genting Berhad and

10   Resorts World agreed to pay $10.5 million in penalties for pervasive and systemic money

11   laundering violations.  In addition to the fine, Genting Berhad and Resorts World agreed to replace

12   the board of directors, terminate several executives, and implement significant remediation to its

13   AML compliance program and oversight function.  Even with this major disciplinary settlement,

14   it is not clear that Genting Berhad and Resorts World are out of the woods yet -- the U.S. Justice

15   Department apparently maintains jurisdiction over a potential criminal investigation of the

16   companies.[2]

17        4.    In the face of these serious challenges, and after agreeing to the settlement, Genting

18   Berhad and Resorts World now claim that the casino has "implemented wholesale changes" to

19   restore its good name and to continue its operations with proper regard for ethics and compliance.

---

[1] Reynolds, C., *5 Things to Know about the Vast Vegas Hotel-Casino that Opens Today*, Los Angeles Times, June 24, 2021, available here; Segall, E., *Resorts World is Last New Hotel to Open in Las Vegas, For Now*, Las Vegas Review-Journal, June 26, 2021, available here.

[2] *See* Gentry, D., *Resorts World Could face Additional Sanctions from Nevada Should Feds Take Action*, Nevada Current, March 21, 2025, available here (the NGCB settlement included provision reserving right to revisit settlement in the event the U.S. Justice Department or the U.S. Department of Treasury take any enforcement action against Resorts World) .

1    These claims ring hollow in the face of evidence to the contrary; and, based on information and

2    belief, including the allegations set forth herein, it is likely that this racketeering enterprise will

3    continue its pattern

4         5.     Indeed, Genting Berhad and Resorts World trumpeted its initial appointment of Jim

5    Murren as Chairman of the new Board of Directors, the former CEO of MGM Resorts

6    International, as a member of the so-called "Dream Team."[3] Murren's history and past record of

7    performance, however, was anything but a dream -- it was a nightmare.  Under Murren's

8    stewardship,[4] MGM Resorts suffered significant anti-money laundering failures, which ultimately

9    lead to MGM Resorts paying the Justice Department an $8.5 million fine for AML violations at

10   its casinos.[5]  Murren resigned from MGM in February 2020.

11        6.     Murren was recently replaced as Chairman at Resorts World Las Vegas to assume

12   a new position but retains the title of Chairman Emeritus. [6]  Further, press reports indicate that

13   Resorts World has resumed its past practice of embracing and welcoming criminals to its casino.[7]

---

[3] Gentry, D., *Resorts World Fields "Dream Team" as Gaming Commission Signs Off on $10.5 Million Fine*, Nevada Current, March 27, 2025, available here .  Recently, Murren accepted a new position in Dubai and remained Chaiman Emeritus at Resorts World, an honor reflecting Resorts World's inability to commit to wholesale reform.

[4] Gentry, D., *Murren, Headed to Resorts World, Knew in 2019 of Questionable Gamblers,* Nevada Current, December 5, 2024.

[5] MGM executives "suspected" that criminals were illegally gambling at their casinos.  These suspicions were reinforced by a 2019 letter from Plaintiff Cipriani to Murren  providing details as to the systemic and pervasive illegal gambling and money laundering activities occurring at the MGM casinos.  Ironically, the then President of MGM was none other than -- Defendant Scott Sibella, who jumped from MGM to Resorts World in 2019 and subsequently in 2024 was singled out by the U.S. Justice Department to plead guilty to a felony offense for his conscious strategy to embrace and welcome criminals to gamble, invest in and participate at MGM casinos and properties.

[6] Wargo B., *Former Nevada Gov. Brian Sandoval New Chairman of Resorts World Las Vegas Board of Directors,* CDC Gaming, November 13, 2025, available here.

[7] Levitan, C., *Indicted Gambler Wins Major Las Vegas Poker Event, Exposing Industry Blind Spot*, Casino.org, November 13, 2025, available here.

It is hard to credit Resorts World's claims of reform when its "commitment" to ethics and compliance appears to be nothing more than window dressing.[8]

7.      Looking back on the Genting Berhad and Resorts World debacle, it is important to examine exactly what occurred -- after four years of criminal racketeering activity, Genting Berhad and Resorts World left behind in their wake a disastrous pile of governance failures, massive losses suffered by victims of fraud, and a far-reaching, unceasing practice and pattern of money laundering and illegal activities.  As recounted here, Genting Berhad and Resorts World adopted a deliberate business strategy -- premised on ignoring regulatory and legal restrictions -- to maximize revenues by welcoming criminals at Resorts World to launder their illicit proceeds.  In short, Genting Berhad and Resorts World consciously and deliberately chose not to operate a legitimate gaming business, but instead to conduct "business" as a criminal racketeering enterprise.

8.      The Genting Berhad and Resorts World fiasco stands as a testament to the dangers to an organization suffering from a weak ethical and compliance culture that willingly embraces criminal patrons (who should have otherwise been barred).  Before opening in June 2021, Genting Berhad and Resorts World hired Defendant Scott Sibella, a long-time senior executive in the casino and resort industry to lead the new casino.  Defendant Sibella brought to Resorts World his loyal team from MGM, where he served as the President and Chief Operating Officer.

9.      Genting Berhad and Resorts World's first mistake was its first hire -- Defendant Scott Sibella, who bears the ignominious distinction of serving as the President of two large casinos that have been the subject of major federal criminal prosecutions and regulatory enforcement actions.  In 2024, after Defendant Sibella's departure, MGM Grand had to pay a criminal fine of $8.5 million for anti-money laundering violations, and Defendant Sibella himself

---

[8] As the saying goes, "*You can put lipstick on a pig, but it's still a pig.*" See Oxford Dictionary of English Idioms (3d ed. 2010).

1    was required to plead guilty to a criminal offense of failing to file a suspicious activity report, as

2    required under the Bank Secrecy Act and applicable regulations.

3         10.    Before his 2024 guilty plea, Defendant Sibella consistently aligned himself with

4    the criminal element -- first at the MGM Grand and then at Resorts World.  Defendant Sibella was

5    obsessed with growing Resorts World's revenues, by legitimate and illegitimate means.  When he

6    joined Resorts World, Defendant Sibella knew that his financial success depended on permitting

7    criminals to gamble and invest in Resorts World businesses.  In other words, Defendant Sibella

8    knew that he had to welcome "wealthy" criminals involved in illegal gambling, fraud, money

9    laundering and other illicit schemes.  By encouraging criminals to gamble at, and invest in, Resorts

10   World, Defendant Sibella was singularly focused on increasing Resorts World's revenues, while

11   ignoring basic governance, compliance, due diligence and legal requirements.  To this end, based

12   on information and belief and which will be established by the evidence, Defendant Sibella with

13   the assistance and support of the Co-Defendants and other members of the Resorts World

14   racketeering enterprise employed a deliberate strategy that had a clear message: welcome the

15   criminals, many of whom Defendant Sibella had established relationships, and let them launder

16   their illicit funds at the casino and invest in Resorts World businesses, all to the benefit of the

17   Resorts World's bottom line.  Ultimately, Defendant Sibella saw the Resorts World opportunity as

18   his last great chance to cash in on his career.

19        11.    As a consequence of this deliberate scheme to operate as a racketeering enterprise,

20   not as a legitimate business, Resorts World stands as one of the worst examples of a governance

21   and compliance disaster in the casino industry.

22        12.    Resorts World executed this illicit strategy with the support, willingness and

23   encouragement of its parent, Genting Berhad, which emphasized revenue growth, and which

1   ignored serious concerns about Resorts World illegal activities.  Genting Berhad's Chaiman and

2   CEO, KT Lim deliberately ignored governance and oversight responsibilities to ensure compliance

3   with the law in favor of advancing its overriding objective -- make money at any cost.

4         13.     Defendant Sibella's leadership strategy was summed up in a statement he often

5   repeated when he faced the fundamental choice of accepting money from criminals versus

6   compliance and denying criminals access to the casino -- "We need [the money] to keep the lights

7   on."  In fact, however, Defendant Sibella and his team wanted no "lights" to shine that might

8   expose Resorts World's illegal casino's operations.  Defendant Sibella and his team were dedicated

9   to hiding his business strategy -- Resorts World invited, encouraged and welcomed criminals to

10   patronize Resorts World with their illicit proceeds.  To this end, Genting Berhad and Resorts

11   World's illicit strategy infected every level of their business including the board, senior executives,

12   senior managers, and employees. Defendant Sibella and his Co-Defendant team, in this case,

13   Defendants Taube, Forbes, Tatonetti, Henderson, Samarani and other former MGM Grand

14   professional staff, followed this overriding strategy of neglect -- the word was to "keep your head

15   down," and hold onto your job.

16         14.     Defendant Chesnoff, a well-regarded criminal defense attorney and known as a

17   local "fixer,"  was a longtime friend and colleague of Defendant Sibella. Defendant Chesnoff

18   joined the enterprise to enrich himself and members of the enterprise by arranging and disguising

19   investments in Resorts World businesses on behalf of known criminals and prohibited persons.

20   These relationships had to be approved by Defendant Sibella, who did so, as long as Sibella

21   received  a "piece of the action," either in a kickback or an equity interest.

22         15.     Plaintiff Robert Cipriani and Plaintiff James Russell are just two of the many

23   victims of Resorts World's racketeering enterprise.  But they are important nonetheless, Cipriani

is a well-respected high-stakes gambler who regularly frequented the Resorts World casino in its opening months. Importantly, Plaintiff Cipriani is a long-time source who has assisted federal law enforcement and regulators in cracking down on illegal activities at casinos. Plaintiff Cipriani informed the federal and NGCB investigations of MGM Grand, and he assisted the criminal and regulatory investigations against Resorts World.

16.    In the first few months after the June 2021 opening, Plaintiff Cipriani spent significant time at the new Resorts World casino, and he did not like what he observed -- known criminals involved in illegal gambling, wire fraud schemes, and money launderers were regularly playing at the Resorts World casino. He could not believe his eyes. He reported the presence of the known criminals to Defendants Sibella, Taube, Forbes, Tatonetti and others on the security and surveillance staff. Nothing was done. Indeed, even after reporting the presence of criminals, Cipriani observed Defendant Sibella, on one specific occasion, overrule the compliance staff to allow a known criminal and his associates to gamble using illegal proceeds in the millions.[9] And, of course, Defendant Sibella repeated his guiding principle -- "We need [the money] to keep the lights on."

17.    Plaintiff Cipriani's presence and reporting to Resorts World and law enforcement created a real problem for Defendants Genting Berhad, Resorts World, Sibella, Chesnoff, Taube, Forbes, and Tatonetti -- Plaintiff Cipriani was a threat to their illegal racketeering enterprise. Unlike the solutions represented in popular movies like *Casino (Martin Scorsese dir., Universal Pictures 1995)* and *Goodfellas (Martin Scorsese dir. Warner Bros. Pictures 1990)*, the Defendants and another individual, Robert Alexander, a long-time fraudster who is now deceased, joined together to harass, intimidate, threaten and retaliate against Plaintiff Cipriani to silence him as a

---

[9] After being overruled in such a blatant manner, Resorts World's compliance staff did not report such conduct to the AML Committee or the Board of Directors -- a well-known best practice to address wrongdoing.

1    cooperating witness. Working together, the Defendants arranged to "arrest" Plaintiff Cipriani on

2    false charges, and, for good measure, manufactured a separate criminal felony charge of cheating

3    at blackjack, with the clear intent and message to silence and prevent Plaintiff Cipriani's future

4    cooperation.  Based on the fraudulent and false set of criminal charges, the Defendants were able

5    to impose an immediate ban on Plaintiff Cipriani's presence at Resorts World, unlike its criminal

6    patrons and constituency that it depended on.  As a result of this action, Plaintiff Cipriani suffered

7    substantial damages since his long-time livelihood, high-stakes gambling, was taken away -- other

8    casinos followed suit and Plaintiff Cipriani was effectively banned from every casino around the

9    world.  Plaintiff Cipriani suffered significant harm -- as a professional gambler, he was deprived

10   of his livelihood for over four years. For a serious gambler like Plaintiff Cipriani with a record of

11   performance, his losses reached millions of dollars; his reputation suffered serious harm.

12       18.    Plaintiff Jim Russell suffered his own set of indignities and financial loss at the

13   hands of Resorts World and its criminal enterprise.  Plaintiff Russell is a long-time successful

14   businessman in the steel industry. Unfortunately, Plaintiff Russell and other businesspeople in the

15   community were victims of a massive investment fraud executed by Defendant Brandon Sattler, a

16   member of the enterprise, who cheated Plaintiff Russell and his partners out of approximately $10

17   million.

18       19.    Defendant Sattler manufactured on paper a business, SattCom Video LLC

19   ("SattCom"), and used it as a false vehicle to pitch investors for loans.  Besides his fraud scheme,

20   Defendant Sattler regularly gambled at Resorts World as a convenient location to launder his

21   illegal proceeds, despite two prior fraud convictions and a non-dischargeable order from the United

22   States Bankruptcy Court. Defendant Sattler also linked his fraudulent business to Tacos El Cabron,

23   a restaurant in the Resorts World complex, which was owned by Dave Stroj and Jaime Behar, both

1   of whom were alleged criminals and had been indicted for running an illegal gambling operation

2   in southern California.  Yet, Resorts World welcomed them to operate Tacos El Cabron at the

3   Resorts World complex as another vehicle to promote money laundering, and failed to run even

4   basic due diligence, the results of which would have revealed criminal links to its owners.

5        20.    As the walls of justice closed in on Defendant Sattler, he continued to gamble his

6   illegal wire fraud proceeds, even after Plaintiff Cipriani warned numerous senior executives at

7   Resorts World, including Defendants Sibella, Taube, Forbes and Tatonetti that Defendant Sattler

8   was a known criminal and fraudster who was under FBI investigation.

9        21.    In January 2021, Plaintiff Russell and his partners secured a nondischargeable

10  Court Order pursuant to his petition for involuntary bankruptcy in an attempt to recover funds from

11  Defendant Sattler.  The judgment issued was based upon the premise of fraud. But even after the

12  Court Order was issued, Resorts World welcomed Defendant Sattler with open arms -- Sattler

13  continued to frequent the casino and associate with the known money laundering business at Tacos

14  El Cabron.  Eventually, Plaintiff Russell lost any chance of recovery as a direct result of Resorts

15  World's failure to prevent Defendant Sattler from gambling away or investing his illegal proceeds.

16       22.    Plaintiffs bring this to vindicate the interests of two (of many) victims, Plaintiff

17  Cipriani and James Russell, who suffered significant and serious damages as a direct result of

18  Genting Berhad and Resorts World's racketeering enterprise.  In the end, Plaintiffs believe that by

19  exposing the full scope of this long-time racketeering enterprise, and by pursuing their claims,

20  justice will ultimately be done.

21              **I.    Jurisdiction and Venue**

23.     The Court has jurisdiction over the subject matter of this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961 et seq. (specifically 18 U.S.C. § 1964(c)) and 28 U.S.C. § 1331.

24.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' Nevada State law claims.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant Resorts World's principal place of business is in this district; because Defendants Sibella, Chesnoff, Taube, Forbes, Tatonetti, Henderson and Smarani reside in this district; and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## II.     Parties

26.     <u>Plaintiff Robert J. Cipriani, aka "R.J." and "Robin Hood 702" ("Plaintiff Cipriani"),</u> is a high-stakes gambler and resident of Los Angeles, California. He is a well-known blackjack player. Plaintiff Cipriani often shares his winnings with those less fortunate and regularly donates substantial monies to a number of charitable causes.

27.     Beginning in or around 2018, Plaintiff Cipriani became a cooperating witness who provided substantial assistance to the Federal Bureau of Investigation (FBI), the Internal Revenue Service  (IRS) and the Homeland Security Investigations (HSI) and other law enforcement and regulatory agencies.   With his assistance, the Department of Justice, state prosecutors and regulatory agencies have successfully prosecuted organizations and individuals involved in wire fraud, illegal gambling activities, drug trafficking, money laundering, and other significant criminal conduct and regulatory violations.   To this end, Plaintiff Cipriani provided truthful information that exposed criminal activities by casinos, illegal gamblers, money launderers and

1  other individuals involved in the criminal underworld in Las Vegas and other jurisdictions in the

2  United States and around the world.  Plaintiff Cipriani's assistance to authorities resulted in

3  numerous successful criminal prosecutions. Several of the Defendants retaliated against Plaintiff

4  Cipriani to punish and silence him by engaging in an elaborate scheme to intimidate, harass,

5  threaten and ultimately arrest him based on fabricated charges to ensure Plaintiff Cipriani was

6  banned from entry at casinos around the world.

7           28.   Plaintiff James Russell (Defendant Russell") is a successful businessman in Las

8  Vegas, Nevada.  He is the owner of a steel distribution company based in the Las Vegas, Nevada

9  area.  As a successful businessman, Plaintiff Russell, from time to time, has loaned money to

10  entrepreneurs.  Starting in 2016, Plaintiff Russell and his partners loaned approximately $10

11  million to Defendant Brandon Sattler, who portrayed himself as the owner and operator of

12  SattCom, which installed video systems in casinos and other businesses.  Defendant Sattler's

13  business was fraudulent, and he never repaid Plaintiff Russell's loans.

14           29.   Starting in 2018, Plaintiff Russell, through counsel, initiated involuntary

15  bankruptcy proceedings against Defendant Sattler.  On January 5, 2021, Plaintiff Russell secured

16  a Judgment for Nondischargeability of Debt from the Nevada Bankruptcy Court. The judgment

17  issued was based upon the premise of fraud.   Despite his past criminal record and this bankruptcy

18  Order, Resorts World permitted Sattler to continue to gamble illegal proceeds at Resorts World's

19  casino.  Plaintiff Russell and his partners were unable to recover any of the $10 million from

20  Defendant Sattler, a significant portion of which Defendant Sattler used to gamble at Resorts

21  World's casino.

22           30.   Defendant Genting Berhad, aka Genting Group ("Defendant Genting") is a global

23  conglomerate based in Malaysia that oversees a diversified portfolio in five industries -- leisure &

1   hospitality, plantations, energy, property and life sciences.  Defendant Genting's leisure and

2   hospitality business operates under the Resorts World brand, and consists of integrated resorts and

3   casinos across Malaysia, Singapore, the United Kingdom, the Bahamas and the United States.

4   Defendant Genting owns Resorts World Las Vegas in Nevada, which it views as its crown jewel

5   in the gaming and resort industry.  Defendant Genting opened the Resorts World casino and resort

6   in 2021.

7        31.    <u>Defendant KT Lim, aka KT Lim ("Defendant KT Lim")</u> is the Executive Chairman

8   and long-time CEO of Defendant Genting.  In the early 2000s, he succeeded his father, Tan Sri

9   Lim Goh Tong as the Executive Chairman of the Board and CEO.  Recently, on March 1, 2025,

10  Defendant KT Lim resigned from his position as CEO and retained his position as Executive

11  Chairman.

12       32.    As the CEO and Executive Chairman of Defendant Genting, Defendant Lim and

13  other board members failed to exercise proper oversight of Defendant Resorts World Las Vegas

14  LLC to ensure that the Resorts World casino operated in compliance with legal and regulatory

15  requirements.  In particular, after receiving a detailed letter on December 6, 2021, from Plaintiff

16  Cipriani outlining serious money laundering and criminal activities at the Resorts World casino in

17  Las Vegas, Defendant Lim took no steps to follow up, respond or inquire of appropriate officials

18  at Defendant Genting and at Defendant Resorts World.

19       33.    <u>Defendant Resorts World Las Vegas LLC dba Resorts World Las Vegas and</u>

20  <u>Resorts World Las Vegas Hotels, LLC (collectively referred to as "Defendant Resorts World," or</u>

21  <u>for convenience, "Resorts World" or "RW"),</u> is an indirect, wholly-owned subsidiary of Defendant

22  Genting Berhad.  Defendant Resorts World holds a legal licensee for nonrestricted gambling in

23  Nevada.  Resorts World Las Vegas, LLC and Resorts World Las Vegas Hotels, LLC are limited

1    liability companies duly formed and organized under the laws of Delaware, with members who

2    are citizens of the State of Nevada.

3         34.    Genting purchased an unfinished project in 2013 with the plan to redevelop the area

4    as Resorts World Las Vegas.  After various construction and litigation delays,  Resorts World

5    opened in June 2021 at 3000 Las Vegas Boulevard, as the first new resort on the Las Vegas strip

6    since 2010, at a total cost of upwards $4.3 billion.  At the time of its opening, Resorts World was

7    the most expensive resort property ever developed in Las Vegas, including a casino, and a 59-story

8    tower housing over 3,500 rooms in three Hilton hotels.  The Resorts World complex includes

9    restaurants, entertainment venues, a retail center, a pool complex and other entertainment

10   features.[10]

11        35.    Beginning at an unknown time but at least on or about June 2021 and thereafter,

12   Defendant Resorts World and the other Defendants operated a racketeering enterprise with the

13   singular purpose of increasing its revenues by encouraging and welcoming gamblers and patrons

14   who spend money from illegal sources of funds in the Resorts World complex and casino in Las

15   Vegas, Nevada.  To this end, Defendant Resorts World: (A) encouraged and permitted illegal

16   gamblers, fraudsters, drug traffickers and other criminal elements to gamble at Defendant Resorts

17   World casino using money that was known or suspected proceeds of criminal activity; and (B)

18   encouraged and permitted illegal gamblers, fraudsters, drug traffickers and other criminal elements

19   to invest in, participate in and operate businesses located at Defendant Resorts World's complex

20   and casino, which are commonly referred to as vendors. All of these activities listed in paragraphs

21   (A) and (B) were conducted by Defendant Resorts World and the Defendants in violation of federal

---

[10] Stutz, H., *Resorts World Unveiling 'Seems Like an Old-School Las Vegas Resort Opening'*, The Nevada Independent, June 21, 2021, available here; Resorts World Las Vegas, Property Fact Sheet, available at www.rwlasvegas.com here.

1    anti-money laundering and racketeering laws and with disregard for Resorts World's then-existing

2    anti-money laundering compliance program and procedures.

3        36.    As a result of its pervasive and notorious illegal activities, and Resorts World's

4    reputation as a home for illegal criminals, which was well known by the Defendants, sometime in

5    2023, Defendants Genting, Resorts World, and others became the subject of separate investigations

6    conducted by the U.S. Department of Justice ("DOJ" or "Justice Department") and the Nevada

7    Gaming Control Board ("NGCB").   Plaintiff Cipriani was instrumental in providing critical

8    intelligence and information to law enforcement and regulatory agencies that was used to prosecute

9    the Defendants.

10       37.    In March 2025, Defendant Resorts World agreed to pay a $10.5 million fine in a

11   settlement with Nevada's Gaming Control Board ("NGCB") to resolve allegations of anti-money

12   laundering compliance failures for permitting illegal bookmakers and fraudsters to gamble without

13   adequate due diligence and source-of-funds verification.   Further, the NGCB alleged that

14   Defendant Resorts World's AML Compliance Committee redacted or altered compliance meeting

15   minutes and were aware of numerous and repeated red flags in its AML oversight.[11]

16       38.    Defendant Scott Sibella was a career-executive in the casino and hospitality

17   industry who  worked at high-end hotels, resorts and casinos. Beginning in June 2021, Defendant

18   Sibella served as the President and Chief Operating Officer of Defendant Resorts World.  He

19   continued in that position until he was terminated in September 2023.

---

[11] *Stipulation and Settlement, Nevada Gaming Control World v. Genting Berhad, Resorts World Las Vegas, LLC, et al.*, Nevada Gaming Commission, March 27, 2025, available here; Associated Press, *Resorts World Casino Fined $10.5 Million in Money-Laundering Case*, March 27, 2025, available at espn.com here; Stutz, H., *Gaming Commission Accepts $10.5 Million Settlement to End Case Against Resorts World*, The Nevada Independent, March 27, 2025, available here:

39.     Prior to his position at Resorts World, Defendant Sibella served as President and Chief Executive Officer of the MGM Grand Hotel and Casino; served as the Vice President of casino marketing for the Tropicana Casino Resort in both Atlantic City and Las Vegas; and served in various executive positions at the Trump Taj Mahal (now Hard Rock Hotel & Casino) in Atlantic City and the Golden Nugget Hotel and Casino in Las Vegas.

40.     Aside from overseeing and facilitating Resorts World's pervasive and systemic illegal activities at the casino and hotel complex, Defendant Sibella took valuable kickbacks from many illegal gamblers, fraudsters, drug traffickers and other criminal elements to gamble at Resorts World casino and invest in resort businesses using money that was suspected proceeds of criminal activity in violation of federal anti-money laundering, fraud and racketeering laws.

41.     Defendant David Chesnoff ("Defendant Chesnoff") is a high-profile criminal defense lawyer and "fixer" in Las Vegas, Nevada, who has represented numerous criminal defendants involved in illegal gambling, fraud, drug trafficking, money laundering and other criminal offenses.  Defendant Chesnoff maintained a close relationship with Defendants Resorts World and Sibella, and other illegal gamblers, fraudsters and money launderers.  In addition to representing various illegal gamblers, fraudsters, drug traffickers and other criminals, Defendant Chesnoff invested in, participated in and owned business interests at Resorts World, which were used to facilitate money laundering, and other illegal activities.

42.     Defendant Doni Taube ("Defendant Taube") is a long-time casino executive who served from at least June 2021 until September 2024 as the Senior Vice President, International Marketing and Business Development at Resorts World Las Vegas.  Defendant Taube had a close working relationship with Defendant Sibella and maintained day-to-day contact with Defendant Sibella and played a significant role in the casino operations.  Defendant Taube was a key player

1    in protecting Defendant Sibella and ensuring that Resorts World maintained its revenue stream

2    from criminals who gambled at, or invested in businesses, at the casino.

3         43.    <u>Defendant Matthew Forbes ("Defendant Forbes")</u> is an experienced security

4    executive in the casino industry.  Forbes served as the Vice President, Security For Resorts World

5    Las Vegas from September 2021 until recently in 2025.  Prior to Resorts World, Forbes was

6    Director of Security at the Wind Creek Bethlehem Casino, the Sands Casino Resort in Bethlehem,

7    and the Venetian Macao Resort Hotel.  As the Director of Security, Forbes was responsible for

8    casino surveillance, guest and employee safety, compliance with gaming regulations, and

9    coordination with law enforcement and gaming regulators.

10         44.    <u>Defendant Joseph Tatonetti ("Defendant Tatonetti")</u> was the Manager of

11    Surveillance Operations at Resorts World casino from June 2021 until late 2021, and was

12    responsible for monitoring the casino floor, guest behavior and compliance alerts.  In or about

13    sometime after November 2021, Defendant Tatonetti resigned from Resorts World rather than

14    continuing to participate with Defendants Resorts World, Sibella, Chesnoff, Taube, and Forbes, to

15    retaliate against, punish and silence Plaintiff Cipriani to prevent his cooperation with federal and

16    state law enforcement and regulators.

17         45.    <u>Defendant Tonya Henderson ("Defendant Henderson")</u> was Vice President of

18    Compliance at Resorts World and later was elevated to Chief Compliance Officer.  She served as

19    the compliance leader from September 2020 until recently in May 2025.  She was a member of

20    Resorts World's Compliance Committee that was responsible for reviewing high-risk patrons,

21    source of funds verification and AML procedures. Prior to that, Henderson served as Legal

22    Counsel at MGM Resorts International (January 2019 to September 2020), and as Vice President

23    of Compliance; BSA/AML Officer at CG Technology (2016 - 2019).

46.    <u>Defendant Elie Samarani ("Defendant Samarani")</u> served as the Director of Cage, Credit, Collections & Loyalty Club at Resorts World.  Currently, Defendant Samarani is the Director of Credit for Cherokee Nation Entertainment.  In the position of Director of Cage and Credit, Defendant Samarani was responsible for managing the casino cage, including cashiers, tellers, chips, checks and foreign currency.  Defendant Samarani played an important role in the implementation of internal controls, compliance with gaming regulations and anti-money laundering rules and the Bank Secrecy Act.

47.    <u>Defendant Brandon Sattler</u> is a well-known high-stakes gambler, fraudster, and businessman who has engaged in multiple fraud schemes.  Beginning in 2016 and continuing for years, Defendant Sattler engaged in a large fraud scheme, linked to his business SattCom Video LLC ("SattCom"), during which he defrauded Plaintiff Russell and his two partners to illegally secure over $10 million in loans.

48.    Defendant Sattler spent significant proceeds on gambling at casinos, including Resorts World, and was allowed to continue gambling despite specific warnings and notices from Plaintiff Cipriani and even after Plaintiff Russell had secured a nondischargeable Court Order in involuntary bankruptcy, premised on fraud, in January 2021.  Notwithstanding these warnings, Defendants Resorts World, Sibella, Taube, Forbes, Tatonetti and others permitted Defendant Sattler to gamble at Resorts World casino using illegal proceeds from criminal fraud and illegal activities.

### III.    Factual Statement

#### A.    *Plaintiff Cipriani's Substantial Assistance to Federal Law Enforcement*

49.    Plaintiff Cipriani has extensive history of informing federal law enforcement and the Nevada Gaming Commission and the Nevada Gaming Control Board ("NGCB") about illegal

1    activity and regulatory violations in casinos.  Beginning in or around 2018 and continuing through

2    2025, Plaintiff Cipriani assisted the Federal Bureau of Investigation ("FBI"), the Internal Revenue

3    Service ("IRS"), the Department of Homeland Security Investigations ("HSI"), resulting in the

4    prosecution of several entities and individuals for illegal gambling, drug trafficking, money

5    laundering, fraud and other illegal activities.  Additionally, Plaintiff Cipriani provided information

6    to the Nevada Gambling Commission and Board that was used to initiate, investigate and bring

7    enforcement actions against entities and individuals, including Defendants Genting, Resorts

8    World, Scott Sibella, and other casinos.

9        50.    In one of his early cases, Plaintiff Cipriani provided valuable information to law

10   enforcement that contributed to the successful prosecution of a transnational racketeering

11   enterprise aka "ODOG Enterprise," headed by Owen Hanson, which was involved in international

12   drug trafficking, illegal bookmaking for sporting events and money laundering.  Plaintiff Cipriani

13   worked as an informant to provide information about the ODOG Enterprises use of casinos and

14   gambling to launder money.  Hanson and other members of the ODOG Enterprise threatened

15   Plaintiff Cipriani after learning of his cooperation in the federal investigation.[12]  Hanson plead

16   guilty and was sentenced to twenty-two years imprisonment.[13]

---

[12] A total of twenty-two defendants from the ODOG Enterprise were convicted in the United States.  The ODOG Enterprise trafficked hundreds of kilograms of cocaine, heroin, methamphetamine, MDMA (also known as "ecstasy"), and anabolic steroids and Human Growth Hormone ("HGH"). ODOG Enterprise's drug operation routinely distributed controlled substances at wholesale and retail levels, including selling performance enhancing drugs to numerous professional athletes. The ODOG Enterprise also operated a vast illegal gambling operation focused on high-stakes wagers placed on sporting events. The case arose out of a joint investigation by FBI, IRS and the New South Wales (Australia) Police Force in conjunction with the New South Wales Crime Commission.

[13] See United States v. Hanson et al., 3:15-cr-02310-WQH (S.D. CA 2015).

1    51.    By the late 2010s, Plaintiff Cipriani's role as an informant was well known in the

2    gaming industry.[14] Given Plaintiff Cipriani's reputation as a high-stakes gambler, Cipriani learned

3    of illegal activities from a variety of sources, including personal observation, and passed on this

4    information to federal law enforcement and Nevada regulators.   In several significant cases,

5    Plaintiff Cipriani was a key source of information, resulting in successful criminal prosecutions

6    and regulatory enforcement actions of major criminals and illegal gamblers, including Matthew

7    Bowyer, Wayne Nix, Damien LeForbes, Defendant Sattler, Edward Ting, Robert Alexander,

8    Joseph Angelo Bravo, and others.   Adding to this significant information, Plaintiff Cipriani

9    supplied extensive information concerning Defendants Resorts World, Sibella, and other criminals

10   involved in illegal facilitation of money laundering as approved vendors   As detailed herein,

11   Plaintiff Cipriani's information was instrumental in the Nevada regulatory investigation and

12   enforcement actions against MGM Grand and Defendant Resorts World.

13   **B.    *Plaintiff Cipriani's Significant Role in Uncovering Money Laundering***
14        ***Activities Authorized by Defendant Sibella at the MGM Grand Casinos***
15

16   52.    In and around 2018 and 2019, Plaintiff Cipriani played an instrumental role in the

17   investigation and prosecution of the MGM Grand, Defendant Sibella, and Wayne Nix, an illegal

18   bookmaker who gambled at MGM Grand casinos.  Plaintiff Cipriani provided information to law

19   enforcement, Nevada regulators, and MGM leadership implicating MGM Grand, Defendant

20   Sibella, and other senior executives in engaged in a systemic and pervasive strategy to encourage

21   and permit illegal money laundering and fraud activities.

---

[14] *See* Gentry. D., *DA Seeks to Jail Professional Gambler Robin Hood 702 Over Tweets*, Nevada Current, January 18, 2022, available here;

1      53.  As a result of the allegations of misconduct at MGM Grand, a federal criminal

2  investigation of MGM Grand and individuals was initiated.  In 2019, Defendant Sibella was forced

3  to resign from his position as President at MGM Grand.

4      54.  While the federal criminal and Nevada regulatory investigations were ongoing,

5  Plaintiff Cipriani continued to expose widespread illegal activities at MGM Grand -- he sent a

6  detailed letter to James Murren, the President and Chief Executive Officer of MGM Grand,

7  outlining the nature and scope of illegal activities at MGM Grand hotels and casinos.  Murren

8  never responded to Plaintiff Cipriani's letter.

9      55.  In January 2024, MGM Grand entered into a Non-Prosecution Agreement with the

10  U.S. Department of Justice in which MGM Grand paid approximately $6.5 million and forfeited

11  $500,000, and agreed to enhance its compliance program.[15]  MGM Grand acknowledged, in a

12  lengthy statement of facts, that it had violated various Bank Secrecy Act[16] and Money Laundering

13  statutes.[17]

---

[15] *See*, DOJ Press Release, *Former President of MGM Grand Pleads Guilty to Violating the Bank Secrecy Act for Allowing Man Involved in Criminal Conduct to Gamble*, January 25, 2024, available here. MGM Grand also admitted that its anti-money laundering compliance program failed to instruct the compliance team to use all available information, as required by the BSA, when performing KYC reviews to determine whether to file SARs, or to identify and verify customer information, including source of funds, for transactions found to be suspicious. Compliance personnel did not regularly reach out to the marketing hosts, even where the compliance team could not substantiate or identify the customer's source of funds, despite the fact that other departments would routinely reach out to hosts in connection with, for example, the collection of funds owed to the casino. Because of the deficiencies in the AML compliance program, MGM Grand failed to detect and report the extent of Nix's suspicious activities in SARs and failed to prevent Nix's money laundering.

[16] Under the BSA, casinos like MGM Grand are required to implement and maintain AML compliance programs designed to prevent criminals from using casinos to launder large sums of cash that illegal activity can generate. For example, the BSA requires casinos to file reports documenting suspicious activity, such as instances where a client's source of funds cannot be determined or are suspected to be related to crime.

[17] 18 U.S.C. § 1956(a)(1): Laundering of Monetary Instruments; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 31 U.S.C. §§ 5318(h), 5322: Failure to Maintain an Effective Anti-Money Laundering Program; 31 U.S.C. §§ 5318(g), 5322: Failure to File Suspicious Activity Reports; and conspiracy to commit those any of those offenses under 18 U.S.C. § 371 or 18 U.S.C. § 1956(h).

56.    On January 25, 2024, Defendant Sibella pleaded guilty to one count of Failure to File a Suspicious Activity Report under the Bank Secrecy Act in violation of 31 U.S.C. § 5318, 5322(a), 31 C.F.R. § 1021.320 and 18 U.S.C. § 2(b).  Defendant Sibella was the President of MGM Grand from August 2017 to February 2019, during which time, he allowed a well-known patron, Wayne Nix, who operated an illegal sports-booking business, to gamble at MGM properties using proceeds from that illegal business.[18]    Defendant Sibella also authorized giving Nix "complementary benefits" (meals, room, golf trips, etc.) to encourage his patronage.

57.    Despite being trained and having knowledge of his duties, Defendant Sibella failed to report to MGM compliance personnel that Nix was an illegal sports bookmaker. Because of Sibella's failure to report the suspicious activity by Nix, MGM Grand failed to file at least one suspicious activity report regarding Nix's source of funds in relation to Nix's cash payments to MGM Grand.

58.    Defendant Sibella admitted to law enforcement in 2022 that he believed Nix was involved in illegal sports bookmaking, but "didn't want to know because of my position,… If we know, we can't allow them to gamble…. I didn't ask, I didn't want to know I guess because he wasn't doing anything to cheat the casino."[19]

59.    As part of their respective resolutions of their criminal cases, MGM Grand and Defendant Sibella admitted that two casino hosts knew about Nix's illegal gambling business, allowed Nix to continue to gamble at MGM Grand and affiliate properties, permitted Nix to use

---

[18] Wayne Nix pleaded guilty in April 2022 to one count of conspiracy to operate an illegal gambling business and one count of subscribing to a false tax return. Wayne Nix cooperated with federal law enforcement in the investigation and prosecution of other criminals. Defendant Nix has not yet been sentenced. See DOJ Press Release, *Federal Authorities Announce Charges Related to Multi-Million Dollar Sport Gambling Business Involving Current and Former Pro  Athletes*, March 31, 2022, available here.

[19] *See*, DOJ Press Release, *Former President of MGM Grand Pleads Guilty to Violating the Bank Secrecy Act for Allowing Man Involved in Criminal Conduct to Gamble*, January 25, 2024, available here.

1  illicit proceeds at the casino properties, and provided Nix complementary benefits to encourage

2  him to spend his illicit proceeds at the casino. MGM Grand also admitted that Nix at times used

3  golf trips with MGM Grand's high-net-worth customers to solicit new customers for his illegal

4  gambling business.  By 2020, MGM Grand had accepted $4,079,830 in cash illicit proceeds from

5  Nix's illegal gambling business.

6      60.     Defendant Sibella was sentenced on May 8, 2024, to one year probation, a fine of

7  $9500 and 200 hours of community service.  Following his federal plea and his firing from Resort

8  World casino, Sibella agreed to a regulatory settlement with the Nevada Gaming Control Board

9  under which Sibella agreed to pay $10,000, loss of his gaming license and a five-year ban from

10  the Nevada gaming industry.

11      61.     In April 2025, the Nevada Gaming Commission reached a settlement with MGM

12  Grand under which MGM Grand paid a civil fine of approximately $8 million for violations of

13  Nevada regulations stemming from illegal conduct under the Bank Secrecy Act and Anti-Money

14  Laundering laws.

15  **C.     *Defendant Sibella is Appointed President of Defendant Resort's World Casino***
16
17      62.     In April 2019, Defendant Chesnoff arranged for a meeting in Los Angeles,

18  California between Defendant Sibella and Plaintiff Cipriani and Cipriani's counsel.  Defendant

19  Sibella was seeking a position with Defendant Resorts World to oversee the operation of its new

20  casino and hotel complex.  Defendants Chesnoff and Sibella requested that Plaintiff Cipriani

21  remove various social meeting postings outlining Defendant Sibella's illegal conduct at MGM

22  Grand casinos and hotel.  According to Defendants Chesnoff and Sibella, Plaintiff Cipriani's

23  postings caused harm to Defendant Sibella's attempt to secure a position at the new Resorts World

24  casino and hotel complex.  Plaintiff Cipriani agreed to their request and removed the social meeting

1    postings. In exchange, Defendant Sibella confirmed that Plaintiff Cipriani would be welcome to

2    gamble at the Resorts World casino, if Defendant Sibella was successful in joining Resorts World.

3           63.     Subsequently, Defendant Resorts World hired Defendant Sibella as President and

4    Chief Operating Officer of the Resorts World casino and hotel complex which was scheduled to

5    open in June 2021.  Defendant Sibella hired a significant number of former MGM Grand

6    employees to work at Resorts World, many of whom were involved in, or failed to report

7    Defendant Sibella's illegal activities at MGM Grand.

8           64.     In his leadership role at Resorts World, Defendant Sibella regularly encouraged,

9    permitted and welcomed illegal gamblers, fraudsters, drug traffickers and other criminals to

10   gamble at, and to invest in, participate in and operate businesses at Defendant Resorts World.  It

11   was well known that Defendant Sibella extracted kickbacks, either in cash or equity interests, for

12   allowing criminals to gamble at Resorts World or authorizing their ownership and operation of

13   businesses at Resorts World, knowing that these businesses were facilitating illegal money

14   laundering activities.  In other words, after being appointed to lead the new Resorts World casino

15   and hotel, Defendant Sibella resumed his illegal activities combining two separate and lucrative

16   strategies -- allowing known criminals to launder proceeds at Resorts World, and permitting

17   criminals to participate in and operate as vendors at the Resorts World complex in which they

18   could launder illegal proceeds.  Defendant Sibella directly benefited from these illegal activities,

19   increasing the revenue earned at the casino and his own potential compensation, as well as securing

20   hidden equity interests or payments from criminals who were allowed to operate businesses in the

21   Resorts World casino and hotel complex.

22          **D.**      ***After its Opening in June 2021, Plaintiff Cipriani Raises Concerns***
23                   ***About Criminals Gambling and Money Laundering at Resorts World***
24

65.     After the Resorts World casino first opened in June 2021, Plaintiff Cipriani regularly gambled at the casino and observed on numerous occasions known criminals, fraudsters, money launderers and convicted felons were gambling at Resorts World, including Defendant Sattler, Edward Ting, Robert Alexander, Joseph Angelo Bravo, Damien LeForbes and others. Plaintiff Cipriani notified Genting leadership, including Defendant KT Lim, and Resorts World officials, including Defendants Sibella, Taube, Forbes, Tatonetti, Henderson, Samarani and others at Resorts World about the presence of various criminals gambling or maintaining vendor relationships at locations in the Resorts World casino and hotel complex.  Notwithstanding these reports, Defendant Sibella and Resorts World officials and employees regularly ignored or overruled these objections, and then acted individually and in concert, to continue permitting known criminals, fraudsters and drug traffickers to gamble at Resorts World, and maintain their prohibited vendor relationships.

66.     From the opening of Resorts World, on June 21, 2021, and continuing until his illegal and retaliatory false arrest on November 19, 2021, Plaintiff Cipriani regularly communicated to Resorts World, Sibella, Taube, Forbes, Tatonetti, Henderson, Samarani and others about the presence of criminals who were gambling at Resorts World.  A brief review of some of the criminals who Plaintiff Cipriani observed at Resorts World is set forth below along with relevant text messages to Defendant Tatonetti.

**(i).     Defendant Branden Sattler**

67.     Between the period between June 2021 until sometime in or around early 2022, Defendant Sattler frequented Resorts World where he was a known fraudster and criminal who regularly gambled at Resorts World, using illegal proceeds from criminal activities to gamble, invest in and participate in business activities using illegal proceeds.  During the period June 24 to

1    October 28, 2021, Defendant Sattler gambled at Resorts World casino on at least seven separate

2    occasions, wagering $394,025 and winning $443,595.[20]

3        68.    In or about sometime in early 2022, Defendant Sattler was finally banned from

4    Resorts World, after Plaintiff Cipriani made numerous reports to law enforcement and regulators

5    concerning Defendant Sattler's illegal gambling and money laundering activities at Resorts World.

6    Defendants Resorts World, Sibella, Taube, Forbes, Tatonetti, Henderson, Samarani, and others at

7    Resorts World permitted Defendant Sattler to gamble and participate in business activity at Resorts

8    World, despite his criminal record, and nondischargeable Bankruptcy Court Order against Sattler

9    dated January 5, 2021.[21]    Defendant Sattler was a known colleague and co-conspirator of the

10    Defendants, who was also closely linked to the restaurant Tacos El Cabron, which was owned by

11    alleged criminals, Jaime Behar and David Stroj.[22]

12        69.    Beginning in 2016 and continuing for years, Defendant Sattler engaged in a large

13    fraud scheme, linked to his business SattCom Video LLC ("SattCom"), during which he defrauded

14    Plaintiff Russell and other well-respected business leaders to illegally secure over $10 million in

15    loans. Defendant Sattler orchestrated a campaign of fabrications and false information involving

16    fraudulent emails, bids and contracts, bank records, and letters of intent, to convince lenders that

17    he needed funding to purchase audio visual equipment for projects with hotels and casinos.  These

---

[20] Smith, J., *Embattled Gambler Lets Fly with Accusations Against Resorts World President [Defendant Sibella]*, The Nevada Independent, April 19, 2022 available here;

[21] During 2016, 2017, and 2018, Plaintiff James Russell and his partners made several loans to Defendant Sattler's company, Sattcom , reflecting three separate loans in the amounts of $4.6 million, $1.37 million, and $4.48 million, respectively. After Defendant Sattler failed to make any payments on the loans on October 29, 2018, Plaintiff Russell and others filed a chapter 7 petition against Defendant Sattler. On March 5, 2019,  the Court entered an Order granting relief. See *In re Brandon Sattler, Debtor*, BAP No. NV-19-1174-LBG; *Sattler v. James Russell, et al.*, Bk. No. 2:18-bk-16466-ABL, June 1, 2020 (U.S. Bankruptcy Appellate Panel, 9th Cir.)

[22] DOJ Press Release, *Twenty Five People Charged as Members of $10 Million Illegal Gambling and Money Laundering Operation*, December 9, 2015, available here (Jaime Behar and Dave Stroj are included in Indictment).

1    falsified documents and material misrepresentations were further corroborated with Sattler's

2    numerous oral misrepresentations regarding SattCom's contracts and projects, the need for the

3    loans, the use of the loan proceeds, payments received by SattCom for work performed, and

4    outstanding receivables that would be used to repay the loans.[23]

5        70.    In December 2024, Defendant Sattler was sentenced to 51 months in federal prison

6    after pleading guilty to one count of wire fraud for fraudulently obtaining more than $10 million

7    from Plaintiff Russell and his partners.[24]  Defendant Sattler has at least two prior fraud convictions,

8    one in 2004 for aiding and abetting bank fraud in Texas, and a second in 2006 for grand theft and

9    forgery.[25]

10       71.    Plaintiff Cipriani alerted Defendants Sibella and Tatonetti on numerous occasions

11   of Defendant Sattler's unlawful gambling at Resorts World casino as corroborated in these text

12   messages.

13                              **July 9, 2021**

14   Tatonetti:    I am but I am deathly afraid of anything going south here.
15                 Can't afford to lose this job, this is my last shot in this town, I've burned a
16                 lot of bridges with the MGM BS.
17
18   Cipriani:     No worries.  Just want to give you intel you should know.
19
20   Cipriani:     [Text picture from Defendant Sattler Instagram and
21                 involuntary bankruptcy case Sattler v. [Plaintiff] Russell, No. 20-60029.]
22
23   Cipriani:     He's been playing at [Resorts World] Brandon Sattler.
24

---

[23] After obtaining the loans, Defendant Sattler made misrepresentations to extend the maturity date of the loans and delay the deadline for repayment.  After the involuntary proceeding was initiated by Plaintiff Russell, Defendant Sattler destroyed documents and communicated with various individuals urging them to destroy documents and invoke the Fifth Amendment privilege when testifying.

[24] *United States v. Sattler*, No. 2:23-cr-00075-GMN-EJY, Indictment dated April 5, 2023, and sentenced on December 3, 2024.

[25] Conneller, P., *Brandon Sattler, Vegas High Rolle, Serial Fraudster, Gets 51 Months*, Casino.org, December 5, 2024, available here;

| | | |
|---|---|---|
| 1 | Tatonetti: | I saw him last night. |
| 2 | Cipriani: | BAD GUY.  Was playing 11 pm - 3 PM.  I was sitting with |
| 3 | | him.  He held up game for 30 minutes to do a double down.  He's a criminal. |
| 4 | | Stole $10M. From one guy. He's in bankruptcy RIGHT NOW. |
| 5 | | |
| 6 | Tatonetti: | I remember something not good about him from Cosmo as |
| 7 | | well. |

**July 10, 2021**

| | | |
|---|---|---|
| 10 | Cipriani: | Brandon [Sattler] was here again last night playing.  Bro, |
| 11 | | Between you and I, He's under FBI investigation.  I know that for a fact!  I |
| 12 | | saw you yesterday on the floor.  I avoided you on purpose. |
| 13 | | |
| 14 | Tatonetti: | Thanks man.  I am so scared around here. |
| 15 | Cipriani: | I got you covered. |
| 16 | Tatonetti: | Appreciate it!! |
| 17 | Cipriani: | I saw Eddie Ting in there.  Can't believe they let him play. |

**September 18, 2021**

| | | |
|---|---|---|
| 20 | Cipriani: | I told [Sibella] yesterday he better stop letting [Defendant |
| 21 | | Sattler] gamble at [Resorts World] because the FBI is going to arrest him |
| 22 | | for stealing millions of dollars.  I told [Defendant Sibella], "How's it going |
| 23 | | to look if the FBI arrests [Defendant Sattler] at Resorts World?" |
| 24 | | |
| 25 | Tatonetti: | They are [definitely] looking at him.  That's for sure. |
| 26 | Cipriani: | He told Donnie [Defendant Taube] to look into it.  Lol. They |
| 27 | | know he's gambling and a vendor at [Resorts World]  [Defendant Sattler's] |
| 28 | | been throwing [Defendant Sibella's] name all over [Resorts World.]  I told |
| 29 | | Defendant Sibella that. |
| 30 | | |
| 31 | Cipriani: | "It's a joke who they let in to play.  I told [Defendant Sibella] |
| 32 | | Google him. |
| 33 | | |
| 34 | Tatonetti: | Sattler won't be playing there much longer in my |
| 35 | | professional opinion [emoji]" |
| 36 | | |
| 37 | Cipriani: | [Defendant Sattler] is friends with [Defendant Sibella for |
| 38 | | years.  [Defendant Sattler] is doing electrical work at [Resorts World] and |

his girlfriend killed someone when she was driving her car. The girlfriend works at Gatsbys. Can you f ing believe it?

Cipriani:    I told [Defendant Sibella] yesterday at Mulberry Street Pizzeria that i know FOR SURE FBI is on Defendant Sattler.

Tatonetti:    I can confirm FBI is.

Cipriani:    I literally barged into his meeting there and sat right next to him so he couldn't escape. Hey just so you know Sattler was at blackjack tournament last weekend. You should absolutely get that footage for the FBI. He was trolling for another victim."

Tatonetti:    [Thumbs Up emoji].

Cipriani:    Believe it or not they invited him but not me. WTF.

Tatonetti:    Lol.

**October 7, 2021**

Cipriani:    How are you? Did they bar Brandon Sattler yet. Can you talk.

Tatonetti:    Not sure. I heard he's in Cali though. Had a contact reach out to me from San Manuel.

*********************************

Cipriani:    When they arrest Sattler Krack [Krackenburg, a colleague] is going to be scared to death.

Tatonetti:    Lol, be funny if they arrested him in front of

**October 8, 2021**

Cipriani:    Good morning. See what you can find out about Sattler's play at San Manuel. . . .

**October 29, 2021**

Cipriani:    Good morning. Call when free. Sattler was at Grand opening for Taco place outside of [Resorts World]. Sattler did so much dirty business with Whack Crack. You have no idea.

1          Tatonetti:     Shocker.  This whole town is a bunch of scum bags.  Even
2          the governor got pulled over drunk the other day and they covered that up
3          as well.
4
5      72.     It was not until later in 2022, that Resorts World acted on Defendant Sattler's illegal

6  activities occurring at the casino.  In September 2021, the FBI requested photographs and other

7  information about Sattler's gambling activities in the Resorts World casino.

8      73.     Aside from the above-cited dates, Plaintiff Cipriani observed Defendant Sattler

9  gambling at the Resorts World casino on at least five (5) other occasions.  From the date of Resorts

10  World's opening to roughly November 21, 2021, when Defendants Sibella, Chesnoff, Taube,

11  Forbes, Tatonetti, and others retaliated against Plaintiff Cipriani by having him illegally arrested

12  in November 2021, Plaintiff Cipriani gambled at Resorts World several days each week and often

13  would observe Defendant Sattler gambling at Resorts World, or working at various store locations

14  installing audio and video equipment pursuant to contracts with various vendors designed to

15  promote Sattler's fraudulent schemes and money laundering activities in coordination with various

16  co-conspirators.

17                 **(ii).**    **Edward Ting**

18      74.     On or about January 21, 2014, the U.S. Attorney for the Southern District

19  of New York announced that Edwin Ting (Ting) was sentenced, based on his guilty plea,

20  for the felony crime of conducting an illegal gambling business. This guilty plea arose

21  from federal charges related to him running high-stakes poker and sports book operations.

22  Prosecutors contended that Ting "ran what was most likely the largest and most high-profile

23  illegal poker [game] in New York City."[26]

---

[26] Press Release, *Defendant [Ting] Sentenced in Manhattan Federal Court to Five Months in Prison for Role in Gambling Ring*, January 21, 2014, available here.

75.    On July 10, 2021, and then again on September 18, 2021, Plaintiff advised Defendant Tatonetti that Edward Ting, a well-known known convicted felon was gambling at Resorts World . On September 18, 2021, Ting and a number of high-stakes gamblers arrived at Resorts World casino.  Initially, Resorts World compliance staff rejected Ting and his associates who were planning to gamble millions of dollars.  Defendant Sibella specifically overruled Resorts World compliance to allow Ting and his associates to gamble at Resorts World's casino.

**July 10, 2021**

Cipriani:    Brandon was here again last night playing.  Bro, Between you and I, He's under FBI investigation.  I know that for a fact!  I saw you yesterday on the floor.  I avoided you on purpose.

Tatonetti:    Thanks man.  I am so scared around here.

Cipriani:    I got you covered.

Tatonetti:    Appreciate it!!

Cipriani:    I saw Eddie Ting in there.  Can't believe they let him play.

**September 18, 2021**

Cipriani:    I can't believe Eddie Ting got through compliance and is playing at [Resorts World].  A f---ing Triad, money launderer and convicted felon!  Other than that, How are you?

Tatonetti:    Me either.  The Cage Director is really pissed about it as well.  I'm ok, hanging in there.

Cipriani: I [was sic] had a big blowup with Casino Manager about yesterday afternoon in high roller pit. Look at the footage.  They didn't want to reserve a table for me but they did for him.   [Defendant] Sibella overruled compliance and him and his friends have wired in millions and he's playing blackjack, poker, and having a birthday party too.

Tatonetti:    Lol. Shocker.

(iii).    <u>**Robert Alexander (Deceased October 18, 2024)**</u>

76.     Robert Alexander was a well-known, high-stakes gambler and criminal fraudster who had a long-time business and personal relationship with Defendants Sibella and Chesnoff.

77.     On January 8, 2020, Alexander pleaded guilty to one count of securities and wire fraud in New York City federal court stemming from his scheme to defraud investors in Kizzang, his illegal online company.[27]  Alexander died on October 18, 2024, before he was sentenced in his criminal case.

78.     Defendant Chesnoff, who briefly represented Alexander, was a shareholder in Kizzang, and offered to assist Alexander in soliciting new investors, including contacting casino executives and gamblers.  Defendant Chesnoff was never charged in the Alexander case, but was known as Alexander's attorney and business colleague, and vouched for Alexander's character.

79.     In text messages on October 1 and 4, 2021, between Plaintiff Cipriani and Defendant Tatonetti, Cipriani alerted Tatonetti about Robert Alexander who was gambling at Resorts World:

**October 1, 2021**.

Cipriani:     Hey my friend.  How are you?



Cipriani:     This guy was in Resorts World last night.  His name is
              Robert Alexander.  I think he was gambling. not 100% sure.

---

[27] *See, DOJ Press Release, Founder and President of Online Gaming Company Pleads Guilty to Securities and Wire Fraud*, January 8, 2020, available here. Alexander made numerous false representations regarding his professional background, Kizzang's financial condition, expected returns on investment, and false assurances that investments would be used solely for Kizzang's business purposes.  Alexander misappropriated over $1.3 million in investor funds. and used funds for gambling excursions, entertainment and personal expenses.

1          **October 4, 2021**.

2    

3          Cipriani: That's the guy I told you about.

4          Tatonetti:     Yea, ty.

5          Cipriani:      I put that in just because he's a bad guy.

6          **October 20, 2021**

7          Cipriani:      Good morning.  Robert Alexander was playing again
8          yesterday.
9
10          **October 25, 2021**

11         Cipriani:      Alexander in again WTF. Feds are pissed!!!

12         Tatonetti:     Hope they come arrest him at [Resorts World] [smiling
13         emoji].
14
15         Cipriani:      He's there almost every day.

16          **October 28, 2021**

17         Cipriani:      Alexander there again last night.  Amazing Never wins.  I'm
18         surprised Feds haven't subpoenaed you yet.
19
20         Tatonetti:     Maybe they have [smiling emoji]

21         Cipriani:      Aahhhh.

22          **(iv).    <u>Joseph Angelo Bravo</u>**

23    80.    Joseph Angelo Bravo was convicted in federal court in 1993 for cocaine trafficking.

24    He was linked to the Buffalo crime family active in Las Vegas in the late 1980s and 1990s.  Bravo

25    was sentenced to 87 months' imprisonment. Bravo was represented by Defendant Chesnoff.

81.     Guiseppe Bravo, Joseph's son, and Defendant Chesnoff owned the Eight Cigar Lounge, Bravo Concierge and Bravo Tickets, three separate businesses based in the Resorts World casino and hotel complex.  Defendant Sibella had long-time ties to Joseph Angelo Bravo and approved the vendor relationships.

82.     Defendant Chesnoff was a partner with Bravo in a real estate holdings in a private airport and nearby resort in Punta Arena de la Ventana, La Paz, Baja, California Sur, Mexico. an area known for cartel activity.[28]   Also, Defendant Chesnoff represented Bravo in litigation surrounding this resort project and private airport.[29]

**October 31, 2021**

Cipriani:



Cipriani:

[28] Las Vegas Review, *Familiar Faces Show Up in HOA Probe*, June 10, 2012, available here; Las Vegas Review, *Baja Resort Promoter's Release Comes Too Late*, June 24, 2012, available here.

[29] Smith, J.L., Las Vegas Review, *Tight Vise Closes Even Tighter on Players in HOA Indictments*, May 26, 2013, available here.

1               Re-text of message from @MOBBuffalo

2

3               Who is Joe Bravo? He is a convicted drug trafficker who was sentenced to
4               87 months in 1993 for role in a cocaine importing ring with ties to the
5               Buffalo mob.  The Niagara Falls-to-Las Vegas distribution network.
6               Distributed 400 kilos.

7



8               Cipriani:

9               Chesnoff is partnered in this and Concierge business at [Resorts World]

10



11

12              Cipriani:      David Chesnoff is Joe Bravo's attorney  Look at his name on
13              court docs.

14

15              Cipriani:      F---ing joke.  Sibella doing business with drug traffickers.

16

17              Tatonetti:     Shocker. [laughing emoji]

18

19              Cipriani:      And Chesnoff.  What would [Defendant] KT Lim say about
20              this??? They are so brazen and arrogant.

21

22              Tatonetti:     Whole town is a scam man.  Just keeping my head down
23              trying to survive.

24

25              Cipriani:      I know you are.  This must drive you absolutely insane!

26

27                            **(v).**   **David Stroj**

28      83.     In December 2015, Stroj was indicted along with twenty-four (24) other defendants

29  in the Southern District of California for running an illegal gambling operation that laundered $10

million in gambling proceeds through Chula Vista and San Diego card rooms.[30] Stroj operated an illegal bookmaking business that extended throughout North America. Millions of dollars in illegal proceeds from the gambling events were laundered through the Palomar and Village Club card rooms, Las Vegas casinos, various bank accounts, shell companies, and a bail bonds business. The ring also operated illegal offshore online gaming websites.

84.    Stroj is a large-scale international bookmaker based in the San Diego area. He was charged with conducting an illegal bookmaking business, conducting an illegal poker and blackjack business and conspiracy to launder money. In 2018, Stroj pleaded guilty and he was sentenced to 18 months in prison. His supervised release began on March 10, 2020, the terms of which prohibited him from gambling and frequenting casinos or gaming establishments without approval from his probation officer.

85.    Plaintiff Cipriani observed Stroj playing blackjack at Resorts World, and reported these observations to his federal probation officer, the FBI, and the Nevada Gaming Control Board.

86.    In April 2022, Stroj admitted to violating the terms of his supervised release by gambling in Las Vegas casinos, including Resorts World. As a result, the terms of his supervised release were modified to prohibit any gambling, and his travel to Las Vegas was restricted to business only and subject to permission.

87.    While Stroj was prohibited from gambling at Resorts World, Stroj was permitted to invest in and participate in the operation of the Tacos El Cabron restaurant, which was owned by him and Jamie Beher, a co-defendant in the indictment charging them with running illegal poker

---

[30] DOJ Press Release, *Twenty Five People Charged as Members of $10 Million Illegal Gambling and Money Laundering Operation*, December 9, 2015, available here (Jaime Behar and Dave Stroj are included in Indictment). Defendant Chesnoff represented Arturo Diaz-Ramirez, one of the twenty-five defendants.

1    rooms in the Southern California.  Stroj disguised his ownership interest by including his father as

2    managing partner of the owner, Abyan Properties 2 Las Vegas LLC.

3         **E.    Defendants Sibella, Chesnoff, Taube, Forbes, and Tatonetti**
4               **Successfully Retaliate Against Plaintiff Cipriani to Silence**
5               **Him and Obstruct Federal and Regulatory Investigations**
6

7         88.    For several months after the opening of the Resorts World casino and hotel,

8    Plaintiff Cipriani regularly communicated with law enforcement, Nevada regulators and Resorts

9    World officials, including Defendant Sibella and others about the illegal activity occurring at

10   Resorts World.  Recognizing that Plaintiff Cipriani's whistleblower activities created a real threat

11   of investigation and prosecution of Resorts World and others, the Defendants and other individuals

12   jointly worked together to harass, intimidate, retaliate and bring trumped-up, fake criminal

13   charges, against Plaintiff Cipriani to punish and silence him.   The Defendants enlisted co-

14   conspirator, Robert Alexander, to assist in this joint effort to retaliate against and silence Cipriani.

15        89.    The Defendants and Alexander knew that Plaintiff Cipriani was a cooperating

16   witness working with federal law enforcement, who regularly provided federal law enforcement

17   with information concerning the illegal money laundering activities and investments involving the

18   Defendants, Alexander, and other criminals at Resorts World.

19              i.    Cipriani's Orchestrated Arrest and False Imprisonment

20        90.    Beginning in or about sometime in October 2021 and continuing to the date of

21   Cipriani's trumped up false arrest, on November 19, 2021, Robert Alexander, with the assistance

22   and support of the Defendants, regularly harassed, intimidated and threatened  Plaintiff Cipriani in

23   the Resorts World casino. Initially, Alexander  followed Cipriani in the casino and sought to record

24   Cipriani's gambling activities on his cellphone.   After these initial steps, Alexander threatened

25   physical harm to Cipriani, on several occasions, by warning him that he (Alexander) had people

1    outside the casino who were waiting to attack Cipriani.  Further, Alexander coordinated with other

2    affiliated individuals to sit next to Cipriani at the blackjack tables and repeatedly  threaten physical

3    harm to Cipriani.

4         91.    When Cipriani complained to Resorts World security and staff, Defendants Sibella,

5    Taube, Forbes, Tatonetti and other security and surveillance staff took no action or accepted

6    Alexander's denials, false explanations that he was watching You Tube videos and other ridiculous

7    claims.  Alexander regularly engaged in this conduct whenever he and Cipriani were at the casino.

8    Despite Cipriani's regular complaints, Resorts World security and surveillance officials failed to

9    take action.

10        92.    On November 19, 2021, Defendants Sibella, Chesnoff, Taube, Forbes and Tatonetti

11   and Alexander escalated their campaign of harassment, intimidation, and retaliation against

12   Plaintiff Cipriani.  Alexander used his mobility scooter to position himself closer to Cipriani and

13   continued to film Cipriani using his cellphone.  Alexander's brazen actions were intended to disrupt

14   Cipriani's ability to gamble, intimidate Cipriani by recording his gambling activities, and cause

15   Cipriani to leave Resorts World. Plaintiff Cipriani feared physical harm. Alexander's threatening

16   conduct and repeated threats and assaults were recorded by Resorts World's internal security system

17   and video recording, and observed by numerous employees and security personnel, but yet no one

18   acted, no one responded, and no one enforced any basic rules and procedures surrounding safety

19   of patrons at Resorts World.

20        93.    Following weeks of repeated efforts by Alexander to harass, intimidate and retaliate

21   against Plaintiff Cipriani, who was assisted and supported by Defendants Sibella, Chesnoff, Taube,

22   Forbes, Tatonetti and others, Cipriani was convinced that he would continue to be subjected to this

1   illegal retaliation regime.  In response, and out of frustration, on November 19, 2021, Plaintiff

2   Cipriani acted with restraint and diplomacy in the hopes of de-escalating the situation.

3         94.    On November 19, 2021, Alexander  maneuvered  his  mobility  scooter  within

4   inches  of Plaintiff Cipriani's person once again to video record him with his mobile phone.

5   Plaintiff gently took Alexander's cellphone and walked directly to the casino cage and requested

6   that security employees take possession of Alexander's telephone.  Plaintiff Cipriani repeated

7   again his persistent complaint about Alexander's harassment, intimidation and threats.  Again,

8   Defendants Sibella, Chesnoff, Taube, Forbes, Tatonetti and others at Resorts World made no

9   attempt to assist Plaintiff Cipriani or even acknowledge his request for help.  A Resorts World

10  security guard took possession of Alexander's telephone.  Plaintiff Cipriani remained at the casino.

11        95.    Later in the day, Plaintiff Cipriani met Defendant Chesnoff, who was fully aware

12  of the details surrounding the earlier incident with Alexander.  Defendant Chesnoff told Plaintiff

13  Cipriani "not to worry" about Alexander or any "trouble" that may arise relating to Alexander's

14  behavior and Plaintiff Cipriani's removal of Alexander's cellphone, yet  the police arrived within

15  minutes and arrested Plaintiff Cipriani and removed him and his wife from the casino.

16        96.    On the following day, November 20, 2021, Plaintiff Cipriani texted Defendants

17  Sibella and Tatonetti to request that Resorts World preserve the footage of Alexander "filming and

18  confronting" him.  In an almost too perfect illustration of Defendants' failure to ensure the

19  safety of Plaintiff, Tatonetti responded as follows: "I cannot afford to get caught up in this and

20  lose another job."  Defendant Sibella feigned ignorance when Plaintiff Cipriani contacted Sibella

21  to alert him to preserve the security tapes.

22        Cipriani:



Tatonetti:    I cannot afford to get caught up in this and lose another job. Casino guests never get to make requests directly to Surveillance.  Go through your host or Scott [Sibella] or whoever you deal with directly there and make your requests.

Cipriani:    Believe me I know and I don't want to jeopardize you.  I just want to make sure YOU can get it and have it when a formal request.

    ii.    <u>The Defendants Pursue False and Fabricated Criminal Charges</u>

97.    Defendants Resort World, Sibella, Chesnoff, Taube, Forbes,  and Tatonetti pursued their ongoing campaign to retaliate against, punish and silence Plaintiff Cipriani by leveraging their long-time support of the District Attorney, to manipulate and enlist Nevada's criminal justice system to further and execute their scheme.[31]

98.    As an initial step, the District Attorney charged Plaintiff Cipriani with two criminal offenses -- Larceny and Robbery Larceny from person, property value less than $3500, and robbery of an elderly victim in violation of state statute 205.2701a and 200.380 -- without any evidentiary basis.  The felony charges against Plaintiff Cipriani lacked a key element -- Cipriani lacked the requisite intent by possessing Alexander's phone only for a fleeting moment before he turned the

---

[31] Defendants Resorts World, Sibella, Chesnoff and Resorts World's General Counsel contributed to District Attorney Stephen Wolfson's campaign and held fundraising events at Defendant Chesnoff's Eight Cigar Lounge at Resorts World.

1    phone over to security staff.  On November 20, 2021, Plaintiff Cipriani was released after spending

2    the night in jail.

3         99.     This vindictive pursuit of charges and the complicity of the actors involved therein

4    are more than coincidental. Steven Wolfson's public Contributions and Expenses Reports shows

5    that Resorts World contributed $10,000 to Wolfson's reelection campaign less than one month

6    after Plaintiff Cipriani's arrest. At the same time, Resorts World's General Counsel contributed

7    $1,000.  Defendant Sibella contributed $5,000 in January 2022, and another $5,000 in August

8    2022—apparently his only political contributions since 2018.

9         iii.     <u>Defendants File False Gambling Fraud Complaint Against Cipriani</u>

10        100.     Shortly after his arrest, Defendants Sibella, Chesnoff, Taube, Forbes and Tatonetti

11   took further steps to retaliate against and silence Plaintiff Cipriani by concocting a false charge of

12   gambling fraud against Plaintiff Cipriani.  Defendant Sibella directed Defendants Taube, Forbes

13   Tatonetti and other security and surveillance personnel to review the entirety of Resorts World's

14   video footage of Plaintiff Cipriani to find an instance where they could allege that Plaintiff Cipriani

15   cheated.  Defendant Tatonetti replied, "Cipriani doesn't cheat.  There's no footage of that."

16   Defendant Sibella ordered Tatonetti and the surveillance staff to "Find anything at all that we could

17   use to show something."  Defendant Tatonetti later resigned from Resorts World because he knew

18   that Plaintiff Cipriani had not committed gambling fraud and that the Defendants were pursuing a

19   fraudulent case against Cipriani.

20        101.     In a false and fabricated report to the Nevada Gaming Control Board, dated

21   November 26, 2021, Defendants Sibella, Taube, and Forbes, with the assistance of other officials

22   and employees at Resorts World alleged that Plaintiff Cipriani "past-posted" wagers while playing

23   blackjack on November 19, 2021, the same day he was arrested.  The Defendants, under the

1    direction and control of Defendant Sibella, and acting in concert with others from Resorts World,

2    filed the false gambling fraud complaint and District Attorney Wolfson approved the issuance of

3    an arrest warrant against Plaintiff Cipriani for the felony count of Gambling Fraud.

4        102.    Over the next few weeks, Plaintiff Cipriani posted accurate comments about his

5    ordeal on social media concerning the Defendants conspiracy to retaliate against, punish and

6    silence him from reporting to law enforcement about the illegal activities at Resorts World.  The

7    District Attorney sought to revoke Plaintiff Cipriani's bond based on his continuing social media and

8    tweeting activity, in combination with the new felony gambling fraud warrant.

9        103.    On December 22, 2021, a status hearing was held.  Plaintiff Cipriani did not appear

10   on the advice of his counsel. However, his attorney noticed Defendant Chesnoff presumably

11   observing as a spectator for Plaintiff Cipriani's  bond revocation and execution of the gambling fraud

12   warrant.[32]  There was, evidently, no other reason for Defendant Chesnoff to be there.

13       iv.    <u>Plaintiff Cipriani is Forced to Plead Guilty to a Misdemeanor and Silenced</u>

14       104.    Faced with the unusual severity of these criminal charges and threatened sentences,

15   Plaintiff Cipriani was coerced into pleading guilty to a misdemeanor charge, disorderly conduct,

16   and was compelled to agree to cease usage of his Twitter account during a one-year probationary

17   period.

18       105.    On May 4, 2022, Plaintiff Cipriani admitted to the charge of misdemeanor

19   disorderly conduct pursuant to a plea agreement, in exchange for dismissal of  the felony count of

20   robbery with a special enhancement for Alexander's status as a claimed "vulnerable victim," a

21   violent crime and category B felony carrying a minimum sentence of two years imprisonment.

---

[32] Plaintiff Cipriani elevated his concerns to the Las Vegas Sheriff's Department. On February 22, 2022, Mr. Cipriani emailed Sheriff Joe Lombardo and his Lieutenant, Joey Herring, to alert them to Resort World's retaliation against him through the filing of bogus criminal charges.  The Sheriff's Department never responded.

1    Plaintiff Cipriani was sentenced to probation and barred from using his social media account

2    during that one year period of probation.

3              v.    <u>Plaintiff Cipriani is Barred from All Casinos and Silenced</u>

4    106.    Defendants Resorts World, Sibella, Chesnoff, Taube, Forbes and Robert Alexander

5    and other individuals' plan to retaliate against, punish and silence Plaintiff Cipriani worked --

6    during that six month period while the criminal charges and the gambling fraud complaints were

7    on file and for years thereafter, Plaintiff Cipriani was barred from all casinos and could not report

8    either to law enforcement or regulators (or internally to Resorts World officials) any illegal activity

9    that he observed or learned about.  The Defendants' conspiracy to retaliate was thus successful --

10    Plaintiff Cipriani was now barred from every casino in Las Vegas, destroying his livelihood; and,

11    importantly, Plaintiff Cipriani was silenced in order to obstruct any further federal, regulatory or

12    internal investigations.

13    F.    *Plaintiff Cipriani Notifies Defendant KT Lim Concerning Wide-Spread*
14          *Misconduct and Illegal Money Laundering at Resorts World*
15
16
17    107.    Weeks after he was arrested and subjected to a campaign of retaliation and

18    obstruction, Plaintiff Cipriani decided to contact Defendants Genting and KT Lim to alert them to

19    the corruption, fraud and illegal activity permeating Resorts World, under the direction and

20    influence of the Defendants and criminal elements.  Rather than address the problem, Resorts

21    World instead acted to silence Plaintiff Cipriani and any other persons. To this end, Plaintiff

22    Cipriani was compelled to elevate his concerns to Defendant Genting and its chairman and CEO,

23    Defendant KT Lim, and on January 6, 2021, sent Defendant Lim a letter memorializing his

24    concerns.

25    108.    In his letter to Defendant Lim, Plaintiff Cipriani wrote:

26

43

Mr. Lim,

Hope you're well.

My name is RJ Cipriani. I've been coming to your property at
Resorts World Las Vegas on a regular basis for over four months.
I connected and brought my friend and business associate, Harvey
Mason Jr, CEO of the Recording Academy and his two Co-
Presidents, to meet with Scott Sibella and Kevin Jones on
November 15th, to discuss various business opportunities at
Resorts World Las Vegas, including a GRAMMYs Museum. This
meeting took many months to arrange. Looking back I feel I have
made a lapse in judgment for even letting that meeting take place,
based on disturbing and troubling information I have witnessed as
a guest of the new resort. I also feel I've put the Recording
Academy in a precarious situation.

As the Chairman of Genting Corporation, you should be made
aware of what's been going at the property since it opened.

I have personally witnessed criminals gambling at Resorts World
Las Vegas that are not welcome to gamble anywhere else in the
United States. I have seen a friend of Scott Sibella's, Alan
Richardson, operate and control the private poker rooms in
Crockfords that appears were built for this purpose. This same
friend is given access by Scott to other property business decisions,
as he and Alan have spoken about the search for a new VP of hotel
operations.

I have spoken directly with other individuals who have told me
they are partners with Scott in restaurants at the property. It's
common knowledge by many guests and employees at the property
that other friends of Scott's are operating 3rd party services at the
resort. These services range from concierge to outsourcing the
purchasing of show tickets by the concierge. I'm sure if you looked
at all of your 3rd party deals you'd find more that are connected to
Scott and his friends. Many of the 3rd party operators, owners or
partners, are criminals or well-connected lawyers and
businessman in Las Vegas. None would list their primary
livelihood or career experience in the service area they are now
contracted to provide to Resorts World Las Vegas.

These issues should be of concern to you, to Genting's investors
and to gaming boards in Las Vegas, New York and Singapore.

*I believe you're unaware of these issues and I'd like to meet to
personally discuss. I want this email to prove you've been made
aware of these issues and extend an opportunity to meet with me
before the issues become a problem for your company in New York
or Singapore where Scott is not insulated and protected.*

*No one seems to be protecting your Las Vegas investment or your
legacy!*

*Call me anytime.*

*RJ Cipriani*

*310 770-0334*

*EDWIN TING*

*https://www.pokernews.com/news/2014/01/edwin-ting-sentenced-17319.htm*

*ROBERT ALEXANDER*

*https://nypost.com/2020/01/16/grand-theft-auto-kingpin-pleads-guilty-to-fraud-charges/*

*BRANDEN SATTLER*

*https://www.pacermonitor.com/public/case/28664589/RUSSELL_et_al_v_SATTLER*

*UNITED STATES BUREAU OF PRISONS Name: JOSEPH
ANGELO BRAVO*

*Register Number: Race: White Sex: Male*

*Released On: 07/23/1999*

109.    Defendants Genting and Mr. Lim never responded nor contacted Plaintiff Cipriani.

G.    *The Nevada Gaming Commission Board and the Department of Justice
Launch Investigations of Resorts World and Related Entities and
Individuals*

110.    In the Fall of 2023, the Nevada Gaming Commission Board initiated an investigation of Resorts World and related companies concerning criminal and regulatory violations stemming from AML failures and deficiencies in permitting known gamblers to either gamble at or invest in Resorts World's casino and hotel complex. Shortly thereafter, Resorts World opened an internal investigation focusing on the same issues.

45

1    111.    Around the same time, the U.S. Department of Justice appears to have initiated a

2    criminal investigation, with the focus on illegal gambling businesses in California and stretching

3    to Las Vegas casinos where the casinos and their executives encouraged and embraced illegal

4    gamblers as patrons who intended to launder their proceeds.  These relationships were beneficial

5    to both parties -- casinos earned increased profits and individuals earned larger bonuses, and

6    criminals were able to launder their proceeds at the casino.  MGM Grand and Resorts World

7    became two primary locations for criminal money laundering and gambling by convicted felons,

8    fraudsters and illegal gambling moguls.

9    112.    The common denominator in the misconduct that was uncovered at both casinos

10    was Defendant Sibella -- he was the President and COO at MGM Grand and the President and

11    CEO at Resorts World.  Shortly thereafter Defendant Sibella was fired from Resorts World.  Later,

12    in 2024, Defendant Sibella pleaded guilty to a federal felony offense for failing to file a suspicious

13    activity report stemming from his role at MGM Grand.[33]

14    113.    The NGCB conducted a comprehensive investigation involving interviews and

15    investigative hearings of executives, casino hosts, employees and other individuals, and a review

16    of extensive documents including policies, procedures and other records.

17    114.    One year later, on August 15, 2024, the NGCB filed a *Complaint* before the Nevada

18    Gaming Commission for disciplinary actions against Defendant Genting and Resorts World.[34]  *See*

---

[33] As noted above, Plaintiff Cipriani played a key role in supplying evidence to the DOJ and the NGCB.  Plaintiff Cipriani had established contacts with FBI, HSI and IRS agents on the west coast, at Las Vegas and in New York.  In addition, Plaintiff Cipriani had well-established contacts at the NGCB.  Plaintiff Cipriani provided information regularly over a seven- year period to law enforcement and regulators.  This information was used and appeared in various prosecutions and regulatory enforcement actions.  Consistently, Plaintiff Cipriani's information was found to be accurate, reliable and trustworthy.  Plaintiff Cipriani had an exemplary record as a reliable confidential witness who provided substantial assistance in the successful prosecution of numerous organizations and individuals in a number of criminal schemes.

[34] As a licensee, Defendant Resorts World is subject to regulation by the Nevada Gaming Commission under Title 40 of the Nevada Revised Statute and the Regulations of the Commission. Under NRS 463.0129, the Nevada Legislature

1    *NGC 24-04, Nevada Gaming Control Board v. Genting Berhad et al., Complaint*, August 15, 2024

2    ("NGCB Complaint").  The *Complaint* included twelve separate charges and was later amended as

3    part of a *Stipulation and Settlement* to ten charges alleging "unsuitable methods of operation" and

4    anti-money laundering failures tied to illegal gambling at Resorts World casinos.[35]  *See NGC 24-04,*

5    *Nevada Gaming Control Board v. Genting Berhad et al., Amended Complaint*, March 20, 2025

6    ("NGCB Amended Complaint"); *NGCB 24-04, Nevada Gaming Control Board v. Genting Berhad,*

7    *et al., Stipulation for Settlement and Order,* March 27, 2025 ("NGCB Settlement").

8        115.    Based on its investigation, the NGCB determined that Resorts World "welcomed

9    certain individuals to wager at its casino over a period of numerous months while Resorts

10   World executives and employees knew, or should have known, that certain individuals

11   were likely illegal bookmakers." *See Amended Complaint* at § 28.

12       116.    The NGCB also alleged that Resorts World's AML Compliance Committee

13   ("AML Committee") and certain Resorts World executives and employees not only failed

14   to fulfill the purpose and spirit of Resorts World's AML Program but also failed to comply

15   with various specific provisions of Resorts World's AML Program as well as with the

16   Commission's regulations. *See Amended Complaint* at § 29.

---

has set out the need for continued growth and success of the gaming industry which depends on public confidence and trust that such "[p]ublic confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments . . . ." See NRS 463.0129.  A person approved by the Commission has an ongoing obligation to meet the standards required to obtain such approval including, without limitation, to be a person of good character, honesty and integrity and to refrain from activities and associations which may impact the interests of Nevada, the regulation of gaming, or the reputation of gaming in Nevada.  Further, failure to continue to meet such applicable standards and qualifications constitutes' grounds for discipline. *See* NRS 463.170.

[35] The Nevada Gaming Control Board ("NGCB") is statutorily charged with determining whether a violation of the Nevada Gaming Control Act has occurred.  See NRS 463.310(1).  If the NGCB is satisfied that discipline is warranted, it shall initiate disciplinary action by filing a complaint with the Commission.  See NRS 463.310(2).  The Board is authorized to observe the conduct of licensees to ensure that gaming operations are not being operated in an unsuitable manner or by an unqualified or unsuitable person.  See NRS 463.1405(1) and Commission Regulation 5.040.

1      117.    The NGCB's investigation further revealed that there existed an overall lack

2  of control within Resorts World and acceptance among Resorts World executives of a culture

3  where information of suspicious or illegal activity is, at a minimum, negligently

4  disregarded, or, at worst, willfully ignored for financial gain given the overall pressure

5  for Resorts World to generate revenue and that the bonuses of Resorts World's executives

6  are directly tied to the financial success of Resorts World. *See Amended Complaint* at §

7  30.

8      118.    The NGCB's investigation further explained that Resorts World failed to

9  fulfill its obligations as the holder of a Nevada gaming license and caused damage to the

10  reputation of the State of Nevada and Nevada's gaming industry. *See Amended Complaint*

11  at §§ 30- 31.  The NGCB reserved the right to revisit the investigation against Resorts

12  World in the event that the Justice Department brings a criminal action for violations of

13  the BSA and AML laws. *See NGCB at § 6; Amended Complaint* at § 32.[36]

14      119.    On March 27, 2025, the NGCB, Genting and Resorts World reached a settlement,

15  requiring Defendants Genting, and Resorts World to (1) pay a $10.5 million fine, along with

16  interest; and (2) ensure compliance with conditions, which included: (a) maintenance of its anti-

17  money laundering compliance program and procedures; (b) retention of employee AML training

18  records and AML Committee meeting minutes; (c) training of independent agents; (d) conduct an

19  independent audit to review, evaluate and report on Resorts World's compliance with its AML

20  Program; and (e) maintenance of staff for AML compliance.  *See NGCB Settlement.*

---

[36] Nevada casinos are subject to federal and state regulations relating to cash transactions, suspicious activity reporting, and anti-money laundering (AML) programs. The U.S. Bank Secrecy Act (BSA), 31 U.S.C. Chapter 53, subchapter II and specified regulations, *inter alia*, require casinos to implement a written AML compliance program reasonably designed to assure and monitor compliance with the BSA.  As part of this requirement, casinos have to implement know your customer procedures ("KYC") and inquire about the source of funds (SOF) for customers in response to a specific, risk profile. 31 C.F.R. § 1021.210.

120.    In the remediation portion of the settlement, Defendants Genting, Resorts World and other Respondents acknowledged that their AML Program "needed enhancements to address certain compliance risks." To this end, Resorts World implemented "extensive changes to not only address the areas identified but also to enhance the overall AML Program and compliance function, with the aim of having industry-leading policies, procedures and practices." *NGCB Settlement* at §5

121.    Further, "[u]pon learning of allegations about certain patrons' source of funds and potential compliance concerns, Resorts World fully cooperated with NGCB investigation. Additionally, Defendant Resorts World made changes to its leadership, replacing its CEO, COO and CFO, creating a new position of Chief Compliance Officer, and appointing a new Board of Directors. *NGCB Settlement* at §5.

122.    To remediate compliance and culture of compliance deficiencies, Defendants Genting, Resorts World and other Respondents completed a number of remedial actions, including: (a) conducting in-person enhanced training to over 1,100 employees; (b) revising its governance documents and decision-making for its AML Committee; (c) executive and key team members attendance of an AML seminar; (d) engaging the UNLV International Center for Gaming Regulation to create and host a customized gaming compliance program; (e) hiring additional compliance staff; (f) requesting vendors to provide software enhancements to help automate and streamline AML functions; (g) adopting in an August 2023 a policy to ban patrons identified as having criminal convictions related to an illegal gambling or money laundering crime. *NGCB Settlement* at §5.

123.    As outlined in the *NGCB Amended Complaint at §28*, Resorts World "welcomed certain individuals to wager at its casino over a period of numerous months while executives and

1    employees knew, or should have known, that certain individuals were likely illegal bookmakers."

2    In addition, the *Amended Complaint* cites certain executives and employees who not only failed to

3    comply with Resort World's AML Program but violated Nevada Gaming Commission regulations.

4    *NGCB Amended Complaint at §29.*

5          124.    The NGCB noted that Resorts World originally adopted in 2021 an AML program

6    that was approved by executive management and applied to its officers and employees. As to its

7    AML Program, the NGCB quoted, at *Amended Complaint at §34:*

> *[Resorts World] is committed to maintaining a risk-based AML program that includes effective internal controls and procedures to comply with Title 31 requirements and regulatory guidance and measures reasonably designed to prevent its casinos from being used for money laundering or other criminal activity.*
>
> *Legal compliance and ethical business practices are at the core of our business. The Company regards attempts at money laundering as a threat to the integrity of the company, the gaming "industry, and on the entire financial system. The Company will not enter into any business relationship or engage in any activity if it knows or suspects that business relationship or activity is, in any way, connect [sic] with or facilitates money laundering, or the funding of terrorist or criminal activities. No business opportunity is worth the potential risk of becoming involved in money laundering. The Company and its executive management are strongly committed to compliance with all laws and regulations designed to combat money laundering including those rules and regulations requiring the reporting of transactions involving currency, certain money instruments, and suspicious activity.*
>
> *The Company is committed to the education and training of its employees in money laundering prevention. In turn, it is the responsibility of every · Company employee to protect the Company from exploitation by money launderers*

36          125.    Resorts World's AML Program requires its employees to internally report unusual

37    and suspicious activity and violations of the AML Program to their supervisor or the AML

38    Compliance Officer. Resorts World's AML Compliance Officer was responsible for its AML

39    Program. including ensuring the filing of Suspicious Activity Reports ("SARs") with FinCEN.

40    *NGCB Amended Complaint at §§ 35-36.*

126.    Resorts World's AML Committee was responsible for coordination and implementation of the AML Program and to advise the AML Compliance Officer on matters, including the filing of SARs with FinCEN, and making recommendations on terminating or restricting customer relationships. The AML Committee was comprised of the following executives and included the AML Officer, President (Defendant Sibella), Chief Financial Officer, General Counsel, Senior Vice President of Operations (Defendant Taube), Vice President of Player Development, Director of Surveillance (Defendant Forbes), and Director of Compliance (Defendant Henderson).  Each AML Committee member had access to, copies of the minutes and/or comments related to all AML Committee meetings. *NGCB Amended Complaint at § 37.*

127.    Resorts World's AML Program describes different types of suspicious activities specified by Title 31 and it includes suspicions regarding a patron's source of funds.  Under the AML Program, a patron "with incomplete BSA information will be considered barred ... [and] will be restricted from gaming activity until the required information is obtained."  Further, if the patron "poses a significant AML risk, the Company may ban the patron from further activities with the Company." *NGCB Amended Complaint at §§ 40-41.*

128.    To support its conclusions and the allegations in its *Complaint* and *Amended Complaint,* the NGCB detailed Resorts World's AML failures, deficiencies in executive and staff misconduct related to several significant criminals who laundered proceeds at Resorts World: (1) Matthew Bowyer; (2) Damien LeForbes; and (3) Edward Ting. The NGCB's *Complaint* describes detailed events surrounding these three illegal gamblers and criminals who should not have been permitted to gamble at Resorts World's casino.

**(a).    Matthew Bowyer Federal Criminal Prosecution**

129. The Bowyer federal criminal prosecution was part of a broad investigation into illegal sports gambling operations across Southern California and connections to Las Vegas casinos.

130. On August 9, 2024, Matthew Bowyer pleaded guilty to three federal criminal charges for running an illegal gambling business that took in unlawful sports bets, including from then-current and former professional athletes as well as Ippei Mizuhara, a former Japanese-language interpreter and *de facto* manager of Major League Baseball superstar Shohei Ohtani.[37] Bowyer plead guilty to a three-count information charging him with operating an unlawful gambling business, money laundering, and subscribing to a false tax return. *See United States v. Bowyer*, 8:24-cr-00080 (C.D. CA August 2024).[38]

131. Bowyer operated an unlicensed and illegal bookmaking business that focused on sports betting and remained in operation for at least five years until October 2023 and had more than 700 bettors. He operated this business out of various locations in Los Angeles and Orange counties as well as at Resorts World casino and hotel complex in Las Vegas.

---

[37] Ippei Mizuhara pleaded guilty to one count of bank fraud and one count of subscribing to a false tax return. Mizuhara admitted to stealing nearly $17 million from Ohtani to pay off gambling debts and failing to pay tax on his gambling income. From September 2021 to January 2024, Mizuhara placed at least 19,000 bets with Bowyer's illegal gambling business through one of the betting websites Bowyer used for it. During this period, Mizuhara had total winning bets of at least $142,256,769, and total losing bets of at least $182,935,206, leaving Mizuhara owing approximately $40,678,436. On a regular basis during this period, Bowyer would increase Mizuhara's betting limits. DOJ Press Release, *Former Interpreter Sentenced to Nearly 5 Years in Prison for Illegally Transferring Nearly $17 Million from Baseball Star's Bank Account*, February 6, 2025, available here.

[38] Bowyer admitted in his plea agreement to knowingly and willfully falsely reporting his taxable income to the IRS on his tax return for the year 2022. On that year's tax return, Bowyer reported $607,897 in total income. His unreported income for that year was $4,030,938, which was income from his illegal gambling business, including $3.8 million in wire transfers into one of his bank accounts, which he did not declare on his tax return. As a result of the false information Bowyer provided, he owes additional taxes of $1,613,280 for the tax year 2022, not including interest and penalties. Upon pleading guilty, Bowyer will face a statutory maximum sentence of 10 years in federal prison on the money laundering count, up to five years in federal prison for the unlawful gambling business count, and up to three years in federal prison for the false tax return count. As part of his plea agreement, Bowyer will forfeit $257,923 in U.S. currency and $14,830 in Resorts World casino chips seized by law enforcement in October 2023. He also has agreed to fully cooperate with federal prosecutors and investigators. DOJ Press Release, *Orange County Man Sentenced to One Year in Federal Prison for Running Illegal Sports-Betting Business and Cheating on Taxes*, August 29, 2025, available here.

132.    Bowyer also employed agents and sub-agents – including two Resorts World casino hosts – who worked for his illegal gambling business and who referred to Bowyer four individual betting clients.  The Resorts World hosts were paid a portion of the losses that bettors incurred and paid.

133.    At times, Bowyer operated his illegal sports gambling business while gambling in private salons and the sports book in Resorts World. Bowyer would adjust credit lines and discuss payments and bets with clients of his illegal gambling business by phone while gambling in Resorts World. At times, Resorts World staff would stop play at a table game while Bowyer took calls and discussed his illegal gambling business. At other times, Bowyer would collect payments of proceeds of his illegal gambling business while gambling at Resorts World, including receiving and making payments in casino chips or in cash in envelopes or bags.

134.    Bowyer would bring agents, bettors, and associates of his illegal gambling business to Resorts World with him to gamble as a group, some of which were referred to by Resorts World employees as the "Bowyer Group." In addition, Resorts World sports book would at times reach out to Bowyer and invite Bowyer to make large bets, to offset the sports book's risk.

135.    From February 2022 to January 2024, Bowyer directed Mizuhara to make payments of at least $16.25 million to Bowyer-controlled bank accounts, from which Bowyer transferred or directed the transfer of least $9.3 million to Resorts World in the form of wire transfers as payment for markers for Bowyer and his associates.

136.    During this period, Bowyer lost at least $4,164,299 at Resorts World, and one of his associates lost at least $1,585,960 at Resorts World.

137.    Under his plea agreement, Bowyer agreed to cooperate with federal prosecutors and investigators.  In light of his cooperation, Bowyer was sentenced to 12 months' imprisonment and restitution to the IRS of approximately $1.6 million.[39]

### (b)    Matthew Bowyer NGCB Amended Complaint

138.    *NGCB's Amended Complaint* sets out a number of AML failures and deliberate misconduct committed by Resorts World, executives and senior management and employees.  For a period of approximately twenty months from February 2022 to October 2023, when Resorts World finally banned Bowyer, Resorts World failed to substantiate Bowyer's source of funds and/or that his source of funds was consistent with his level of play.  By failing to adhere to the legal requirements under the Bank Secrecy Act and its AML Program, Defendants Genting, Resorts World, KT Lim, Scott Sibella, Doni Taube, Matthew Forbes, Joseph Tatonetti, David Chesnoff, Tonya Henderson, Elie Samarani, and others conducted, facilitated, caused and aided numerous transactions in violation of money derived from illegal bookmaking business, fraud or other illegal activities. *See Amended Complaint at §§ 42-119.*

139.    On or about December 18, 2021, Bowyer submitted to Resorts World a $5,000 credit application, which was later converted to a $1 million front-money loan application. The application listed his personal information, including his bank account information and claimed that he was self-employed as a real estate investor.

140.    On or about December 18, 2021, Resorts World conducted a source of funds review on Bowyer which identified a California real estate investment business owned by Bowyer, but it did not include any information regarding the number of employees for the business, a date the business was established, its annual sales, or its legitimacy.

---

[39] Plea Agreement for Defendant Mathew Bowyer, United States v. Mathew Bowyer, Cr. No. 24-80 (HDV), filed June 25, 2024, available here.

1     141.    On or about December 22, 2021, Resorts World prepared a due diligence report in

2    relation to Bowyer's $1 million front-money application. There was limited information available

3    regarding Bowyer's business or income and the report indicates Bowyer had a previous bankruptcy

4    and foreclosure. Bowyer was categorized as "medium risk", and the comments indicate "[u]nable

5    to confirm SOF. Applicant owns his own home but no other assets."

6     142.    Bowyer first visited Resorts World in February 2022. He made a $1 million front-

7    money deposit and was allowed to wager even though Resorts World had not established his source

8    of funds.

9     143.    Sometime in 2022, Resorts World, at the request of Bowyer, changed Bowyer's

10    casino host to Nicole Bowyer. Specifically, on or about April 14, 2022, Resorts World entered into

11    an Independent Agent Agreement with Nicole Bowyer. Matthew Bowyer's spouse. Resorts World

12    approved this request and used its relationship with Bowyer's spouse to funnel money to Bowyer

13    as a further incentive for Bowyer to gamble at Resorts World and continue to launder his illegal

14    proceeds.

1      144.    The AML Committee reviewed Bowyer's casino and financial activity on four

2  separate occasions: (a) July 19, 2022[40]; (b) August 17, 2022[41]; (c) February 21, 2023[42]; and (d)

3  March 21, 2023[43].   At each of these meetings, the AML Committee was obligated to make

4  recommendations to bar, ban, or otherwise restrict patrons from Resorts World in accordance with

5  the AML Program. However, despite the information available as of July 19, 2022, August 17,

6  2022, February 21, 2023, and March 21, 2023, the AML Committee did not fulfill its duty to make

7  such a recommendation to bar, ban, or otherwise restrict Bowyer and, instead, Bowyer was allowed

8  to continue to wager millions of dollars at Resorts World.

---

[40] Documentation provided to NGCB by Resorts World related to the AML Committee meeting on July 19, 2023, reflects, in part, the following regarding Bowyer: a. June Total In: $5,178,804; b. June F/M Deposit: $2,513,000; c. June Loss: $642,434; d. Average wager: $31,815; e. "Unable to confirm SOF. Patron owns his home valued at $2,203,200 and a condominium valued at $679,173"; (f) "Bowyer was listed as a partner for Pick Enterprises, LLC - No information was found online for the business"; (g) "Patron's spouse, Nicole Bowyer (Sandoval) is an Independent Agent and owns a clothing line ... with an annual revenue of $75,000 2021"; and (h) "Director of Cage stated that patron is a known 'bookie' and is using his spouse's Independent Host business as a cover."

[41] Documentation provided to NGCB by Resorts World related to the AML Committee meeting on that date reflects, in part, the following regarding Bowyer: a. July Total In: $1,420,013; (b) July F/M Deposit: $565,000; (c) July Loss: $551,843; (d) Average wager: $17,854; (e) Reiterated information from prior AML committee meeting, including "[u]nable to confirm SOF"; (f) Mr. Bowyer's possible spouse is a registered independent agent under Coco Gaming, LLC and its annual revenue cannot be determined; and (g) "VP Compliance requested further review by Director of Casino Operations and SVP of Casino Operations, for possible sports betting business affiliation."

[42] Documentation provided to NGCB by Resorts World related to the AML Committee meeting on that date reflects, in part, the following regarding Bowyer: (a) January Total In: $1,170,000; (b) January Loss: $298,408; (c) Average wager: $13,433; (d) "Mr. Bowyer has been previously reviewed by the Committee in June 2022 for CTR analytics. Allegedly, according to the Director of the Cage patron is a known 'bookie' and is using his spouse's business as a cover." And (e) "Patron SOF not established other than spouse's income."

[43] Documentation provided to NGCB by Resorts World related to the AML Committee meeting on that date reflects, in part, the following regarding Bowyer: (a) Mr. Bowyer was discussed at the previous meeting for CTR and Sports Book analytics." Doni Taub "also requested that the word 'bookie' be stricken from the January 2023 agenda as that was one person's opinion and there was no evidence of such behavior; (b) "Mr. Bowyer's host is now reported as Nicole Bowyer on the agenda and the word 'bookie' has been stricken from January 2023 agenda"; (c) February Totals In: $3,779,600; (d) February Loss: $426,151; (e) Average wager: $31,017; (f) "Patron has been previously reviewed by the Committee on June 2022" and "again last month; (g) "Patron SOF established but inconsistent with the level of play.

145.    At the March 21, 2023, AML Committee meeting, the AML Committee, including Defendants Sibella, Forbes and Henderson agreed to Defendant Taube's request that the word 'bookie' be stricken from the January 2023 agenda. The NGCB flagged this as an instance of internal governance failure: the minute-taking and agenda-setting practices allowed for the cover-up of documented risk.

146.    Defendants Sibella, Taube, Forbes, Tatonetti and others had the unilateral authority to bar, ban, or otherwise restrict patrons from Resorts World. However, despite the information available at the time of each AML Committee meeting on July 19, 2022, August 17, 2022, February 21, 2023, and March 21, 2023, Resorts World executives did not exercise their authority to bar, ban, or otherwise restrict Bowyer from Resorts World and he was allowed to continue to play and wager millions of dollars.

147.    Throughout this time period of approximately one year, Bowyer lost millions, while Resorts World failed to verify his source of funds and knew that Bowyer was involved in illegal bookmaking. Bowyer was allowed to play at Resorts World for approximately 20 months without establishing his source of funds and/or that his level of play was consistent with a legitimate source of funds.

148.    During the NGCB investigation, AML Committee members acknowledged that Bowyer's source of funds did not justify his level of play and/or that Bowyer should have been barred.  Resorts World and its AML Committee failed to exercise proper due diligence and follow-up to establish Bowyer's source of funds.

149.    Aside from failures by the AML Committee and others to fulfill their obligations under Resorts World's AML Program, two casino hosts failed to comply with the AML Program

1   upon learning that Bowyer may be an illegal bookmaker.[44]   In addition to the two casino hosts,

2   Resorts World permitted Bowyer's spouse to serve as an independent agent for Resorts World with

3   her husband as her  client.  Bowyer's spouse earned substantial commissions that were derived, in

4   part,  from  Bowyer's  losses  at  Resorts  World  that  were  derived  from  an  illegal  bookmaking

5   business.

6        150.   A federal search warrant was executed at Bowyer's home in October 2023.  On or

7   about October 6, 2023, Bowyer was banned from Resorts World.

8        151.   At no time prior to approximately October 6, 2023, Resorts World did not bar, ban

9   or restrict Bowyer. Further, at no time between February 2022 and  October 2023, Resorts World

10  did not substantiate Bowyer's source of funds or conduct a proper KYC review.

11       152.   Resorts World allowed  Bowyer  to  play 80 separate  days  between approximately

12  February 2022 and October 2023. During that period, Resorts World extended numerous benefits

13  to  Bowyer  to  encourage  him  to  play  at  Resorts  World  including  comps,  promo  chips,  gifts,

14  discounts and flights on Resorts World's jet.  Over the entire time Bowyer was a patron of Resorts

15  World, Bowyer lost over $7.9 million.

16       153.   Resorts  World's  violated  its  AML  Program  requirements  by  failing  to  confirm

17  Bowyer's source of funds for over 20 months.  The Defendants and others knew, or should have

---

[44] The *Amended Complaint* listed the following incidents: (a) On or about October 1, 2023, RESORTS WORLD
Host 1 and  Bowyer, amongst others, were on a Resorts World arranged marketing trip to an NFL football
game in Dallas, Texas; (b) On or about October 1, 2023, Bowyer informed RESORTS WORLD Host 1 that
Bowyer "runs a book" and asked RESORTS WORLD Host 1 to refer clients to Bowyer. Bowyer offered
RESORTS WORLD Host 1 money in return for referring clients to Bowyer. RESORTS WORLD Host 1
understood that Bowyer was an illegal bookmaker; (c) On or about October 1, 2023, RESORTS WORLD
Host 1 provided the name of one of his Resorts World clients to Bowyer through a text message; (d)
RESORTS WORLD Host 1 felt "uneasy" about referring his Resorts World client to Bowyer and
subsequently sent a text message to the client telling him to stay away from Bowyer. (e)  RESORTS WORLD
Host 1 did not report to Resorts World that Bowyer informed RESORTS WORLD Host 1 that Bowyer "runs
a book." (f) At some point while Damien LaForbes was  playing at  Resorts World, he informed RESORTS
WORLD Host 2, his casino host, that Bowyer was "taking action" and was an apparent illegal bookmaker; (g)
RESORTS WORLD Host 2 did not report to Resorts World that Bowyer may be an illegal bookmaker. NGCB
Amended Complaint ¶ 65.

1    known, from at least February 2022, that Bowyer was engaged in an illegal bookmaking business.

2    Resorts World and that Bowyer did not have a legitimate source of income that would justify his

3    gambling activities.

4                    **(c).    Damien LeForbes Federal Criminal Prosecution**

5            154.    The federal prosecution of Damien LeForbes was part of the broad investigation

6    into illegal sports gambling operations across Southern California and their connections to Las

7    Vegas casinos.

8            155.    On August 26, 2024, LeForbes, a professional poker play, pleaded guilty to charges

9    for operating an illegal gambling business and money laundering. During the period from January

10   2022 through December 15, 2023, LeForbes wagered $148 million at Resorts World casino.

11   LeForbes also recruited Resorts World hosts to act as agents in referring bettors to his illegal sports

12   betting business.

13           156.    During the period of October 1, 2021, through December 22, 2023, LeForbes

14   executed at least 17 personal or cashier's checks to Resorts World, totaling at least $9,105,000,

15   including one check for $1,000,000 executed on April 14, 2023. LeForbes knew that these

16   personal and cashiers' checks to Resorts World involved illegal proceeds generated from his

17   gambling business.

18           157.    LeForbes also presented illicit cash proceeds from LeForbes illegal gambling

19   business to Resorts World. Specifically, between January 28, 2022, and December 15, 2023,

20   LeForbes  presented at least $2,815,070 in cash to Resorts World, which represented proceeds

21   from LeForbes illegal gambling business . During this same period, LeForbes wagered more

22   than $148 million at Resorts World.

158.    LeForbes or his agents would also pay or accept payment from bettors in Resorts World casino chips.  For example, on or about November 16, 2022, LeForbes messaged another illegal bookmaker, stating "[Resorts World] is most important because the chips are so versatile for me."[45]

**(d)    Damien LeForbes NGCB Amended Complaint**

159.    Damien LeForbes became a patron of Resorts World when the casino opened in June 2021.

160.    From September 1, 2022, to December 16, 2023, LeForbes wagered a total of 150 separate days. During that period, Resorts World extended numerous benefits to LeForbes to encourage him to play there including comps, promo chips, and gifts. Ultimately, over that period, LeForbes lost in excess of $10 million at Resorts World.

161.    Host 2 was LeForbes' casino host at Resorts World.  In early 2022, LeForbes informed Host 2 that LeForbes "takes action." Host 2 understood that LeForbes was an illegal bookmaker but did not report the information to his supervisors or the AML Compliance Officer at Resorts World.  Host 2 testified to the NGCB agents that he did not tell his supervisors because he "thought that [he] was not the only one that kind of knew and it was kind of looked over."

162.    According to Host 2, LeForbes "marketed aggressively" and asked Host 2 to refer clients to him. Host 2 referred at least one prospective customer to LeForbes to wager with LeForbes.

163.    LeForbes was not banned until on or about March 12, 2024, when, as a result of a Resorts World internal investigation, Host 2 acknowledged that LeForbes was an illegal bookmaker. On May 9, 2024, Host 2 resigned from Resorts World.

---

[45] Gentry, D., *Another Resorts World Gambler Pleads Guilty to Money Laundering, Bookmaking*, Nevada Current, August 28, 2024, available here.

164.    At no time from early 2022, until March 2024, did Resorts World bar, ban, or otherwise restrict LeForbes from Resorts World.

### (e)    Edward Ting Criminal Background

165.    Edward Ting was a long-time criminal involved in illegal gambling.  In September 2013, Ting plead guilty to conducting an illegal gambling business by operating high-stakes underground poker games.  On January 21, 2014, Ting was sentenced **to** five months in prison **and** ordered to forfeit $2 million.

166.    Ting was originally charged in April 2013 in a 34-defendant indictment charging members and associates of two Russian-American organized crime enterprises with various crimes including racketeering, money laundering, extortion, and various gambling offenses. Ting ran high-stakes poker and sportsbook operations, respectively, that handled many millions of dollars in illegal gambling. From 2010 to 2013, Ting ran a high-stakes illegal poker game in New York City. At these games, the pots frequently reached tens of thousands of dollars or more. The operators of these games, including Ting, collected percentages of the pots known as "rakes."

### (f)    Edward Ting NGCB Complaint

167.    Ting became a patron of Resorts World at the time, or soon after, Resorts World opened in 2021. In or about July 2021, Resorts World extended a $300,000 credit to Ting. Subsequently, in 2021, Ting requested that Resorts World increase his credit to $1 million.

168.    From on or about June 24, 2021, to July 9, 2023, Ting wagered a total of 21 separate days and lost over $800,000 at Resorts World. During this same time period, Ting's average wager at Resorts World was approximately $9,000 and he had a total buy-in of more than $8 million.

169.    On or about December 16, 2021, the AML Committee evaluated Ting. Documentation provided to the AML Committee meeting on that date reflects that Ting was

1 "denied credit/FM on 9/13/2021" The credit denial was based on Ting's negative criminal history

2 and reputation related to him "conducting an illegal gambling business connected to organized

3 crime in 2014."

4     170.    The AML Committee, as part of its duties, was obligated to make recommendations

5 to bar, ban, or otherwise restrict patrons from Resorts World in accordance with the AML Program.

6 However, despite the information available as of December 16, 2021, the AML Committee did not

7 fulfill its duty to make such a recommendation to bar, ban, or otherwise restrict Ting.

8     171.    Defendants Resorts World, Sibella, Taube, Forbes, Tatonetti and other executives

9 had the unilateral authority to bar, ban, or otherwise restrict patrons from Resorts World. However,

10 despite the information available as of December 16, 2021, Resorts World's executives did not

11 exercise their authority to bar, ban, or otherwise restrict Ting from Resorts World and he was

12 allowed to continue to play.

13     172.    On or about March 13, 2023, Ting again requested credit, in the amount of

14 $500,000, which was approved by Resorts World through its compliance department. Ting was

15 not banned from Resorts World until August 23, 2023, as a result of an internal review.

16     173.    Resorts World knew, or should have known, of Ting's readily available criminal

17 convictions, reputation related to illegal gambling business and ties to organized crime. However,

18 Resorts World ignored its obligations as a Nevada gaming licensee by allowing Ting to wager at

19 Resorts World and extending him credit.

20                **V.     Plaintiffs' Claims**

1  **Count One: Participation in a Racketeer Influenced and Corrupt Organization 18 USC**
2  **1962(c)**

3                              **A.    RICO Overview**

4        174.    Plaintiffs Cipriani and Russell reallege and incorporate by reference Paragraphs 24

5   to 173 as if fully set forth herein.

6        175.    Between sometime in at least 2019 and continuing until sometime in 2025,

7   **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni**

8   **Taub, Joseph Tatonetti, and Brandon Sattler** violated the Racketeer Influenced and Corrupt

9   Organizations Act ("RICO"), and in particular 18 U.S.C §1962(c), which provides, in pertinent

10  part:

11        "[i]t shall be unlawful for any person employed by or associated with any enterprise
12        engaged in, or the activities of which affect, interstate or foreign commerce, to
13        conduct or participate, directly or indirectly, in the conduct of such enterprise's
14        affairs through a pattern of racketeering activity."

15        176.    Plaintiffs specifically allege, with respect to each Defendant, and will prove by a

16  preponderance of the evidence, the following five elements, which establish a violation of 18

1    U.S.C. §1962(c): (1) conduct[46], (2) of an enterprise[47], (3) through a pattern[48], (4) of racketeering

2    activity (known as "predicate acts")[49], (5) causing injury to the plaintiff's "business or property"

3    by the conduct constituting the violation.[50]

4        177.    As members of the alleged Association-in-Fact Enterprise, the Defendants shared

5    a common purpose[51] and maintained relationships among the members of the enterprise for a

---

[46] The conduct element of § 1962(c) requires that the defendant have some part in directing the affairs of the enterprise. Liability is not limited to those with primary responsibility for the enterprise's affairs, nor is a formal position within the enterprise required. However, the defendant is not liable under § 1962(c) unless the defendant has participated in the operation or management of the enterprise itself. *See Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that accountants hired to perform audit of cooperative's records did not participate in "operation or management" of cooperative's affairs by failing to inform cooperative's board of directors that cooperative was arguably insolvent). In determining whether the conduct element has been satisfied, relevant questions include whether the defendant "occup[ies] a position in the 'chain of command'," "knowingly implement[s] [the enterprise's] decisions," or is "indispensable to achievement of the enterprise's goal." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (holding that attorney's performance of services for alleged associated-in-fact enterprise was not sufficient to satisfy § 1962(c)'s conduct element). *See Ninth Circuit Pattern Jury Instructions, Civil Cases*, 2017, at 118.

[47] 18 U.S.C. § 1961(4) defines an "enterprise" to include what is commonly referred to as an "Association-in-Fact Enterprise," which is not a legal entity, but an informal association of individuals and entities. An "enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The "definition is not very demanding." *Odom*, 486 F.3d at 548. RICO does not require that either the racketeering enterprise or the predicate acts of racketeering be motivated by an economic purpose. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262 (1994).

[48] A pattern is defined as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Proving two predicate acts is a necessary condition for finding a violation but may not be sufficient. *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). To establish a "pattern of racketeering activity," the predicate acts must be both "related" and "continuous." *Id.*; *Sever*, 978 F.2d at 1529.

[49] To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985) (noting that "racketeering activity' consists of no more and no less than commission of a predicate act"). Predicate acts must be proved by a preponderance of the evidence. *See Wilcox v. First Interstate Bank*, 815 F.2d 522, 531-32 (9th Cir. 1987).

[50] *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).

[51] Related conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.*, 492 U.S. at 240. Relatedness of the alleged or proven predicate acts is rarely an issue. *See Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*, 833 F.2d 1360, 1363 (9th Cir. 1987) (finding alleged predicate acts to be related when all were directed toward inducing plaintiff to enter into joint venture and provide funds to obtain certain rights). However, merely alleging that the predicate acts share the same participants is insufficient to establish that they are related. *See Howard v. Am. Online Inc*., 208 F.3d 741, 749 (9th Cir. 2000) (finding that when the purpose, result, victim and method of one set of predicate acts were "strikingly different" from those of the other set of alleged predicate acts, fact that both sets implicated same participants was not enough to establish relatedness).

1    significant duration of time beginning in or around in June 2021 and continuing until sometime in

2    March 2025.

3        178.    Each Defendant engaged in a "pattern of racketeering activity" by committing at

4    least two distinct Predicate Acts. In defining how "the predicate acts must relate to each other,"

5    the Ninth Circuit[52] has held that the predicate acts must "have the same or similar purposes, results,

6    participants, victims, or methods of commission, or otherwise are interrelated by distinguishing

7    characteristics and are not isolated events."[53]

8        179.    Plaintiffs Cipriani and Russell each have standing to bring this action because they

9    each were injured "by reason of the violation(s) of section 1962(c)" as set forth herein.  To establish

10   standing, Plaintiffs need only show that ***at least one Predicate Act*** of the pattern of Racketeering

---

[52] The continuity requirement reflects Congress's concern in RICO with long-term criminal conduct.  *See H.J., Inc.*, 492 U.S. at 242.  Plaintiffs must prove either "open-ended" or "closed-ended" continuity—that is, a plaintiff must either prove a series of related predicate acts committed over a substantial period of time (known as closed-ended continuity) or show past conduct that by its nature projects into the future with a threat of repetition (known as open-ended continuity).  *See id.* at 241-42; *Howard*, 208 F.3d at 750.  There is no bright line rule for what period of time the pattern of activity must extend to establish closed-ended continuity, though activity spanning only several months is unlikely to satisfy the requirement.  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) (noting that it would be "misguided" to state as  "hard and fast rule" that to establish closed-ended continuity, pattern of activity must extend more than year, but also stating that activity spanning only several months without threatening any future criminal conduct does not meet continuity requirement); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) ("[T]he alleged activity continued for six months at most . . . . We have found no case in which a court has held the [closed-ended continuity] requirement to be satisfied by a pattern of activity lasting less than a year."). Open-ended continuity is shown through "predicate acts that specifically threaten repetition or that become a regular way of doing business."  *Allwaste*, 65 F.3d at 1528; *see, e.g., Ikuno v. Yip*, 912 F.2d 306, 308 (9th Cir. 1990) (finding open-ended continuity based on two filings of false annual trading reports for phantom commodity trading company and no evidence that defendant would have stopped filing false annual reports if company had continued to do business); *Medallion*, 833 F.2d at 1364 (finding continuity requirement not satisfied because fraud engaged in posed no threat of future activity).

[53] *Ninth Circuit Pattern Jury Instructions, Civil Cases.*

1    Activity resulted in injury to the Plaintiffs;[54] Plaintiffs need not demonstrate an injury caused by

2    every alleged Predicate Act in order to establish standing.[55]

3        180.    Plaintiffs' RICO injuries flow directly from the Defendants' Predicate Acts of

4    Money Laundering, Willful Failure to File Suspicious Activity Reports, Witness Tampering,

5    Witness Retaliation, which are set forth and specifically alleged below, either one of which alone

6    is sufficient to establish Plaintiff's standing to bring this action.[56] Loss of money, loss of livelihood

7    or other business opportunities constitute an "injury to business or property."

8                    **B.    The Association-in-Fact Enterprise**.

9        181.    Defendants Genting and Resorts World, acting individually and collectively with

10    the individual Defendants, and others listed herein, did form an association-in-fact for the common

11    and continuing purpose described herein that constituted an "enterprise" within the meaning of 18

12    U.S. 1961(4), and engaged in the conduct of their affairs through a pattern of racketeering

13    activity.[57] The members of the enterprise functioned as a continuing unit with an ascertainable

---

[54] A civil RICO plaintiff must demonstrate a (1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury. As to the element of causation, a plaintiff must prove that the defendant's unlawful conduct was the proximate cause of the plaintiff's injury. *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019).

[55] *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)); see also *Eleventh Circuit Pattern Jury Instructions, Civil Cases*, § 7.3 at 6, March 10, 2022 ("***[i]t isn't necessary that every predicate act caused damage to [Plaintiffs]***") (emphasis added); *Cf. Deppe v. Tripp*, 863 F.2d 1356, 1366 (7th Cir. 1988) ("no requirement exists that the plaintiff must suffer an injury from two or more predicate acts"); *Town of Kearny v. Hudson Meadows Urban Renewal*, 829 F.2d 1263, 1268 (3d Cir. 1987) ("[requiring] injury from the entire pattern rather than from any predicate act would . . . be inconsistent with the core Congressional purpose behind [RICO's] enactment"); *Shea v. Best Buy Homes*, 533 F. Supp. 1321, 1336 (N.D. Ga. Mar. 30, 2021) ("[i]t is the pattern which must be shown, not that the plaintiff was injured by each incident of which the pattern was comprised").

[56] As to the element of causation, a plaintiff must prove that the defendant's unlawful conduct was the proximate cause of the plaintiff's injury. *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019).

[57] An "association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). To plead an association-in-fact enterprise, the Supreme Court has held that a plaintiff must allege that a group of persons shares three structural features: "(1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Id*. at 944, 946.

1    structure separate and distinct from that of the conduct of the pattern of racketeering activity.[58]

2    The Association-in-Fact Enterprise engaged in, and its activities have affected, domestic and

3    foreign commerce.

4        182.    The "Association-in-Fact Enterprise"[59] was an informal and continuing

5    organization among: (a) Defendants Genting Berhad, , Resorts World, Scott Sibella, David

6    Chesnoff, Doni Taube, Matthew Forbes, Joseph Tatonetti, Tonya Henderson, Elie Samarani, and

7    Brandon Sattler; (b) Matthew Bowyer, Damien LeForbes, Edward Ting, Robert Alexander, who

8    is deceased, Joseph Angelo Bravo, and David Stroj; and (c) other criminals engaged in illegal

9    gambling, fraud, money laundering, drug trafficking and other crimes.[60]

---

[58] A RICO enterprise must be an entity separate and distinct from any individual defendant—a person cannot conspire with itself. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("to establish liability under §1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name"). For purposes of § 1962(c), a single individual or entity cannot be both the RICO enterprise and an individual defendant. *See Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (holding that plaintiff could not assert RICO claim against defendant bank because bank was also alleged to be RICO enterprise). However, "the inability of a corporation to operate except through its officers is not an impediment to section 1962(c) suits." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992) (holding that individual officers of corporation could be named as defendants even though corporation was alleged to be enterprise and could not act without its officers); *see United States v. Benny*, 786 F.2d 1410, 1416 (9th Cir. 1986) (stating that corporate form is "sort of legal shield for illegal activity that Congress intended RICO to pierce").

[59] Defendants in RICO actions must have had "some knowledge of the nature of the enterprise . . . to avoid an unjust association of the defendant[s] with the crimes of others," but the requirement of a common purpose may be met so long as the defendants were "each aware of the essential nature and scope of [the] enterprise and intended to participate in it." *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 828 F.3d 763 (9th Cir. 2015). A RICO enterprise is not defeated even when some of the enterprise's participants lack detailed knowledge of all of the other participants or their activities. Instead, "it is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *Id.* (quoting *United States v. Eufrasio*, 935 F.2d 553, 557 n. 29 (3rd Cir. 1991). In particular cases, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise" may overlap. *Boyle*, 556 U.S. at 947. However, "enterprise" and "conduct" are two separate and necessary elements of a civil RICO claim. *Odom*, 486 F.3d at 549 ("The 'enterprise' is the actor, and the 'pattern of racketeering activity' is an activity in which that actor engages.")

[60] An organizational defendant can be a member of a larger associated-in-fact enterprise. *See Living Designs*, 431 F.3d at 361 (finding associated-in-fact enterprise could be formed between defendant corporation, law firms employed by it and expert witnesses retained by law firm). An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 945-46 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)). Its existence is proven through evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit. No particular organizational structure, separate or otherwise, is necessary for an associated-in-fact enterprise. *Odom*, 486

1          **C.     Purposes of the Association-in-Fact Enterprise**.

2          183.    Genting Berhad, a Malaysian conglomerate and Resorts World are significant

3    players in the casino and resort industry.  Genting Berhad invested almost $4.3 billion to construct

4    and open the Resorts World complex.  Resorts World is the crown jewel of Genting Berhad's

5    presence in the casino and resort industry, and annual revenues are approaching $700- $800

6    million.  The casino industry in Las Vegas is estimated to earn approximately $9 billion annually.

7          184.    Resorts World opened in 2021 and earned revenues from its casino, its large hotel

8    complex with over 3500 rooms, retail stores in a 70,000 square foot space, restaurants and

9    entertainment including a 5000-seat theater.

10         185.    The purposes of the Association-in-Fact Enterprise included:

11         (a) to maximize strong financial performance of Genting Berhad and Resorts World
12         and the Resorts World casino and hotel complex by (1) encouraging and welcoming
13         criminals (1) to gamble with illegal proceeds generated from illegal gambling, wire
14         fraud, and money laundering schemes; (2) to invest in, participate in, and operate
15         stores, restaurants and other businesses at the Resorts World complex as a means
16         to maximize and facilitate illegal money laundering activities, which would benefit
17         Genting Berhad and Resorts World, individual executives, and criminal patrons of
18         Resorts World.
19
20         (b) to knowingly and deliberately permit criminals to gamble at Resorts World
21         casino and spend money at the Resorts World complex as a means to ensure
22         Genting Berhad and Resorts World's investment in the construction of a significant
23         new casino and hotel complex was financially lucrative and recognized for its
24         overall success as the newest casino and hotel complex in Las Vegas in 2021.
25
26         (c) to knowingly and deliberately ignore basic anti-money laundering rules, policies
27         and procedures to increase the presence of the criminal element at Resorts World
28         so that revenues will increase from the use of illegal proceeds from illegal
29         gambling, fraud and money laundering activities.  To execute this strategy, Resorts
30         World implemented on paper the elements needed to appear as if it was maintaining

F.3d at 551 (finding that plaintiffs had sufficiently alleged associated-in-fact enterprise between defendant software manufacturer and co-defendant retailer wherein defendants established cross-marketing scheme for transferring plaintiffs' personal information from retailer to manufacturer in order to allow manufacturer to improperly charge plaintiffs for services); *see also Boyle*, 556 U.S. at 946 ("It is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.").

an effective AML program and was in compliance with Nevada Gambling Commission regulations, while in practice, many of the AML program requirements and Nevada Gaming Commission regulations and best practices were ignored or overruled.

(d) to promote financial success and loyalty among members of the enterprise by ensuring that each member earns financial benefits from: (1) lucrative salaries, commissions and benefits for Genting and Resorts World executives, senior managers and employees, including but not limited to, Scott Sibella, Doni Taube, Matthew Forbes, Jospeh Taonetti, Tonya Henderson, Elie Samarani and others; (2) lucrative investment opportunities and financial benefits which members can offer to patrons, clients and criminals who would otherwise be barred from such financial investments in Resorts World; and (3) gambling and money laundering of illegal proceeds earned by criminal patrons who desire access to casinos as an effective and easy means to launder the illegal proceeds.

(e) to prevent whistleblowers and individuals, who either who work at Resorts World or are patrons of the casino and hotel complex, from reporting illegal activities occurring at the Resorts World complex to federal and state law enforcement, and Nevada Gaming Commission regulators. The Defendants each recognized that the success of their illegal scheme and financial benefits depended on preventing law enforcement or regulators from initiating an investigation that could have a disastrous impact on Genting Berhad and Resorts World and affiliated individuals. To that end, the Defendants and other members of the enterprise would engage in intimidation, harassment, threats and make false reports against whistleblowers to have them illegal arrested, barred from Resorts World's casino and punish them to silence whistleblowers and protect the Enterprise's ongoing illegal activities, which benefited all of the members of the enterprise.

(f) to deliberately and willfully ignore basic AML governance structures and procedures to conduct effective oversight and monitoring of Resorts World business to present an image as a compliant casino but in reality is dedicated to promoting illegal acti June 2021 to November 2021 to deliberately or willfully ignore basic governance obligations to review and monitor USSSA's operations to ensure compliance with all applicable policies, regulations, and laws governing USSSA's operations, including but not limited to its culture of ethics and compliance, internal financial controls, accuracy of financial reports, books and records, handling of internal human relations and employment issues, enforcement of its whistleblower protection policy, the filing of accurate and complete annual IRS Forms 990.

### D.    Pattern of Racketeering Activity

186.    The Defendants, each of whom are persons or a legal entity associated with, or employed by, the Association-in-Fact Enterprise, did knowingly, willfully and unlawfully conduct

1    or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering

2    activity within the meaning of 18 U.S.C. §§1961(1)(3) and 1962(c).  The racketeering activity was

3    made possible by Defendants' regular and repeated use of the facilities and services of the

4    Association-in-Fact Enterprise.

5                                    **RICO Predicates Summary**

6

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani Sattler | Money Laundering | 1-12 | 18 USC 1956 | June 2021-October 2021 | **Sattler** Gambling Criminal Proceeds 12 |
| Genting RW KT Sibella Taube Forbes Tatonetti Henderson Samarani | Willful Failure to File Suspicious Activity Report | 13-24 | 31 USC 5318(g), 31 CFR 1020.320; 18 USC 5322(a) | June 2021-October 2021 | **Sattler** Gambling Criminal Proceeds 12 |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani Sattler | Money Laundering **Sattler** Stroj Gambling Criminal Proceeds | 25 | 18 USC 1956 | October 2021 - April 2022 | **Sattler** Gambling Criminal Proceeds 1 |

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| | | | | | |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Money Laundering | 26-29 | 18 USC 1956 | June 2021 to November 2021 | **Alexander (Deceased)** Gambling Criminal Proceeds 4 |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Willful Failure to File Suspicious Activity Report | 30-33 | 31 USC 5318(g), 31 CFR 1020.320, 18 USC 5322(a) | June 2021 to November 2021 | **Alexander (Deceased)** Gambling Criminal Proceeds 4 |
| | | | | | |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Money Laundering | 34-58 | 18 USC 1956 | June 2021-July 2023 | **Ting** Gambling Criminal Proceeds 25 |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson | Willful Failure to File Suspicious Activity Report | 59-83 | 31 USC 5318(g), 31 CFR 1020.320, 18 USC 5322(a) | June 2021-July 2023 | **Ting** Gambling Criminal Proceeds 25 |

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| Samarani | | | | | |
| | | | | | |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Money Laundering | 84-86 | 18 USC 1956 | June 2021-2025 (1) Eight Cigar Lounge; (2) Bravo Tickets; (3) Bravo Concierge | Chesnoff & Bravo Businesses 3 |
| | | | | | |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Money Laundering | 87-171 | 18 USC 1956 | February 2022-October 2023 | **Bowyer** Gambling Criminal Proceeds 85 |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Willful Failure to File Suspicious Activity Report | 172-256 | 31 USC 5318(g), 31 CFR 1020.320, 18 USC 5322(a) | February 2022-October 2023 (80 days) | **Bowyer** Gambling Criminal Proceeds 85 |
| | | | | | |
| Genting Resorts World (RW) KT Sibella Taube | Money Laundering | 257-423 | 18 USC 1956 | October 2021 - December 2023 | LeForbes Gambling Criminal Proceeds 167 |

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| Forbes Tatonetti Henderson Samarani | | | | | |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Willful Failure to File Suspicious Activity Report | 424-590 | 31 USC 5318(g), 31 CFR 1020.320, 18 USC 5322(a | October 1, 2021 - December 22, 2023 | LeForbes Gambling Criminal Proceeds 167 |
| Genting RW KT Sibella Chesnoff Taube Forbes Tatonetti | Witness Tampering | 591-593 | 18 USC 1512(a)(2)(A)( C); 1512(b)(1)(2)(3 ) 1512(c) 1512(d) 1512(k) | October 2021 - May 2022 | Witness Tampering 3 |
| Genting RW KT Sibella Chesnoff Taube Forbes Tatonetti | NRS 199.240 | 594-596 | NRS 199.240 | October 2021 - May 2022 | Harassing a Witness 3 |
| Genting RW KT Sibella Chesnoff Taube Forbes | Retaliating Against a Witness | 597- 600 | 18 USC 1513(e) | October 2021 - May 2022 | Retaliating Against a Witness 3 |

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| Genting RW KT Sibella Chesnoff Taube Forbes | Detention and False Imprison. | 601 | NRS 171.1235 | November 19, 2021 | Detention and False Imprison. 1 |
| | | | | | |
| Genting RW KT Sibella | Failure to Maintain Effective AML Program | 602 | 31 USC 5318(h) 31 USC 5322(a) | June 2021 - March 2025 | |

1
2      **E.      Predicate Acts 1-12: Money Laundering and Conspiracy**
3              **(Sattler** Gambling and Criminal Fraud Proceeds)
4              (**18 U.S.C. §1956(a)(1)(B)(ii) and (h)**)
5
6          187.    Beginning in or about June 2021, and continuing until in or about sometime i in

7  October 2021, and occurring on twelve separate days in that period, within the District of Nevada

8  and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

9  **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, Elie Samarani,**

10  **and Brandon Sattler**, together with others known and unknown to the Plaintiffs, did knowingly

11  conduct and attempt to conduct financial transactions affecting interstate and foreign commerce,

12  which transactions involved the **proceeds of specified unlawful activity**, that is: (a) the operation

13  of an **illegal gambling business**, in violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation

14  of **18 U.S.C. § 1343.**

15          188.    The Defendants knew that the property involved in these financial transactions

16  represented the proceeds of some form of unlawful activity, and **knew that the transactions were**

1     **designed in whole and in part to conceal and disguise the nature, location, source, ownership,**

2     **and control of the proceeds** of said specified unlawful activity.

3         189.    The financial transactions included, among others: (1) the deposit of gambling and

4     wire fraud proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-

5     value gaming chips and markers using fraud-derived funds; (3) the redemption of casino chips and

6     wire transfer of funds through financial institutions in Nevada, California, and elsewhere; and (4)

7     the transfer of said funds to accounts controlled by the Defendants and associates, for the purpose

8     of concealing their illicit origin.

9         F.     **Predicate Acts 13-24: Willful Failure to File Suspicious Activity Reports**
10                   **(Sattler** Gambling and Fraud Criminal Proceeds)
11                   **((31 U.S.C. §§ 5318(g)(1) and 5322(a))**

13         190.    Defendant Resorts World was a **financial institution** within the meaning of **31**

14     **U.S.C. § 5312(a)(2)**, doing business as **Resorts World Las Vegas**, a licensed gaming

15     establishment subject to the reporting and record-keeping requirements of the **Bank Secrecy Act**,

16     **31 U.S.C. § 5311 et seq.**, and its implementing regulations.

17         191.    Beginning in or about June 2021, and continuing until in or about October 2021,

18     and occurring on twelve separate days in that period, within the District of Nevada and elsewhere,

19     **Defendants Genting Berhad, Resorts World, KT Lim , Scott Sibella, David Chesnoff, Doni**

20     **Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, Elie Samarani, and Brandon**

21     **Sattler**, Resorts World  being required by law to file reports under **31 U.S.C. § 5318(g)** and **31**

22     **C.F.R. § 1021.320**, **did willfully fail to file Suspicious Activity Reports** with the **Financial**

23     **Crimes Enforcement Network (FinCEN)** as required, for transactions that the Defendants knew,

1  or had reason to suspect, involved funds derived from illegal gambling and wire fraud, or that were

2  designed to conceal the nature, source, and ownership of those proceeds.

3  192.  **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

4  **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

5  **Samarani,** and others known and unknown to the Plaintiffs knowingly accepted and processed

6  transactions at **Resorts World Las Vegas**, including high-value cash buy-ins, chip redemptions,

7  and marker repayments, that exhibited indicia of money laundering and structuring, yet willfully

8  failed to report such suspicious activity to FinCEN as required by law.

9  **G.**     **Predicate Act 25: Money Laundering and Conspiracy**
10     **(Sattler** Gambling and Fraud Criminal  Proceeds)
11     **(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**

13  193.  Beginning in or about sometime in June 2021 and continuing to in or about June

14  2022, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World,**

15  **KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**,

16  **Tonya Henderson, Elie Samarani, and Brandon Sattler**, together with others known and

17  unknown to the Plaintiffs, did knowingly conduct and attempt to conduct financial transactions

18  affecting interstate and foreign commerce, which transactions involved the **proceeds of specified**

19  **unlawful activity**, that is: (a) the operation of an **illegal gambling business**, in violation of **18**

20  **U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

21  194.  The Defendants knew that the property involved in these financial transactions

22  represented the proceeds of some form of unlawful activity and **knew that the transactions were**

1    **designed in whole and in part to conceal and disguise the nature, location, source, ownership,**

2    **and control of the proceeds** of said specified unlawful activity.

3    195.    The financial transactions included, among others: (1) the investment of illegal

4    gambling and fraud proceeds into the restaurant business known as Tacos El Cabron, located on

5    the premises of Resorts World Las Vegas; (2) the purchase pf restaurant equipment, supplies, and

6    leasehold improvements, including Defendant Sattler's SattCom Video LLC audio and video

7    equipment which was installed at the restaurant, with funds derived from illegal gambling and

8    fraud schemes; (c) the deposit of cash proceeds from unlawful wagering and wire fraud into

9    business accounts held in the name of Tacos El Cabron LLC; and (d) the transfer of funds from

10   those business accounts to other accounts controlled by the Defendants and their associates, to

11   make the proceeds appear legitimate.

12           H.      **Predicate Acts 26-29: Money Laundering and Conspiracy**
13                   **(Robert Alexander (deceased)** Gambling Criminal  Proceeds)
14                   **(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**
15
16   196.    Beginning in or around sometime in June 2021, and continuing until sometime in

17   2022, and occurring on at least four separate occasions during this time period, within the District

18   of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim , Scott Sibella,**

19   **David Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

20   **Samarani,** together with Robert Alexander, who is now deceased, and others known and unknown

21   to the Plaintiffs, did knowingly conduct and attempt to conduct financial transactions affecting

22   interstate and foreign commerce, which transactions involved the **proceeds of specified unlawful**

1    **activity**, that is: (a) the operation of an **illegal gambling business**, in violation of **18 U.S.C. §**

2    **1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

3    197.    The Defendants knew that the property involved in these financial transactions

4    represented the proceeds of some form of unlawful activity and **knew that the transactions were**

5    **designed in whole and in part to conceal and disguise the nature, location, source, ownership,**

6    **and control of the proceeds** of said specified unlawful activity.

7    198.    The financial transactions included, among others: (1) the deposit of gambling

8    proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming

9    chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer

10    of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer

11    of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing

12    their illicit origin..

13    J.    **Predicate Acts 30-33: Willful Failure to File Suspicious Activity Reports**
14        **(Robert Alexander (deceased)** Gambling Criminal  Proceeds)
15        **((31 U.S.C. §§ 5318(g)(1) and 5322(a))**
16
17    199.    Defendant Resorts World was a **financial institution** within the meaning of **31**

18    **U.S.C. § 5312(a)(2)**, doing business as **Resorts World Las Vegas**, a licensed gaming

19    establishment subject to the reporting and record-keeping requirements of the **Bank Secrecy Act**,

20    **31 U.S.C. § 5311 et seq.**, and its implementing regulations.

21    200.    Beginning in or around sometime in June 2021, and continuing until sometime in

22    2022, and  occurring on at least four specific days in that period, , within the District of Nevada

23    and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

24    **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

25    **Samarani**, within the **District of Nevada** and elsewhere, Resorts World  being required by law to

1  file reports under **31 U.S.C. § 5318(g)** and **31 C.F.R. § 1021.320**, **did willfully fail to file**

2  **Suspicious Activity Reports** with the **Financial Crimes Enforcement Network (FinCEN)** as

3  required, for transactions that the defendant knew, or had reason to suspect, involved funds derived

4  from illegal gambling and fraud, or that were designed to conceal the nature, source, and ownership

5  of those proceeds.

6       201.  **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

7  **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

8  **Samarani,** knowingly accepted and processed transactions at **Resorts World Las Vegas**,

9  including high-value cash buy-ins, chip redemptions, and marker repayments, that exhibited

10  indicia of money laundering and structuring, yet willfully failed to report such suspicious activity

11  to FinCEN as required by law.

12       K.  **Predicate Acts 34-58: Money Laundering and Conspiracy**
13                       **(Ting Gambling** Criminal  Proceeds)
14                   **(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**
15
16       202.  Beginning in or around sometime in June 2021 and continuing until sometime in

17  July 2023, and occurring on at least twenty-five (25) separate occasions, within the District of

18  Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella,**

19  **David Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

20  **Samarani,** did knowingly conduct and attempt to conduct financial transactions affecting

21  interstate and foreign commerce, which transactions involved the **proceeds of specified unlawful**

22  **activity**, that is: (a) the operation of an **illegal gambling business**, in violation of **18 U.S.C. §**

23  **1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

24       203.  The Defendants knew that the property involved in these financial transactions

25  represented the proceeds of some form of unlawful activity and **knew that the transactions were**

1   **designed in whole and in part to conceal and disguise the nature, location, source, ownership,**

2   **and control of the proceeds** of said specified unlawful activity.

3       204.   The financial transactions included, among others: (1) the deposit of gambling

4   proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming

5   chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer

6   of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer

7   of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing

8   their illicit origin..

9       L.   **Predicate Acts 59-83: Willful Failure to File Suspicious Activity Reports**
10           **(Edward Ting** Gambling Criminal  Proceeds)
11           **((31 U.S.C. §§ 5318(g)(1) and 5322(a))**

13      205.   Defendant Resorts World was a **financial institution** within the meaning of **31**

14  **U.S.C. § 5312(a)(2)**, doing business as **Resorts World Las Vegas**, a licensed gaming

15  establishment subject to the reporting and record-keeping requirements of the **Bank Secrecy Act**,

16  **31 U.S.C. § 5311 et seq.**, and its implementing regulations.

17      206.   Beginning in or around sometime in June 2021 and continuing until sometime in

18  July 2023, and occurring on at least twenty-five (25) separate occasions, within the District of

19  Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella,**

20  **David Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

21  **Samarani**, within the **District of Nevada** and elsewhere, Resorts World  being required by law to

22  file reports under **31 U.S.C. § 5318(g)** and **31 C.F.R. § 1021.320**, **did willfully fail to file**

23  **Suspicious Activity Reports** with the **Financial Crimes Enforcement Network (FinCEN)** as

24  required, for transactions that the Defendants knew, or had reason to suspect, involved funds

1  derived from illegal gambling and fraud, or that were designed to conceal the nature, source, and

2  ownership of those proceeds.

3      207.    **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

4  **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

5  **Samarani,** knowingly accepted and processed transactions at **Resorts World Las Vegas**,

6  including high-value cash buy-ins, chip redemptions, and marker repayments, that exhibited

7  indicia of money laundering and structuring, yet willfully failed to report such suspicious activity

8  to FinCEN as required by law.

9      **M.    Predicate Acts 84-86: Money Laundering and Conspiracy**
10          **(Chesnoff & Bravo** Criminal Proceeds)
11          **(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**
12
13      208.    Beginning in or around sometime in June 2021 and continuing until sometime in

14  and around March 2025, and occurring with respect to three separate businesses jointly owned by

15  Joseph  Angelo Bravo and Defendant David Chesnoff, doing business under the names of Eight

16  Cigar Loungs, Bravo Tickets and Bravo Concierge, respectively, within the District of Nevada and

17  elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

18  **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

19  **Samarani**, did knowingly conduct and attempt to conduct financial transactions affecting

20  interstate and foreign commerce, which transactions involved the **proceeds of specified unlawful**

21  **activity**, that is: (a) the operation of an **illegal gambling business**, in violation of **18 U.S.C. §**

22  **1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

23      209.    The Defendants knew that the property involved in these financial transactions

24  represented the proceeds of some form of unlawful activity and **knew that the transactions were**

1  **designed in whole and in part to conceal and disguise the nature, location, source, ownership,**

2  **and control of the proceeds** of said specified unlawful activity.

3      210.    The financial transactions included, among others: (1) the deposit of gambling and

4  fraud proceeds into (a) the cigar lounge business known as (a) Eight Cigar Lounge; (b) the deposit

5  of gambling and fraud proceeds into (b) the entertainment and event business known as Bravo

6  Tickets; and (c) the concierge service at the Resorts World casino and hotel complex known as

7  Bravo Concierge; (2) the purchase of lounge furniture and equipment, supplies, and leasehold

8  improvements, with funds derived from illegal gambling and fraud schemes; (c) the deposit of

9  cash proceeds from unlawful wagering into business accounts held in the names of businesses 1(a)-

10  1(c) above; and (d) the transfer of funds from those business accounts to other accounts controlled

11  by the Defendants and their associates, to make the proceeds appear legitimate.

12      **N.      Predicate Acts 87-171: Money Laundering and Conspiracy**
13              **(Matthew Bowyer Gambling** Criminal  Proceeds)
14                  **(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**
15
16      211.    Beginning in or around sometime in February 2022 and continuing until sometime

17  in October 2023, and occurring on eighty-five (85) separate days within this time period, within

18  the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim,**

19  **Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya**

20  **Henderson, and Elie Samarani,** did knowingly conduct and attempt to conduct financial

21  transactions affecting interstate and foreign commerce, which transactions involved the **proceeds**

22  **of specified unlawful activity**, that is: (a) the operation of an **illegal gambling business**, in

23  violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

24      212.    The Defendants knew that the property involved in these financial transactions

25  represented the proceeds of some form of unlawful activity and **knew that the transactions were**

1  **designed in whole and in part to conceal and disguise the nature, location, source, ownership,**

2  **and control of the proceeds** of said specified unlawful activity.

3  213.  The financial transactions included, among others: (1) the deposit of gambling

4  proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming

5  chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer

6  of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer

7  of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing

8  their illicit origin.

9  **O.  Predicate Acts 172-256: Willful Failure to File Suspicious Activity Reports**
10      **(Matthew Bowyer** Gambling Criminal Proceeds)
11      **((31 U.S.C. §§ 5318(g)(1) and 5322(a))**
12
13  214.  Defendant Resorts World was a **financial institution** within the meaning of **31**

14  **U.S.C. § 5312(a)(2)**, doing business as **Resorts World Las Vegas**, a licensed gaming

15  establishment subject to the reporting and record-keeping requirements of the **Bank Secrecy Act**,

16  **31 U.S.C. § 5311 et seq.**, and its implementing regulations.

17  215.  Beginning in or around sometime in February 2022 and continuing until sometime

18  in October 2023, and occurring on eighty-five (85) separate days within this time period, within

19  the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim,**

20  **Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti, Tonya**

21  **Henderson, and Elie Samarani,** Resorts World being required by law to file reports under **31**

22  **U.S.C. § 5318(g)** and **31 C.F.R. § 1021.320**, **did willfully fail to file Suspicious Activity Reports**

23  with the **Financial Crimes Enforcement Network (FinCEN)** as required, for transactions that

1   the Defendants knew, or had reason to suspect, involved funds derived from illegal gambling and

2   fraud, or that were designed to conceal the nature, source, and ownership of those proceeds.

3       216.    **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

4   **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

5   **Samarani,** knowingly accepted and processed transactions at **Resorts World Las Vegas**,

6   including high-value cash buy-ins, chip redemptions, and marker repayments, that exhibited

7   indicia of money laundering and structuring, yet willfully failed to report such suspicious activity

8   to FinCEN as required by law.

9       **P.      Predicate Acts 257-423: Money Laundering and Conspiracy**
10              **(LeForbes Gambling** Criminal  Proceeds)
11              **(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**

13      217.    Beginning in or around sometime in October 2021 and continuing until sometime

14   in December 2023, and occurring on at least one hundred sixty seven (167) days during that period,

15   within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT**

16   **Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya**

17   **Henderson, and Elie Samarani**, did knowingly conduct and attempt to conduct financial

18   transactions affecting interstate and foreign commerce, which transactions involved the **proceeds**

19   **of specified unlawful activity**, that is: (a) the operation of an **illegal gambling business**, in

20   violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

21      218.    The Defendants knew that the property involved in these financial transactions

22   represented the proceeds of some form of unlawful activity and **knew that the transactions were**

1   **designed in whole and in part to conceal and disguise the nature, location, source, ownership,**

2   **and control of the proceeds** of said specified unlawful activity.

3      219.   The financial transactions included, among others: (1) the deposit of gambling

4   proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming

5   chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer

6   of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer

7   of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing

8   their illicit origin.

9   **Q.      Predicate Acts 424-590: Willful Failure to File Suspicious Activity Reports**
10          **(Damien LeForbes** Gambling Criminal  Proceeds)
11          **((31 U.S.C. §§ 5318(g)(1) and 5322(a))**
12

13      220.   Defendant Resorts World was a **financial institution** within the meaning of **31**

14  **U.S.C. § 5312(a)(2)**, doing business as **Resorts World Las Vegas**, a licensed gaming

15  establishment subject to the reporting and record-keeping requirements of the **Bank Secrecy Act**,

16  **31 U.S.C. § 5311 et seq.**, and its implementing regulations.

17      221.   Beginning in or around sometime in October 2021 continuing until sometime in

18  and around December 2023, occurring on at least one hundred sixty seven days (167) during that

19  period, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts**

20  **World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Jospeh**

21  **Tatonetti**, **Tonya Henderson, and Elie Samarani**, Resorts World  being required by law to file

22  reports under **31 U.S.C. § 5318(g)** and **31 C.F.R. § 1021.320**, **did willfully fail to file Suspicious**

23  **Activity Reports** with the **Financial Crimes Enforcement Network (FinCEN)** as required, for

24  transactions that the defendant knew, or had reason to suspect, involved funds derived from illegal

1  gambling and fraud, or that were designed to conceal the nature, source, and ownership of those

2  proceeds.

3        222.    **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

4  **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, and Elie**

5  **Samarani,** knowingly accepted and processed transactions at **Resorts World Las Vegas**,

6  including high-value cash buy-ins, chip redemptions, and marker repayments, that exhibited

7  indicia of money laundering and structuring, yet willfully failed to report such suspicious activity

8  to FinCEN as required by law.

9                    **R.      Predicate Acts 591-593: Tampering with a Witness**
10                               **(Plaintiff Cipriani)**
11
12        223.    In or about sometime between October 2021 and continuing until May 4, 2022, and

13  occurring on three separate occasions during this time period, **Defendants Genting Berhad,**

14  **Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Jospeh**

15  **Tatonetti**, **Tonya Henderson, and Elie Samarani,** and Robert Alexander, who is now deceased**,**

16  acting individually and in concert, within the District of Nevada, did knowingly and intentionally

17  use intimidation, threats or corrupt persuasion , or attempts to do so, with intent to: (1) influence,

18  delay or prevent the testimony of Plaintiff Cipriani in an official proceeding, in violation of 18

19  U.S.C. § 1512(b)(2)(A) and (k); (2) cause or induce Plaintiff Cipriani to withhold testimony from

20  an official proceeding, in violation of 18 U.S.C. § 1512(b)(2)(B) and (k); and/or (3) hinder, delay,

21  or prevent the communication to a law enforcement officer or judge of the United States of

1  information relating to the commission or possible commission of a Federal offense, in violation

2  of 18 U.S.C. § 1512(b)(3) and (k).

3      **S.      Predicate Acts 594-596: Retaliation Against a Witness**
4              **(Plaintiff Cipriani)**
5

6      224.    In or about sometime between October 2021 and continuing until May 4, 2022, and

7  occurring on three separate occasions during this time period, **Defendants Genting Berhad,**

8  **Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Jospeh**

9  **Tatonetti**, **and Robert Alexander, who is now deceased,** acting individually and in concert,

10  within the District of Nevada, knowingly and intentionally harassed, intimidated, falsely arrested

11  and prosecuted Plaintiff Cipriani for alleged criminal offenses, which the Defendants knew were

12  false, i.e., larceny, robbery, gambling fraud with the intent to: retaliate against and interfere with

13  the lawful gambling activities and livelihood of Plaintiff Cipriani, and thereafter ensure that

14  Resorts World banned Plaintiff Cipriani from Resorts World casino and hotel complex, in order to

15  prevent and retaliate against Plaintiff Cipriani for providing, or attempting to provide, to a law

16  enforcement officer any truthful information relating to the commission or possible commission

17  of any Federal offense, in violation of 18 U.S.C. §1513(e) and (f).

18      **T.      Predicate Acts: 597-599, Retaliation Against Witness or Informant**
19              **(Plaintiff Cipriani)**
20              **NRS 199.240**
21

22      225.    In or about sometime between October 2021 and continuing until May 4, 2022, and

23  occurring on three separate occasions during this time period, **Defendants Genting Berhad,**

24  **Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Jospeh**

25  **Tatonetti**, **Tonya Henderson, and Elie Samarani, and Robert Alexander, who is now**

26  **deceased,** acting individually and in concert, within Clark County, Nevada, did knowingly and

27  maliciously engage in acts of harassment, intimidation and economic retaliation against Plaintiff

1    Cipriani, a person who had provided information and evidence to federal law enforcement

2    authorities and the Nevada Gaming Control Board concerning illegal gambling, fraud and money

3    laundering activities occurring at Resorts World Las Vegas, in retaliation for the witness having

4    and continuing to cooperate with said authorities and for having given truthful statements and

5    evidence in connection with those investigations.

6    226.    Such retaliatory acts included, but were not limited to: (a) causing the witness to be

7    falsely detained and ejected from the casino premises; (b) preparing false statements and affidavits

8    to support an allegation of Gambling Fraud against Plaintiff Cipriani; (c) revoking or interfering

9    with the witness's player account and gaming privileges; (d) threatening loss of livelihood,

10    employment opportunities, and financial harm; and (e) publicly defaming the witness to discourage

11    further cooperation with law enforcement. These acts were intended to punish, harass, and injure

12    the witness for his or her cooperation with federal and state law-enforcement officers and agencies,

13    in violation of NRS 199.240.

14    **U.    Predicate Act 600: Willful Failure to Maintain an Effective AML Program**
15    **(Genting Berhad and Resorts World)**
16    **(31 U.S.C. §§ 5318(h) and 5322(a))**

17

18    227.    At all times material to this Racketeering Act, **Genting Berhad**, a Malaysian

19    holding company, owned and controlled the subsidiary **Resorts World Las Vegas**, a licensed

20    gaming establishment and financial institution within the meaning of 31 U.S.C. § 5312(a)(2).

21    228.    From on or about **June 24, 2021**, the date of Resorts World Las Vegas's opening,

22    and continuing through on or about March 2025, in the District of Nevada and elsewhere, the

23    defendants **Genting Berhad** and **Resorts World Las Vegas LLC** being financial institutions

24    subject to the Bank Secrecy Act ("BSA"), **knowingly and willfully failed to develop, implement,**

1   **and maintain an effective anti–money-laundering program**, as required by 31 U.S.C. § 5318(h)

2   and its implementing regulations, including 31 C.F.R. § 1021.210.

3       229.    The Defendants' AML program was required to include: (a) internal controls to

4   assure ongoing compliance with the BSA; (b) independent testing for compliance; (c) designation

5   of qualified AML compliance officers; and (d) ongoing training of personnel in recognition and

6   reporting of suspicious transactions.

7       230.    The Defendants **willfully failed** to establish and enforce those measures by, among

8   other things: (a) permitting high-value cash transactions and chip redemptions without appropriate

9   customer-due-diligence or Source of Funds confirmation; (b) ignoring red-flag activity involving

10  illegal bookmaking and fraud proceeds channeled through casino accounts and concession

11  operations; (c) failing to designate qualified personnel to oversee AML compliance; and (d)

12  omitting to file required Suspicious Activity Reports with the Financial Crimes Enforcement

13  Network ("FinCEN"), in violation of Title 31, United States Code, Sections 5318(h) and 5322(a).

14          **V.      Predicate Act 601: False Arrest of Plaintiff Cipriani**
15                    **November 19, 2021**
16                    **NRS 200.460**
17
18      231.    On or about November 19, 2021, at or near **Resorts World Las Vegas**, located in

19  Clark County, Nevada, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella,**

20  **David Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti, ,** acting individually and in

21  concert, located in Clark County, Nevada, while acting as an employee and/or agent of a licensed

22  gaming establishment, did unlawfully and unreasonably take into custody and detain Plaintiff

23  Cipriani, a patron lawfully present on the premises, under the pretense of investigating a suspected

24  gaming-related offense, for an unreasonable length of time and in an unreasonable manner, thereby

1  exceeding the authority granted under NRS 171.1235(1) and depriving the patron of liberty

2  without legal justification.

3      232.    Said conduct was done knowingly and intentionally and not in good faith, and

4  thereby constituted an **unlawful detention** in violation of NRS 171.1235(3), rendering the

5  defendant and the licensee criminally liable for **unreasonable detention by a gaming licensee,**

6  **in violation of NRS 171.1235, and in connection** with the operation of a licensed gaming

7  establishment subject to regulation by the Nevada Gaming Control Board; in retaliation for or

8  intimidation of a witness who had cooperated with state or federal law enforcement regarding

9  potential gaming or money-laundering offenses; and as part of a broader pattern of unlawful acts

10  affecting gaming integrity and public justice.

11                        **Count Two: RICO Conspiracy 18 USC 1962(d)**
12                        **(Against all Defendants)**

13      233.    Plaintiffs Cipriani and Russell reallege and incorporate by reference Paragraphs 24

14  to 232 as if fully set forth herein.

15      234.    Between sometime in at least June 2021 and continuing until sometime in 2025,

16  **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni**

17  **Taube, Matthew Forbes, Jospeh Tatonetti**, **Tonya Henderson, Elie Samarani and Brandon**

18  **Sattler** did combine, conspire, confederate, and agree to conduct or participate, directly or

1   indirectly, in the conduct of an enterprise, as defined above, through a pattern of racketeering

2   activity as alleged in Count One of this Complaint, in violation of 18 U.S.C. § 1962(d).[61]

3       235.    Each Plaintiff has been injured and continues to be injured in his business and

4   property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d).

5               **Count Three: Retaliation and Witness Intimidation**
6       **42 U.S.C. 1985(2) Obstructing Justice; Intimidating Party, Witness or Juror**

7       236.    Plaintiffs Cipriani and Russell reallege and incorporate by reference Paragraphs 88

8   to 124 as if fully set forth herein.

9       237.    In or about sometime between October 2021 and continuing until May 4, 2022,

10  Plaintiff Cipriani engaged in protected activity by providing relevant information to federal and

11  state law enforcement and regulatory authorities concerning potential federal criminal and civil

12  law violations, and NGCB laws and regulations.

13      238.    **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David**

14  **Chesnoff, Doni Taube, Matthew Forbes, Jospeh Tatonetti, and Robert Alexander, who is**

---

[61] A RICO conspiracy under § 1962(d) may be established by proof of an agreement to commit a substantive violation of RICO. *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 774-75 (9th Cir. 2002) ("It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy.") (citation omitted). The conspirator need not have agreed to commit or facilitate each and every part of the substantive offense. *Howard*, 208 F.3d 741, 751 (9th Cir. 2000) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997)). However, the conspirator must have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Id*. (citing *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)). The "agreement need not be express as long as its existence can be inferred from words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co.*, 298 F.3d at 775. If a RICO conspiracy is demonstrated, "[a]ll conspirators are liable for the acts of their co-conspirators." *Id*. (citation omitted). A defendant can be held liable for a RICO conspiracy if the evidence shows that he or she "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *United States v. Fernandez*, 388 F.3d 1199, 1229-30 (9th Cir. 2004) (citation omitted). There is no requirement that the defendant have actually conspired to operate or manage the enterprise himself or herself. *Id*. (affirming conviction under § 1962(d) of defendant who collected money on behalf of member of enterprise, facilitated communications between conspirators and accepted payment for drugs sold through enterprise)

1  **now deceased,** acting individually and in concert, in the District of Nevada, did knowingly

2  combine and conspire to deter, prevent or retaliate against Plaintiff Cipriani for said cooperation.[62]

3      239.    Defendants conduct included threats, intimidation, and interference with Plaintiff

4  Cipriani's livelihood and was intended to obstruct justice.

5      240.    Plaintiff Cipriani suffered economic and emotional damages as a direct result.

6          **Count Four: Civil Rights and False Arrest/Unreasonable Seizure**
7          **42 U.S.C. §1983; US Const. Amends. IV & XIV**
8
9      241.    Plaintiffs Cipriani and Russell reallege and incorporate by reference Paragraphs 88

10  to 124 as if fully set forth herein.

11     242.    In or about sometime between October 2021 and continuing until May 4, 2022,

12  **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni**

13  **Taube, Matthew Forbes, Jospeh Tatonetti**, **and Robert Alexander, who is now deceased,**

14  acting under color of state law or in joint activity with Nevada **public officials,** including District

---

[62] Section 1962(d) applies to intracorporate, as well as intercorporate conspiracies; thus, it is possible for a corporation to engage in a RICO conspiracy with its own officers and representatives. *Webster v. Omnitron Int'l*, 79 F.3d 776, 787 (9th Cir. 1996) (quoting with approval *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir. 1998), for the proposition that "intracorporate conspiracies … threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits"). If Plaintiff proves agreement on an overall objective, then it is not necessary that a Defendant agree to personally commit two predicate acts. *See Starrett*, 55 F.3d at 1544. Further, a RICO conspiracy may be found through "the conduct of the alleged participants or from circumstantial evidence of a scheme." *Cisneros*, 972 F.3d at 1220 (quoting *Browne*, 505 F.3d at 1264)); *Cf. Gov't Emples. Ins. Co. v. Kalin*, 2022 U.S. Dist. LEXIS 36982, at *8 (M.D. Fla. Mar. 2, 2022).

1 Attorney Steven Wolfson, seized and detained Plaintiff Cipriani without probable cause or lawful

2 authority.

3   243. Such detention deprived Plaintiff Cipriani of liberty and due process, causing

4 compensable injury.

5         **Count Five: False Arrest of Plaintiff Cipriani**
6            **November 19, 2021**
7          **NRS 200.460; NRS 171.235**
8
9   244. Plaintiffs Cipriani and Russell reallege and incorporate by reference Paragraphs 88

10 to 124 as if fully set forth herein.

11   245. On or about November 19, 2021, at or near **Resorts World Las Vegas**, located in

12 Clark County, Nevada, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella,**

13 **David Chesnoff, Doni Taube, Matthew Forbes, and Jospeh Tatonetti, and Robert Alexander,**

14 **who is now deceased,** acting individually and in concert, located in Clark County, Nevada, while

15 acting as an employee and/or agent of a licensed gaming establishment, did unlawfully and

16 unreasonably take into custody and detain Plaintiff Cipriani, a patron lawfully present on the

17 premises, under the pretense of investigating a suspected gaming-related offense, for an

18 unreasonable length of time and in an unreasonable manner, thereby exceeding the authority

19 granted under NRS 171.1235(1) and depriving the patron of liberty without legal justification.

20   246. Said conduct was done knowingly and intentionally and not in good faith, and

21 thereby constituted an **unlawful detention** in violation of NRS 171.1235(3), rendering the

22 defendant and the licensee criminally liable for **unreasonable detention by a gaming licensee,**

23 **in violation of NRS 171.1235, and in connection** in connection with the operation of a licensed

24 gaming establishment subject to regulation by the Nevada Gaming Control Board; in retaliation

25 for or intimidation of a witness who had cooperated with state or federal law enforcement

1   regarding potential gaming or money-laundering offenses; and as part of a broader pattern of

2   unlawful acts affecting gaming integrity and public justice.

3       247.    Plaintiff suffered loss of liberty and emotional distress.

4                           **Prayer for Relief as to RICO Counts One and Two**
5
6   **WHEREFORE**, Plaintiffs Cipriani and Russell pray that the Court enter judgment in their
7       favor and against the RICO Defendants, containing the following relief:

8   a.  Treble the amount of all injuries, including investment loss, deprivation of livelihood,
9       and any other injury suffered as a result of Defendants' unlawful conduct, including
10      and pre-judgment interest;

11  b.  Compensatory damages in an amount to be determined at trial to compensate Plaintiffs
12      for the damages caused by the RICO Defendants' unlawful conduct;

13  c.  Treble and/or punitive damages as allowed by law;

14  d.  An award of reasonable attorneys' fees, costs, and litigation expenses pursuant to 18
15      U.S.C. § 1964(c) and all other applicable statutes; and

16  e.  Such other relief as the Court may deem just or equitable.

17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39

1    **<u>JURY DEMAND</u>**

2

3    Plaintiffs Cipriani and Russell hereby demand a trial by jury on all issues of fact and damages

4    stated herein.  \\

5

6                                                    Respectfully submitted,

7                                   By:    _____/s/_____
8                                          Kathleen Bliss
9                                          Kathleen Bliss Law PLLC
10                                         170 South Green Valley Parkway
11                                         Suite 300
12                                         Henderson, NV 89012
13                                         (702) 318-7375
14                                         kb@kathleenblisslaw.com
15
16
17                                         _____/s/_____
18                                         Michael Volkov (DC 367348)
19                                         *Pro Hac Vice (pending)*
20                                         The Volkov Law Group PC
21                                         1015 15th Street, N.W., 6th Floor.
22                                         Washington, D.C. 20005
23                                         (240) 505-1992
24                                         mvolkov@volkovlaw.com

95