IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

ROBERT J. CIPRIANI,                                    )
JAMES RUSSELL, and                                     )
ANDREW CHENG TAO DO                                     )
                                                       )
Plaintiffs,                                            )      CASE NO. 2:25-cv-2396-JCM-DJA
                                                       )
                                                       )      JURY TRIAL DEMANDED
GENTING BERHAD                                         )
RESORTS WORLD LAS VEGAS, LLC                           )
TAN SRI LIM KOK THAY, aka KT LIM                       )
SCOTT SIBELLA                                          )
DAVID CHESNOFF                                         )
MATTHEW FORBES                                         )
DONI TAUBE                                             )
ZACHARY KOEP                                           )
JOSEPH TATONETTI                                       )
DANIEL MADURZAK                                        )
TONYA HENDERSON                                        )
ELIE SAMARANI                                          )
BRANDON SATTLER                                        )
                                                       )
Defendants.                                            )

**<u>FIRST AMENDED COMPLAINT</u>**

Plaintiffs Robert J. Cipriani, aka "R.J." and "Robin Hood 702", James Russell and Andrew Cheng Tao Do (hereinafter separately referenced as "Plaintiff Cipriani," "Plaintiff Russell," or "Plaintiff Do," respectively, or collectively referred to as "Plaintiffs Cipriani, Russell and Do" or "Plaintiffs"), by and through their undersigned counsel, file the following First Amended Complaint ("FAC") against Defendants Genting Berhad ("Defendant Genting"), Resorts World Las Vegas LLC ("Defendant Resorts World" and, for convenience referred to as "Resorts World"), Tan Sri Lim Kok Thay, aka "KT Lim" ("Defendant KT Lim"); Scott Sibella ("Defendant Sibella"), David Chesnoff ("Defendant Chesnoff"), Matthew Forbes ("Defendant Forbes"), Doni Taube

1

("Defendant Taube"), Zachary Koep ("Defendant Koep"), Joseph Tatonetti ("Defendant Tatonetti"), Daniel Madurzak ("Defendant Madurzak"), Tonya Henderson (Defendant "Tonya Henderson"), Elie Samarani, ("Defendant Samarani") and Brandon Sattler ("Defendant Sattler"), collectively "Defendants," seeking monetary damages as well as attorneys' fees, litigation expenses, and other relief, and in support thereof alleges the following:

## Introduction

*"The fish rots from the head down -- leadership sets the moral climate" -- Transparency International*

*Those are my principles, and if you don't like them . . . well, I have others." -- Groucho Marx*

*Corporate fraud does not occur in a vacuum. It starts at the top and trickles down when those at the top tolerate or encourage misconduct."- Judge Jed Rakoff (SDNY)*

1.      Genting Berhad, a large Malaysian conglomerate, and Resorts World think of themselves as major players in the casino, resort and hospitality industry. Beginning in on or about 2018, Genting Berhad and Resorts World planned a new casino and hotel complex in Las Vegas, the grand opening of which launched on June 24, 2021. It was the first new casino on the Vegas strip since the early 2010s.[1]

2.      Since its celebrated Las Vegas opening in 2021, Resorts World has proven beyond question that it is unfit and incapable of operating a casino and hotel complex in compliance with the law. In fact, since opening Resorts World in 2021, Genting Berhad and Resorts World have proven their *bona fides* as a corrupt racketeering enterprise that operates with complete disregard of basic governance, corporate ethics and the law.

---

[1] Reynolds, C., *5 Things to Know about the Vast Vegas Hotel-Casino that Opens Today*, Los Angeles Times, June 24, 2021, available here; Segall, E., *Resorts World is Last New Hotel to Open in Las Vegas, For Now*, Las Vegas Review-Journal, June 26, 2021, available here.

3.      In 2025, after a multi-year regulatory investigation, the Nevada Gaming Commission, reached a settlement pursuant to which Genting Berhad and Resorts World agreed to pay $10.5 million in penalties for pervasive and systemic money laundering violations.  In addition to the fine, Genting Berhad and Resorts World agreed to replace the board of directors, terminate several senior executives, and implement significant remediation to its AML compliance program and oversight function.  Even with this major disciplinary settlement, it is not clear that Genting Berhad and Resorts World may not be out of the woods yet -- as the settlement agreement leaves open the possibility of a U.S. Justice Department investigation of the companies.[2]

4.      In the face of these serious challenges, and after agreeing to the settlement, Genting Berhad and Resorts World now claim that the casino has "implemented wholesale changes" to restore its good name and to continue its operations with proper regard for ethics and compliance. These claims ring hollow in the face of evidence to the contrary; and, based on information and belief, including the allegations set forth herein, it is likely that this racketeering enterprise has and will continue its pattern of racketeering activity.

5.      Indeed, Genting Berhad and Resorts World trumpeted its initial appointment of Jim Murren as Chairman of the new Board of Directors, the former CEO of MGM Resorts International, as a member of the so-called "Dream Team."[3] Murren's history and past record of performance, however, was anything but a dream -- it was a nightmare.   Under Murren's

---

[2] *See* Gentry, D., *Resorts World Could face Additional Sanctions from Nevada Should Feds Take Action*, Nevada Current, March 21, 2025, available here (the NGCB settlement included provision reserving right to revisit settlement in the event the U.S. Justice Department or the U.S. Department of Treasury take any enforcement action against Resorts World) .

[3] Gentry, D., *Resorts World Fields "Dream Team" as Gaming Commission Signs Off on $10.5 Million Fine*, Nevada Current, March 27, 2025, available here .  Recently, Murren accepted a new position in Dubai and remained Chaiman Emeritus at Resorts World, an honor reflecting Resorts World's inability to commit to wholesale reform.

stewardship,[4] MGM Resorts suffered significant anti-money laundering failures, which ultimately lead to MGM Resorts paying the Justice Department an $8.5 million fine for AML violations at its casinos.[5]  In the wake of theses scandals, Murren resigned from MGM in February 2020.

6.      Murren was replaced as Chairman at Resorts World to assume a new position but retains the title of Chairman Emeritus. [6]  Further, press reports indicate that Resorts World has resumed its past practice of embracing and welcoming criminals to its casino.[7]  It is hard to credit Resorts World's claims of reform when its "commitment" to ethics and compliance appears to be nothing more than window dressing.[8]

7.      Looking back on the Genting Berhad and Resorts World debacle, it is important to examine exactly what occurred -- after four years of criminal racketeering activity, Genting Berhad and Resorts World left behind in their wake a disastrous pile of governance failures, massive losses suffered by victims of fraud, and a far-reaching, unceasing practice and pattern of money laundering and illegal activities.  As recounted here, Genting Berhad and Resorts World adopted a deliberate business strategy -- premised on ignoring regulatory and legal restrictions -- to maximize revenues by welcoming criminals at Resorts World to launder their illicit proceeds.  In

---

[4] Gentry, D., *Murren*, *Headed to Resorts World, Knew in 2019 of Questionable Gamblers,* Nevada Current, December 5, 2024, available here.

[5] MGM executives "suspected" that criminals were illegally gambling at their casinos.  These suspicions were reinforced by a 2019 letter from Plaintiff Cipriani to Murren  providing details as to the systemic and pervasive illegal gambling and money laundering activities occurring at the MGM casinos.  Ironically, the then President of MGM was none other than -- Defendant Scott Sibella, who jumped from MGM to Resorts World in 2021, and subsequently in 2024 was singled out by the U.S. Justice Department to plead guilty to a felony offense for his conscious strategy to embrace and welcome criminals to gamble, invest in and participate at MGM casinos and properties.

[6] Wargo B., *Former Nevada Gov. Brian Sandoval New Chairman of Resorts World Las Vegas Board of Directors,* CDC Gaming, November 13, 2025, available here.

[7] Levitan, C., *Indicted Gambler Wins Major Las Vegas Poker Event, Exposing Industry Blind Spot*, Casino.org, November 13, 2025, available here.

[8] As the saying goes, "*You can put lipstick on a pig, but it's still a pig." See Oxford Dictionary of English Idioms (3d ed. 2010).*

4

short, Genting Berhad and Resorts World consciously and deliberately chose not to operate a legitimate gaming business but instead acted intentionally and with deliberate indifference to conduct "business" as a criminal racketeering enterprise.

8.      The Genting Berhad and Resorts World fiasco stands as a testament to the dangers to an organization suffering from a weak ethical and compliance culture that willingly embraces criminal patrons (who should have otherwise been barred).  Before opening in June 2021, Genting Berhad and Resorts World hired Defendant Scott Sibella, a long-time senior executive in the casino and resort industry to lead the new casino.  Defendant Sibella brought to Resorts World his loyal team from MGM, where he served as the President and Chief Operating Officer.

9.      Genting Berhad and Resorts World's first mistake was its first hire -- Defendant Scott Sibella, who bears the ignominious distinction of serving as the President of two large casinos that have been the subject of major federal criminal prosecutions and regulatory enforcement actions.  In 2024, after Defendant Sibella's departure, MGM Grand had to pay a criminal fine of $8.5 million for anti-money laundering violations, and Defendant Sibella himself was required to plead guilty to a criminal offense of failing to file a suspicious activity report, as required under the Bank Secrecy Act and applicable regulations.

10.      Before his 2024 guilty plea, Defendant Sibella consistently aligned himself with the criminal element -- first at the MGM Grand and then at Resorts World.  Defendant Sibella was obsessed with growing Resorts World's revenues, by legitimate and illegitimate means.  When he joined Resorts World, Defendant Sibella knew that his financial success depended on permitting criminals to gamble and invest in Resorts World businesses.  In other words, Defendant Sibella knew that he had to welcome "wealthy" criminals involved in illegal gambling, fraud, money laundering and other illicit schemes.  By encouraging criminals to gamble at, and invest in, Resorts

World, Defendant Sibella was singularly focused on increasing Resorts World's revenues, while ignoring basic governance, compliance, due diligence and legal requirements.  To this end, based on information and belief and which will be established by the evidence, Defendant Sibella with the assistance and support of the Co-Defendants and other members of the Resorts World racketeering enterprise employed a deliberate strategy that had a clear message: welcome the criminals, many of whom Defendant Sibella had established relationships, and let them launder their illicit funds at the casino and invest in Resorts World businesses, all to the benefit of the Resorts World's bottom line.  Ultimately, Defendant Sibella saw the Resorts World opportunity as his last great chance to cash in on his career.

11.    As a consequence of this deliberate scheme to operate as a racketeering enterprise, not as a legitimate business, Resorts World stands as one of the worst examples of a governance and compliance disaster in the casino industry.

12.    Resorts World executed this illicit strategy with the support, willingness and encouragement of its parent, Genting Berhad, which emphasized revenue growth, and which ignored serious concerns about Resorts World illegal activities.  Genting Berhad's Chaiman and CEO, KT Lim and other responsible board members and senior officers deliberately ignored governance and oversight responsibilities to ensure compliance with the law in favor of advancing its overriding objective -- make money at any cost.

13.    Defendant Sibella's leadership strategy was summed up in a statement he often repeated when he faced the fundamental choice of accepting money from criminals versus compliance and denying criminals access to the casino -- "We need [the money] to keep the lights on."  In fact, however, Defendant Sibella and his team wanted no "lights" to shine that might expose Resorts World's illegal casino's operations.  Defendant Sibella and his team were dedicated

to hiding his business strategy -- Resorts World invited, encouraged and welcomed criminals to patronize Resorts World with their illicit proceeds.

14. To this end, Genting Berhad and Resorts World's illicit strategy infected every level of their business including the board, senior executives, senior managers, and employees. Defendant Sibella and his Co-Defendant team, in this case, Defendants Taube, Forbes, Koep Tatonetti, Madurzak, Henderson, Samarani and other former MGM Grand professional staff, followed this overriding strategy of neglect -- the word was to "keep your head down," and hold onto your job.

15. Defendant Chesnoff, a well-regarded criminal defense attorney," was a longtime friend and colleague of Defendant Sibella. Defendant Chesnoff joined the enterprise to enrich himself and members of the enterprise by arranging and disguising investments in Resorts World businesses on behalf of known criminals and prohibited persons. These relationships had to be approved by Defendant Sibella, who did so, as long as Sibella received a "piece of the action," either in a kickback or an equity interest.

16. Plaintiffs Robert Cipriani, James Russell and Andrew Do are just three of the many victims of Resorts World's racketeering enterprise. But they are important nonetheless, Cipriani is a well-respected high-stakes gambler who regularly frequented the Resorts World casino in its opening months. Importantly, Plaintiff Cipriani is a long-time source who has assisted federal law enforcement and regulators in cracking down on illegal activities at casinos. Plaintiff Cipriani informed the federal and NGCB investigations of MGM Grand, and he assisted the criminal and regulatory investigations against Resorts World.

17. In the first few months after the June 2021 opening, Plaintiff Cipriani spent significant time at the new Resorts World casino, and he did not like what he observed -- known

7

criminals involved in illegal gambling, wire fraud schemes, and money launderers were regularly playing at the Resorts World casino.  He could not believe his eyes.  He reported the presence of the known criminals to Defendants Sibella, Taube, Forbes, Koep, Tatonetti and others on the security and surveillance staff.  Nothing was done.

18.     Indeed, even after reporting the presence of criminals, Cipriani observed Defendant Sibella, on one specific occasion, overrule the compliance staff to allow a known criminal and his associates to gamble using illegal proceeds in the millions.[9]  And, of course, Defendant Sibella repeated his guiding principle -- "We need [the money] to keep the lights on."  This mantra of lawlessness was attributed to Defendant Sibella and repeated by many responsible officials and staff in Resorts World.

19.     Plaintiff Cipriani's presence and reporting to Resorts World and law enforcement created a real problem for Defendants Genting Berhad, Resorts World, Sibella, Chesnoff, Taube, Forbes, Koep, Tatonetti and Madurzak-- Plaintiff Cipriani was a threat to their illegal racketeering enterprise.  Unlike the solutions represented in popular movies like *Casino (Martin Scorsese dir., Universal Pictures 1995)* and *Goodfellas (Martin Scorsese dir. Warner Bros. Pictures 1990)*, the Defendants and another individual, Robert Alexander, a long-time fraudster who is now deceased, joined together to harass, intimidate, threaten and retaliate against Plaintiff Cipriani to silence him as a cooperating witness. Working together, the Defendants arranged to "arrest" Plaintiff Cipriani on false charges, and, for good measure, manufactured a separate criminal felony charge of cheating at blackjack, with the clear intent and message to silence and prevent Plaintiff Cipriani's future cooperation.  Based on the fraudulent and false set of criminal charges, the Defendants were able to impose an immediate ban on Plaintiff Cipriani's presence at Resorts World, unlike its

---

[9] After being overruled in such a blatant manner, Resorts World's compliance staff did not report such conduct to the AML Committee or the Board of Directors -- a well-known best practice to address wrongdoing.

criminal patrons and constituency that it depended on.  As a result of this action, Plaintiff Cipriani suffered substantial damages since his long-time livelihood, high-stakes gambling, was taken away -- other casinos followed suit and Plaintiff Cipriani was effectively banned from every casino around the world.  Plaintiff Cipriani suffered significant harm -- as a professional gambler, he was deprived of his livelihood for over four years. For a professional gambler like Plaintiff Cipriani with a record of performance, his losses reached millions of dollars; his reputation suffered serious harm.

20.	Plaintiff Jim Russell suffered his own set of indignities and financial loss at the hands of Resorts World and its criminal enterprise.  Plaintiff Russell is a long-time successful businessman in the steel industry. Unfortunately, Plaintiff Russell and other business people in the community were victims of a massive investment fraud executed by Defendant Brandon Sattler, a member of the enterprise, who cheated Plaintiff Russell and his partners out of approximately $10 million.

21.	Defendant Sattler manufactured on paper a business, SattCom Video LLC ("SattCom"), and used it as a false vehicle to pitch investors for loans.  Besides his fraud scheme, Defendant Sattler regularly gambled at Resorts World as a convenient location to launder his illegal proceeds, despite two prior fraud convictions and a non-dischargeable order from the United States Bankruptcy Court.

22.	Defendant Sattler also linked his fraudulent business to Tacos El Cabron, a restaurant in the Resorts World complex, which was owned by Dave Stroj and Jaime Behar, both of whom were known criminals and had been indicted for running an illegal gambling operation in southern California.  Resorts World welcomed these criminals to operate Tacos El Cabron at

the Resorts World complex as another vehicle to promote money laundering, and failed to run even basic due diligence, the results of which would have revealed criminal links to its owners.

23.    As the walls of justice closed in on Defendant Sattler, he continued to gamble his illegal wire fraud proceeds, even after Plaintiff Cipriani warned numerous senior executives at Resorts World, including Defendants Sibella, Taube, Forbes and Tatonetti that Defendant Sattler was a known criminal and fraudster who was under FBI investigation.

24.    In January 2021, Plaintiff Russell and his partners secured a nondischargeable Court Order pursuant to his petition for involuntary bankruptcy in an attempt to recover funds from Defendant Sattler.  But even after the Court Order was issued, Resorts World welcomed Defendant Sattler with open arms -- Sattler continued to frequent the casino and associate with the known money laundering business at Tacos El Cabron.  Eventually, Plaintiff Russell lost any chance of recovery as a direct result of Resorts World's failure to prevent Defendant Sattler from gambling away or investing his illegal proceeds.

25.    Plaintiff Do, a highly-skilled and experienced surveillance officer at Resorts World, fell victim to Resorts World's racketeering culture of criminal activity.  Plaintiff Do was hired in 2022 as a surveillance officer.  Plaintiff Do reported to Defendants Koep and Madurzak, and James Santarufo.

26.    While working in surveillance, Plaintiff Do uncovered numerous instances of cheating and fraud, generating many positive statistics for the surveillance department. For example, Plaintiff Do caught a husband and wife using fake identifications to fraudulently obtain gambling lines of credit, about $70,000 in free play, and other benefits. Plaintiff Do played a key role in the identification and apprehension of a criminal who robbed Resorts World's casino cage. Plaintiff Do was known as a successful surveillance officer with a significant number of "catches,"

10

meaning instances where he identified criminals and fraudsters responsible for cheating and stealing from the casino. In recognition of his superior performance, in 2024, Defendants Koep and Madurzak promoted Plaintiff Do.

27. In his position, Plaintiff Do maintained a unique ability to monitor casino activities, actions or inaction of staff, presence of known criminals and complicit conduct by Resorts World executives, managers and staff. In time, Plaintiff Do observed, documented and reported internally to his supervisors, Defendants Koep and Madurzak, serious breaches and instances of misconduct and illegal activities, ranging from imoney laundering violations, illegal gambling by known criminals, money laundering and fraud committed by casino hosts in relation to known criminal gamblers, illegal poker and gambling events and activities at the Eight Cigar Lounge owned by Defendant Chesnoff, and wholesale theft, misuse and money laundering of millions of dollars in disguised and hidden accounts at Resorts World.

28. Like any criminal organization, Resorts World maintained a culture that punished and retaliated against whistleblowers who reported illegal activities. Plaintiff Do was the victim of this culture and was targeted for termination because of his continued reporting of illegal schemes. To silence and retaliate against Plaintiff Do, Defendants Koep and Madurzak, with the support and encouragement of Resorts World superiors and colleagues, manufactured pretextual reasons to terminate Plaintiff Do. In December 2024, Defendants Koep and Madurzak terminated Plaintiff Do with little explanation and slim justification. Plaintiff Do stood as an example for all Resorts World employees -- keep your mouth shut or you will be fired.

29. In recognition of the value of Plaintiff Do's information and Resorts World's motivation to retaliate against him, Plaintiff Do has provided information and evidence to the Internal Revenue Service's criminal investigation agents.

30.    Plaintiffs bring this action to vindicate the interests of three (of many) victims, Plaintiffs Cipriani, James Russell, and Andrew Do, each of whom suffered significant and serious damages as a direct result of Genting Berhad and Resorts World's racketeering enterprise.  In the end, Plaintiffs believe that by exposing the full scope of this long-time racketeering enterprise, and by pursuing their claims, justice will ultimately be done.

## I.    Jurisdiction and Venue

31.    The Court has jurisdiction over the subject matter of this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961 et seq. (specifically 18 U.S.C. § 1964(c)) and 28 U.S.C. § 1331.

32.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' Nevada State law claims.

33.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant Resorts World's principal place of business is in this district; because Defendants Sibella, Chesnoff, Taube, Forbes, Koep, Tatonetti, Madurzak, Henderson and Samarani reside in this district; and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## II.    Parties

34.    Plaintiff Robert J. Cipriani, aka "R.J." and "Robin Hood 702" ("Plaintiff Cipriani"), is a high-stakes gambler and resident of Los Angeles, California.  He is a well-known blackjack player.  Plaintiff Cipriani often shares his winnings with those less fortunate and regularly donates substantial monies to a number of charitable causes.

35.    Beginning in or around 2018, Plaintiff Cipriani became a cooperating witness who provided substantial assistance to the Federal Bureau of Investigation (FBI), the Internal Revenue

Service (IRS) and the Homeland Security Investigations (HSI) and other law enforcement and regulatory agencies.  With his assistance, the Department of Justice, state prosecutors and regulatory agencies have successfully prosecuted organizations and individuals involved in wire fraud, illegal gambling activities, drug trafficking, money laundering, and other significant criminal conduct and regulatory violations.  To this end, Plaintiff Cipriani provided truthful information that exposed criminal activities by casinos, illegal gamblers, money launderers and other individuals involved in the criminal underworld in Las Vegas and other jurisdictions in the United States and around the world.  Plaintiff Cipriani's assistance to authorities resulted in numerous successful criminal prosecutions. Several of the Defendants retaliated against Plaintiff Cipriani to punish and silence him by engaging in an elaborate scheme to intimidate, harass, threaten and ultimately arrest him based on fabricated charges to ensure Plaintiff Cipriani was banned from entry at casinos around the world.

36.    Plaintiff James Russell (Plaintiff Russell") is a successful businessman in Las Vegas, Nevada.  He is the owner of a steel distribution company based in the Las Vegas, Nevada area.  As a successful businessman, Plaintiff Russell, from time to time, has loaned money to entrepreneurs.  Starting in 2016, Plaintiff Russell and his partners loaned approximately $10 million to Defendant Brandon Sattler, who portrayed himself as the owner and operator of SattCom, which installed video systems in casinos and other businesses.  Defendant Sattler's business was fraudulent and he never repaid Plaintiff Russell's loans.

37.    In 2018, Plaintiff Russell, through counsel, initiated involuntary bankruptcy proceedings against Defendant Sattler.  On January 5, 2021, Plaintiff Russell secured a Judgment for Nondischargeability of Debt from the Nevada Bankruptcy Court.  Despite his past criminal record and this bankruptcy Order, Resorts World permitted Sattler to continue to gamble illegal

13

proceeds at Resorts World's casino. Plaintiff Russell and his partners were unable to recover any of the $10 million from Defendant Sattler, a significant portion of which Defendant Sattler used to gamble at Resorts World's casino.

38.     Plaintiff Andrew Do ("Plaintiff Do") had nearly twenty years of experience as a casino host and surveillance officer in various casinos in Las Vegas. Starting in 2022, Plaintiff Do was employed at Resorts World as a surveillance officer where he was successful in preventing and apprehending fraudsters, cheats and other criminals. When Plaintiff Do turned his attention to illegal and suspicious activities in Resorts World, however, he was unceremoniously terminated in a blatant action motivated to silence Plaintiff Do as a whistleblower and to retaliate against him for raising concerns of significant illegal activities.

39.     Defendant Genting Berhad, aka Genting Group ("Defendant Genting") is a global conglomerate based in Malaysia that oversees a diversified portfolio in five industries -- leisure & hospitality, plantations, energy, property and life sciences. Defendant Genting's leisure and hospitality business operates under the Resorts World brand, and consists of integrated resorts and casinos across Malaysia, Singapore, the United Kingdom, the Bahamas and the United States. Defendant Genting owns Resorts World Las Vegas in Nevada, which it views as its crown jewel in the gaming and resort industry. Defendant Genting opened the Resorts World casino and resort in 2021.

40.     Defendant KT Lim, aka KT Lim ("Defendant KT Lim") is the Executive Chairman and long-time CEO of Defendant Genting. In the early 2000s, he succeeded his father, Tan Sri Lim Goh Tong as the Executive Chairman of the Board and CEO. Recently, on March 1, 2025, Defendant KT Lim resigned from his position as CEO and retained his position as Executive Chairman.

14

41. As the CEO and Executive Chairman of Defendant Genting, Defendant Lim and other board members failed to exercise proper oversight of Defendant Resorts World Las Vegas LLC to ensure that the Resorts World casino operated in compliance with legal and regulatory requirements. In particular, after receiving a detailed letter on December 6, 2021 from Plaintiff Cipriani outlining serious money laundering and criminal activities at the Resorts World casino in Las Vegas, Defendant Lim took no steps to follow up, respond or inquire of appropriate officials at Defendant Genting and at Defendant Resorts World.

42. Defendant Resorts World Las Vegas LLC dba Resorts World Las Vegas and Resorts World Las Vegas Hotels, LLC (collectively referred to as "Defendant Resorts World," or for convenience, "Resorts World" or "RW"), is an indirect, wholly-owned subsidiary of Defendant Genting Berhad. Defendant Resorts World holds a legal licensee for nonrestricted gambling in Nevada. Resorts World Las Vegas, LLC and Resorts World Las Vegas Hotels, LLC are limited liability companies duly formed and organized under the laws of Delaware, with members who are citizens of the State of Nevada.

43. Genting purchased an unfinished project in 2013 with the plan to redevelop the area as Resorts World Las Vegas. After various construction and litigation delays, Resorts World opened in June 2021 at 3000 Las Vegas Boulevard, as the first new resort on the Las Vegas strip since 2010, at a total cost of upwards $4.3 billion. At the time of its opening, Resorts World was the most expensive resort property ever developed in Las Vegas, including a casino, and a 59-story tower housing over 3,500 rooms in three Hilton hotels. The Resorts World complex includes

restaurants, entertainment venues, a retail center, a pool complex and other entertainment features.[10]

44.     Beginning at an unknown time but at least on or about June 2021 and thereafter, Defendant Resorts World and the other Defendants operated a racketeering enterprise with the singular purpose of increasing its revenues by encouraging and welcoming gamblers and patrons who spend money from illegal sources of funds in the Resorts World complex and casino in Las Vegas, Nevada.  To this end, Defendant Resorts World: (A) encouraged and permitted illegal gamblers, fraudsters, drug traffickers and other criminal elements to gamble at Defendant Resorts World casino using money that was known or suspected proceeds of criminal activity; and (B) encouraged and permitted illegal gamblers, fraudsters, drug traffickers and other criminal elements to invest in, participate in and operate businesses located at Defendant Resorts World's complex and casino, which are commonly referred to as vendors. All of these activities listed in paragraphs (A) and (B) were conducted by Defendant Resorts World and the Defendants in violation of federal anti-money laundering and racketeering laws and with disregard for Resorts World's then-existing anti-money laundering compliance program and procedures.

45.     As a result of its pervasive and notorious illegal activities, and Resorts World's reputation as a home for illegal criminals, which was well known by the Defendants, sometime in 2023, Defendants Genting, Resorts World, and others became the subject of separate investigations conducted by the U.S. Department of Justice ("DOJ" or "Justice Department") and the Nevada Gaming Control Board ("NGCB").  Plaintiff Cipriani was instrumental in providing critical

---

[10] Stutz, H., *Resorts World Unveiling 'Seems Like an Old-School Las Vegas Resort Opening'*, The Nevada Independent, June 21, 2021, available here; Resorts World Las Vegas, Property Fact Sheet, available at www.rwlasvegas.com here.

intelligence and information to law enforcement and regulatory agencies that was used to prosecute the Defendants.

46.    In March 2025, Defendant Resorts World agreed to pay a $10.5 million fine in a settlement with Nevada's Gaming Commission to resolve allegations of anti-money laundering compliance failures for permitting illegal bookmakers and fraudsters to gamble without adequate due diligence and source-of-funds verification.  Further, the Nevada Gaming Control Board ("NGCB") alleged that Defendant Resorts World's AML Compliance Committee redacted or altered compliance meeting minutes, and were aware of numerous and repeated red flags in its AML oversight.[11]

47.    Defendant Scott Sibella was a career-executive in the casino and hospitality industry who  worked at high-end hotels, resorts and casinos. Beginning in June 2021, Defendant Sibella served as the President and Chief Operating Officer of Defendant Resorts World.  He continued in that position until he was terminated in September 2023.

48.    Prior to his position at Resorts World, Defendant Sibella served as President and Chief Executive Officer of the MGM Grand Hotel and Casino; served as the Vice President of casino marketing for the Tropicana Casino Resort in both Atlantic City and Las Vegas; and served in various executive positions at the Trump Taj Mahal (now Hard Rock Hotel & Casino) in Atlantic City and the Golden Nugget Hotel and Casino in Las Vegas.

49.    Aside from overseeing and facilitating Resorts World's pervasive and systemic illegal activities at the casino and hotel complex, Defendant Sibella took valuable kickbacks from

---

[11] *Stipulation and Settlement, Nevada Gaming Control World v. Genting Berhad, Resorts World Las Vegas, LLC, et al.*, Nevada Gaming Commission, March 27, 2025, available here; Associated Press, *Resorts World Casino Fined $10.5 Million in Money-Laundering Case*, March 27, 2025, available at espn.com here; Stutz, H., *Gaming Commission Accepts $10.5 Million Settlement to End Case Against Resorts World*, The Nevada Independent, March 27, 2025, available here:

many illegal gamblers, fraudsters, drug traffickers and other criminal elements to gamble at Resorts World casino and invest in resort businesses using money that was suspected proceeds of criminal activity in violation of federal anti-money laundering, fraud and racketeering laws.

50.     Defendant David Chesnoff ("Defendant Chesnoff") is a high-profile criminal defense lawyer in Las Vegas, Nevada, who has represented numerous criminal defendants involved in illegal gambling, fraud, drug trafficking, money laundering and other criminal offenses. Defendant Chesnoff maintained a close relationship with Defendants Resorts World and Sibella, and other illegal gamblers, fraudsters and money launderers.

51.     Building on his relationships with clients and Resorts World Defendants, Chesnoff invested and participated in numerous business opportunities and entities with criminal clients, and Defendant Sibella, some of which included businesses based at the Resorts World complex. Specifically, Defendant Chesnoff was able to establish ownership of the Eight Cigar Lounge at Resorts World, a location used for illegal poker games, as well as two other businesses, Bravo Tickets and Bravo Concierge, which were highly lucrative. Defendant Chesnoff facilitated business investments by individuals with known criminal records or affiliations who would have been otherwise barred from owning business interests at a Las Vegas casino. Defendant Sibella himself authorized these investments by circumventing Resorts World AML and KYC compliance controls. In return, Defendant Sibella was compensated by kickbacks in the form of equity or payments. Defendants Chesnoff and Sibella were able to provide criminals access to lucrative businesses as a means to facilitate money laundering and circumvention of AML and KYC controls. To ensure political protection for Resorts World and Chesnoff's illegal activities, Chesnoff used the Eight Cigar Lounge as a fundraising location for Las Vegas District Attorney Wolfson.

52.     Defendant Chesnoff's critical role in the racketeering enterprise was confirmed through his connection with Robertt Alexander, a fraudster and long-time criminal who was represented by Chesnoff.  Alexander was eventually indicted and charged with fraud in the Southern District of New York for Kizzang, a fraudulent online scam.  Defendant Chesnoff assisted Alexander by vouching for his fraudulent venture to casino executives and investors, and was a shareholder in Kizzang.  Defendant Chesnoff used his relationship with Alexander to intimidate, harass and eventually retaliate against Plaintiff Cipriani by securing his illegal and false arrest, and ensure an aggressive prosecution of Cipriani by District Attorney Wolfson, in order to silence Cipriani and punish Cipriani for his whistleblowing and law enforcement activities.

53.     Defendant Doni Taube ("Defendant Taube") is a long-time casino executive who served from at least June 2021 until September 2024 as the Senior Vice President, International Marketing and Business Development at Resorts World Las Vegas.  Defendant Taube had a close working relationship with Defendant Sibella, and maintained day-to-day contact with Defendant Sibella and played a significant role in the casino operations.  Defendant Taube was a key player in protecting Defendant Sibella and ensuring that Resorts World maintained its revenue stream from criminals who gambled at, or invested in businesses, at the casino.

54.     Defendant Matthew Forbes ("Defendant Forbes") is an experienced security executive in the casino industry.  Forbes served as the Vice President, Security For Resorts World Las Vegas from September 2021 until recently in 2025.  Prior to Resorts World, Forbes was Director of Security at the Wind Creek Bethlehem Casino, the Sands Casino Resort in Bethlehem, and the Venetian Macao Resort Hotel.  As the Director of Security, Forbes was responsible for casino surveillance, guest and employee safety, compliance with gaming regulations, and coordination with law enforcement and gaming regulators.

55.    Defendant Zachary Koep is the Executive Director of Surveillance at Resorts World. He joined Resorts World's surveillance department as the Director in 2020 and was promoted to Executive Director. As recounted herein, Defendant Koep was aware of and knowingly participated in facilitating money laundering and other illegal activities. With the assistance and cooperation of Defendant Dan Madurzak and others at Resort Worlds, Defendant Koep terminated Plaintiff Do in retaliation for Plaintiff's Do's reporting of illegal activities at Resorts World.

56.    Defendant Joseph Tatonetti ("Defendant Tatonetti") was the Manager of Surveillance Operations at Resorts World casino from June 2021 until late 2021, and was responsible for monitoring the casino floor, guest behavior and compliance alerts. In or about sometime after November 2021, Defendant Tatonetti resigned from Resorts World rather than continuing to participate with Defendants Resorts World, Sibella, Chesnoff, Taube, and Forbes, to retaliate against, punish and silence Plaintiff Cipriani to prevent his cooperation with federal and state law enforcement and regulators.

57.    Defendant Dan Madurzak is the Assistant Director of Surveillance at Resorts World. He joined Resorts World's surveillance department as a manager in 2020 and was promoted to Assistant Director. As recounted herein, Defendant Madurzak was aware of and knowingly participated in facilitating money laundering and other illegal activities. With the assistance and cooperation of Defendant Zachary Koep and others at Resort World, Defendant Madurzak terminated Plaintiff Do in retaliation for Plaintiff's Do's reporting of illegal activities at Resorts World.

58.    Defendant Tonya Henderson ("Defendant Henderson") was Vice President of Compliance at Resorts World and later was elevated to Chief Compliance Officer. She served as

20

the compliance leader from September 2020 until recently in May 2025.  She was a member of Resorts World's Compliance Committee that was responsible for reviewing high-risk patrons, source of funds verification and AML procedures. Prior to that, Henderson served as Legal Counsel at MGM Resorts International (January 2019 to September 2020), and as Vice President of Compliance; BSA/AML Officer at CG Technology (2016 - 2019).

59.    Defendant Elie Samarani ("Defendant Samarani") served as the Director of Cage, Credit, Collections & Loyalty Club at Resorts World.  Currently, Defendant Samarani is the Director of Credit for Cherokee Nation Entertainment.  In the position of Director of Cage and Credit, Defendant Samarani was responsible for managing the casino cage, including cashiers, tellers, chips, checks and foreign currency.  Defendant Samarani played an important role in the implementation of internal controls, compliance with gaming regulations and anti-money laundering rules and the Bank Secrecy Act.

60.    Defendant Brandon Sattler is a well-known high-stakes gambler, fraudster, and businessman who has engaged in multiple fraud schemes.  Beginning in 2016  and continuing for years, Defendant Sattler engaged in a large fraud scheme, linked to his business SattCom Video LLC ("SattCom"), during which he defrauded Plaintiff Russell and his two partners to illegally secure over $10 million in loans.

61.    Defendant Sattler spent significant proceeds on gambling at casinos, including Resorts World, and was allowed to continue gambling despite specific warnings and notices from Plaintiff Cipriani and even after Plaintiff Russell had secured a nondischargeable Court Order in involuntary bankruptcy in January 2021.  Notwithstanding these warnings, Defendants Resorts World, Sibella, Taube, Forbes, Tatonetti and others permitted Defendant Sattler to gamble at Resorts World casino using illegal proceeds from criminal fraud and illegal activities.

### III.   Factual Statement

#### A.   *Plaintiff Cipriani's Substantial Assistance to Federal Law Enforcement*

62.   Plaintiff Cipriani has extensive history of informing federal law enforcement and the Nevada Gaming Commission and the Nevada Gaming Control Board ("NGCB") about illegal activity and regulatory violations in casinos.  Beginning in or around 2018 and continuing through 2025, Plaintiff Cipriani assisted the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), the Department of Homeland Security Investigations ("HSI"), resulting in the prosecution of several entities and individuals for illegal gambling, drug trafficking, money laundering, fraud and other illegal activities.  Additionally, Plaintiff Cipriani provided information to the Nevada Gambling Commission and Board that was used to initiate, investigate and bring enforcement actions against entities and individuals, including Defendants Genting, Resorts World, Scott Sibella, and other casinos.

63.   In one of his early cases, Plaintiff Cipriani provided valuable information to law enforcement that contributed to the successful prosecution of a transnational racketeering enterprise aka "ODOG Enterprise," headed by Owen Hanson, which was involved in international drug trafficking, illegal bookmaking for sporting events and money laundering.  Plaintiff Cipriani worked as an informant to provide information about the ODOG Enterprises use of casinos and gambling to launder money.  Hanson and other members of the ODOG Enterprise threatened

22

Plaintiff Cipriani after learning of his cooperation in the federal investigation.[12]  Hanson plead guilty and was sentenced to twenty-two years imprisonment.[13]

64.    By the late 2010s, Plaintiff Cipriani's role as an informant was well known in the gaming industry.[14] Given Plaintiff Cipriani's reputation as a high-stakes gambler, Cipriani learned of illegal activities from a variety of sources, including personal observation, and passed on this information to federal law enforcement and Nevada regulators.  In several significant cases, Plaintiff Cipriani was a key source of information, resulting in successful criminal prosecutions and regulatory enforcement actions of major criminals and illegal gamblers, including Matthew Bowyer, Wayne Nix, Damien LeForbes, Defendant Sattler, Edward Ting, Robert Alexander, Joseph Angelo Bravo, and others.  Adding to this significant information, Plaintiff Cipriani supplied extensive information concerning Defendants Resorts World, Sibella, and other criminals involved in illegal facilitation of money laundering as approved vendors  As detailed herein, Plaintiff Cipriani's information was instrumental in the Nevada regulatory investigation and enforcement actions against MGM Grand and Defendant Resorts World.

### B.    Plaintiff Cipriani's Significant Role in Uncovering Money Laundering Activities Authorized by Defendant Sibella at the MGM Grand Casinos

65.    In and around 2018 and 2019, Plaintiff Cipriani played an instrumental role in the investigation and prosecution of the MGM Grand, Defendant Sibella, and Wayne Nix, an illegal

---

[12] A total of twenty-two defendants from the ODOG Enterprise were convicted in the United States.  The ODOG Enterprise trafficked hundreds of kilograms of cocaine, heroin, methamphetamine, MDMA (also known as "ecstasy"), and anabolic steroids and Human Growth Hormone ("HGH"). ODOG Enterprise's drug operation routinely distributed controlled substances at wholesale and retail levels, including selling performance enhancing drugs to numerous professional athletes. The ODOG Enterprise also operated a vast illegal gambling operation focused on high-stakes wagers placed on sporting events. The case arose out of a joint investigation by FBI, IRS and the New South Wales (Australia) Police Force in conjunction with the New South Wales Crime Commission.

[13] *See United States v. Hanson et al.*, 3:15-cr-02310-WQH (S.D. CA 2015).

[14] *See* Gentry. D., *DA Seeks to Jail Professional Gambler Robin Hood 702 Over Tweets*, Nevada Current, January 18, 2022, available here;

bookmaker who gambled at MGM Grand casinos.  Plaintiff Cipriani provided information to law enforcement, Nevada regulators, and MGM leadership implicating MGM Grand, Defendant Sibella, and other senior executives in engaged in a systemic and pervasive strategy to encourage and permit illegal money laundering and fraud activities.

66.   As a result of the allegations of misconduct at MGM Grand, a federal criminal investigation of MGM Grand and individuals was initiated.  In 2019, Defendant Sibella was forced to resign from his position as President at MGM Grand.

67.   While the federal criminal and Nevada regulatory investigations were ongoing, Plaintiff Cipriani continued to expose widespread illegal activities at MGM Grand -- he sent a detailed letter to James Murren, the President and Chief Executive Officer of MGM Grand, outlining the nature and scope of illegal activities at MGM Grand hotels and casinos.  Murren never responded to Plaintiff Cipriani's letter.  Eventually, in 2020, Murren was forced to resign after failing to take appropriate steps to end MGM Grand's illegal activities.

68.   In January 2024, MGM Grand entered into a Non-Prosecution Agreement with the U.S. Department of Justice in which MGM Grand paid approximately $6.5 million and forfeited $500,000 and agreed to enhance its compliance program.[15]  MGM Grand acknowledged, in a

---

[15] *See*, DOJ Press Release, *Former President of MGM Grand Pleads Guilty to Violating the Bank Secrecy Act for Allowing Man Involved in Criminal Conduct to Gamble*, January 25, 2024, available here. MGM Grand also admitted that its anti-money laundering compliance program failed to instruct the compliance team to use all available information, as required by the BSA, when performing KYC reviews to determine whether to file SARs, or to identify and verify customer information, including source of funds, for transactions found to be suspicious. Compliance personnel did not regularly reach out to the marketing hosts, even where the compliance team could not substantiate or identify the customer's source of funds, despite the fact that other departments would routinely reach out to hosts in connection with, for example, the collection of funds owed to the casino. Because of the deficiencies in the AML compliance program, MGM Grand failed to detect and report the extent of Nix's suspicious activities in SARs and failed to prevent Nix's money laundering.

lengthy statement of facts, that it had violated various Bank Secrecy Act[16] and Money Laundering statutes.[17]

69.     On January 25, 2024, Defendant Sibella pleaded guilty to one count of Failure to File a Suspicious Activity Report under the Bank Secrecy Act in violation of 31 U.S.C. § 5318, 5322(a), 31 C.F.R. § 1021.320 and 18 U.S.C. § 2(b).  Defendant Sibella was the President of MGM Grand from August 2017 to February 2019, during which time, he allowed a well-known patron, Wayne Nix, who operated an illegal sports-booking business, to gamble at MGM properties using proceeds from that illegal business.[18]    Defendant Sibella also authorized giving Nix "complementary benefits" (meals, room, golf trips, etc.) to encourage his patronage.

70.     Despite being trained and having knowledge of his duties, Defendant Sibella failed to report to MGM compliance personnel that Nix was an illegal sports bookmaker. Because of Sibella's failure to report the suspicious activity by Nix, MGM Grand failed to file at least one suspicious activity report regarding Nix's source of funds in relation to Nix's cash payments to MGM Grand.

71.     Defendant Sibella admitted to law enforcement in 2022 that he believed Nix was involved in illegal sports bookmaking, but "didn't want to know because of my position,… If we

---

[16] Under the BSA, casinos like MGM Grand are required to implement and maintain AML compliance programs designed to prevent criminals from using casinos to launder large sums of cash that illegal activity can generate. For example, the BSA requires casinos to file reports documenting suspicious activity, such as instances where a client's source of funds cannot be determined or are suspected to be related to crime.

[17] 18 U.S.C. § 1956(a)(1): Laundering of Monetary Instruments; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 31 U.S.C. §§ 5318(h), 5322: Failure to Maintain an Effective Anti-Money Laundering Program; 31 U.S.C. §§ 5318(g), 5322: Failure to File Suspicious Activity Reports; and conspiracy to commit those any of those offenses under 18 U.S.C. § 371 or 18 U.S.C. § 1956(h).

[18] Wayne Nix pleaded guilty in April 2022 to one count of conspiracy to operate an illegal gambling business and one count of subscribing to a false tax return. Wayne Nix cooperated with federal law enforcement in the investigation and prosecution of other criminals. Defendant Nix has not yet been sentenced. See DOJ Press Release, *Federal Authorities Announce Charges Related to Multi-Million Dollar Sport Gambling Business Involving Current and Former Pro Athletes*, March 31, 2022, available here.

25

know, we can't allow them to gamble…. I didn't ask, I didn't want to know I guess because he wasn't doing anything to cheat the casino."[19]

72.    As part of their respective resolutions of their criminal cases, MGM Grand and Defendant Sibella admitted that two casino hosts knew about Nix's illegal gambling business, allowed Nix to continue to gamble at MGM Grand and affiliate properties, permitted Nix to use illicit proceeds at the casino properties, and provided Nix complementary benefits to encourage him to spend his illicit proceeds at the casino. MGM Grand also admitted that Nix at times used golf trips with MGM Grand's high-net-worth customers to solicit new customers for his illegal gambling business.  By 2020, MGM Grand had accepted $4,079,830 in cash illicit proceeds from Nix's illegal gambling business.

73.    Defendant Sibella was sentenced on May 8, 2024, to one year probation, a fine of $9500 and 200 hours of community service.  Following his federal plea and his firing from Resort World casino, Sibella agreed to a regulatory settlement with the Nevada Gaming Control Board under which Sibella agreed to pay $10,000, loss of his gaming license and a five-year ban from the Nevada gaming industry.

74.    In April 2025, the Nevada Gaming Commission reached a settlement with MGM Grand under which MGM Grand paid a civil fine of approximately $8 million for violations of Nevada regulations stemming from illegal conduct under the Bank Secrecy Act and Anti-Money Laundering laws.

---

[19] *See*, DOJ Press Release, *Former President of MGM Grand Pleads Guilty to Violating the Bank Secrecy Act for Allowing Man Involved in Criminal Conduct to Gamble*, January 25, 2024, available here.

**C.     *Defendant Sibella is Appointed President of Defendant Resort's World Casino***

75.     In April 2019, Defendant Chesnoff arranged a meeting in Los Angeles, California between Defendant Sibella and Plaintiff Cipriani and Cipriani's counsel.  Defendant Sibella was seeking a position with Defendant Resorts World to oversee the operation of its new casino and hotel complex.  Defendants Chesnoff and Sibella requested that Plaintiff Cipriani remove various social meeting postings outlining Defendant Sibella's illegal conduct at MGM Grand casinos and hotel.  According to Defendants Chesnoff and Sibella, Plaintiff Cipriani's postings caused harm to Defendant Sibella's attempt to secure a position at the new Resorts World casino and hotel complex.  Plaintiff Cipriani agreed to their request and removed the social meeting postings. In exchange, Defendant Sibella confirmed that Plaintiff Cipriani would be welcome to gamble at the Resorts World casino, if Defendant Sibella was successful in joining Resorts World.

76.     Subsequently, Defendant Resorts World hired Defendant Sibella as President and Chief Operating Officer of the Resorts World casino and hotel complex which was scheduled to open in June 2021.  Defendant Sibella hired a significant number of former MGM Grand employees to work at Resorts World, many of whom were involved in, or failed to report Defendant Sibella's illegal activities at MGM Grand.

77.     In his leadership role at Resorts World, Defendant Sibella regularly encouraged, permitted and welcomed illegal gamblers, fraudsters, drug traffickers and other criminals to gamble at, and to invest in, participate in and operate businesses at Defendant Resorts World.  It was well known that Defendant Sibella extracted kickbacks, either in cash or equity interests, for allowing criminals to gamble at Resorts World or authorizing their ownership and operation of businesses at Resorts World, knowing that these businesses were facilitating illegal money laundering activities.  In other words, after being appointed to lead the new Resorts World casino

27

and hotel, Defendant Sibella resumed his illegal activities combining two separate and lucrative strategies -- allowing known criminals to launder proceeds at Resorts World, and permitting criminals to participate in and operate as vendors at the Resorts World complex in which they could launder illegal proceeds.  Defendant Sibella directly benefited from these illegal activities, increasing the revenue earned at the casino and his own potential compensation, as well as securing hidden equity interests or payments from criminals who were allowed to operate businesses in the Resorts World casino and hotel complex.

        **D.**        ***After its Opening in June 2021, Plaintiff Cipriani Raises Concerns About Criminals Gambling and Money Laundering at Resorts World***

78.    After the Resorts World casino first opened in June 2021, Plaintiff Cipriani regularly gambled at the casino and observed on numerous occasions known criminals, fraudsters, money launderers and convicted felons were gambling at Resorts World, including Defendant Sattler, Edward Ting, Robert Alexander, Joseph Angelo Bravo, Damien LeForbes and others. Plaintiff Cipriani notified Genting leadership, including Defendant KT Lim, and Resorts World officials, including Defendants Sibella, Taube, Forbes, Tatonetti, Henderson, Samarani and others at Resorts World about the presence of various criminals gambling or maintaining vendor relationships at locations in the Resorts World casino and hotel complex.  Notwithstanding these reports, Defendant Sibella and Resorts World officials and employees regularly ignored or overruled these objections, and then acted individually and in concert, to continue permitting known criminals, fraudsters and drug traffickers to gamble at Resorts World, and maintain their prohibited vendor relationships.

79.    From the opening of Resorts World, on June 21, 2021, and continuing until his illegal and retaliatory false arrest on November 19, 2021, Plaintiff Cipriani regularly communicated to Resorts World, Sibella, Taube, Forbes, Tatonetti, Henderson, Samarani and

others about the presence of criminals who were gambling at Resorts World.  A brief review of some of the criminals who Plaintiff Cipriani observed at Resorts World is set forth below along with relevant text messages to Defendant Tatonetti.

### (i).    Defendant Brenden Sattler

80.     Between the period between June 2021 until sometime in or around early 2022, Defendant Sattler frequented Resorts World where he was a known fraudster and criminal who regularly gambled at Resorts World, using illegal proceeds from criminal activities to gamble, invest in and participate in business activities using illegal proceeds.  During the period June 24 to October 28, 2021, Defendant Sattler gambled at Resorts World casino on at least seven separate occasions, wagering $394,025 and winning $443,595.[20]

81.     In or about sometime in early 2022, Defendant Sattler was finally banned from Resorts World, after Plaintiff Cipriani made numerous reports to law enforcement and regulators concerning Defendant Sattler's illegal gambling and money laundering activities at Resorts World. Defendants Resorts World, Sibella, Taube, Forbes, Koep, Tatonetti, Madurzak, Henderson, Samarani,  and others at Resorts World permitted Defendant Sattler to gamble and participate in business activity at Resorts World, despite his criminal record, and nondischargeable Bankruptcy Court Order against Sattler dated January 5, 2021.  Defendant Sattler was a known colleague and co-conspirator of the Defendants, who was also closely linked to the restaurant Tacos El Cabron, which was owned by known criminals, Jaime Behar and David Stroj.[21]

---

[20] Smith, J., *Embattled Gambler Lets Fly with Accusations Against Resorts World President [Defendant Sibella]*, The Nevada Independent, April 19, 2022 available here;

[21] DOJ Press Release, *Twenty Five People Charged as Members of $10 Million Illegal Gambling and Money Laundering Operation*, December 9, 2015, available here (Jaime Behar and Dave Stroj are included in Indictment).

82.    Beginning in 2016 and continuing for years, Defendant Sattler engaged in a large fraud scheme, linked to his business SattCom Video LLC ("SattCom"), during which he defrauded Plaintiff Russell and other well-respected business leaders to illegally secure over $10 million in loans. Defendant Sattler orchestrated a campaign of fabrications and false information involving fraudulent emails, bids and contracts, bank records, and letters of intent, to convince lenders that he needed funding to purchase audio visual equipment for projects with hotels and casinos.  These falsified documents and material misrepresentations were further corroborated with Sattler's numerous oral misrepresentations regarding SattCom's contracts and projects, the need for the loans, the use of the loan proceeds, payments received by SattCom for work performed, and outstanding receivables that would be used to repay the loans.

83.    During 2016, 2017, and 2018, Plaintiff James Russell and his partners made several loans to Defendant Sattler's company, Sattcom , reflecting three separate loans in the amounts of $4.6 million, $1.37 million, and $4.48 million, respectively. After Defendant Sattler failed to make any payments on the loans, on October 29, 2018, Plaintiff Russell and others filed a chapter 7 petition against Defendant Sattler. *In re Brandon Sattler, Debtor*, Bk. No. 2:18-bk-16466-ABL, June 1, 2020.  On March 5, 2019,  the Court entered an Order for Relief. See *In re Brandon Sattler, Debtor*, BAP No. NV-19-1174-LBG; *Sattler v. James Russell, et al.*, Bk. No. 2:18-bk-16466-ABL, June 1, 2020 (U.S. Bankruptcy Appellate Panel, 9th Cir.)

84.    Following the entry of the Order for Relief, Plaintiff Russell undertook continuous and sustained efforts to identify, preserve, and recover Defendant Sattler's assets, including both liquid financial accounts and non-liquid assets such as real property and trust interests. Plaintiff Russell, through counsel, analyzed Defendant Sattler's security agreements, financial accounts, and potential encumbrances, coordinated with the Chapter 7 Trustee regarding asset recovery

strategy, and actively participated in creditor proceedings, including the Section 341 meeting, to investigate Defendant Sattler's financial condition and the location of recoverable assets. These efforts included ongoing evaluation of Defendant Sattler's bank accounts, security interests, and potential causes of action available to the estate and creditors, reflecting an active and coordinated strategy to maximize recovery following the Order for Relief. These extensive efforts were necessitated by Defendant Sattler's ability to dissipate, conceal, and transfer assets through financial institutions and channels that failed to implement and enforce required anti-money laundering ("AML"), know-your-customer ("KYC"), and other legal and compliance controls.

85.     As the bankruptcy case progressed into 2020 and 2021, Plaintiff Russell expanded his efforts beyond initial bankruptcy proceedings and pursued direct enforcement and collection remedies against Defendant Sattler's assets. These efforts included obtaining and enforcing judgments, preparing and executing writs of execution, pursuing garnishment actions against multiple financial institutions, and calculating and enforcing amounts due under the loan agreements. Plaintiff Russell also investigated Defendant Sattler's use of trusts and other mechanisms to conceal or shield assets, including interests in real property, and developed strategies to reach those assets through litigation and enforcement proceedings. In addition, Plaintiff Russell was required to defend and litigate actions brought by or on behalf of Defendant Sattler relating to real property interests, including quiet title and related claims, which further extended the litigation and required continued judicial involvement. Each of these enforcement and litigation activities was proximately caused by Defendants' racketeering conduct, including their systemic failures to adhere to AML, KYC, and related compliance obligations, which enabled Defendant Sattler to move, obscure, and protect assets from lawful creditor recovery.

31

86.     Plaintiff Russell's efforts to recover assets and enforce his rights continued well beyond 2021 and extended through 2022, 2023, 2024, and into the present. These ongoing activities included continued investigation of Defendant Sattler's assets, pursuit of collection remedies, engagement in post-judgment enforcement strategies, and participation in related litigation necessary to address Defendant Sattler's continued efforts to evade repayment and conceal assets. Plaintiff Russell remained actively involved in coordinating legal strategy, evaluating recovery options, and pursuing available remedies to reach Defendant Sattler's property, including real estate and trust-based interests. This extended course of conduct demonstrates that Plaintiff Russell's recovery efforts were continuous and ongoing for years after the initial bankruptcy filing and Order for Relief, and that the injuries arising from Defendant Sattler's misconduct continued to accrue. These ongoing injuries and enforcement burdens were the direct and proximate result of Defendants' racketeering activity, including their knowing failure to implement and enforce AML, KYC, and other compliance safeguards, which facilitated Defendant Sattler's laundering of proceeds, concealment of assets, and sustained ability to evade enforcement and frustrate Plaintiff Russell's recovery efforts throughout the bankruptcy proceedings and beyond.

87.     Plaintiff Russell's injuries were directly and proximately caused by Defendants' racketeering conduct. Although the initial fraudulent scheme involving Defendant Sattler began prior to the opening of Resorts World, Defendants' subsequent conduct materially prolonged, facilitated, and concealed that scheme by knowingly permitting Sattler and other illegal gambling actors to utilize Resorts World as a venue to gamble, transfer, and launder illicit proceeds.

88.     By providing Sattler and related actors with access to casino accounts, credit, chips, and other financial mechanisms without appropriate oversight, Defendants enabled the rapid

32

dissipation and laundering of funds traceable to Plaintiff Russell, thereby rendering those funds substantially more difficult—if not impossible—to trace, recover, or claw back. Upon information and belief, proceeds traceable to Plaintiff Russell were funneled through Resorts World accounts, gaming activity, or related financial mechanisms as part of Defendants' broader unlawful scheme.

89.    Defendants knew, or were deliberately indifferent to the fact, that illegal gamblers such as Sattler were operating ongoing fraud schemes and using casino facilities to recycle and conceal proceeds. It was entirely foreseeable that victims of those schemes, including Plaintiff Russell, would suffer additional and distinct harm as a result of Defendants' conduct, including the loss of any realistic opportunity to recover stolen funds.

90.    Defendants' conduct was a substantial factor in causing Plaintiff Russell's injuries, including his inability to recover stolen funds, as Defendants' actions provided the infrastructure necessary to convert traceable proceeds into untraceable assets and to shield those proceeds from detection by law enforcement and victims. Plaintiff Russell's injuries are not derivative of injuries to third parties, but instead constitute direct and concrete harm resulting from Defendants' conduct, including the loss of recoverable assets and the impairment of his legal remedies.

91.    Defendants' racketeering activity further caused continuing injury to Plaintiff Russell, as the laundering and concealment of funds persisted over time, further diminishing the likelihood of recovery and compounding his economic losses.

92.    In December 2024, Defendant Sattler was sentenced to 51 months in federal prison after pleading guilty to one count of wire fraud for fraudulently obtaining more than $10 million from Plaintiff Russell and his partners.[22]  Defendant Sattler has at least two prior fraud convictions,

---

[22] *United States v. Sattler*, No. 2:23-cr-00075-GMN-EJY, Indictment dated April 5, 2023 and sentenced on December 3, 2024.

33

one in 2004 for aiding and abetting bank fraud in Texas, and a second in 2006 for grand theft and forgery.[23]

93.    Plaintiff Cipriani alerted Defendants Sibella and Tatonetti on numerous occasions of Defendant Sattler's unlawful gambling at Resorts World casino as corroborated in these text messages.

**July 9, 2021**

Tatonetti:    I am but I am deathly afraid of anything going south here. Can't afford to lose this job, this is my last shot in this town, I've burned a lot of bridges with the MGM BS.

Cipriani:    No worries.  Just want to give you intel you should know.

Cipriani:    [Text picture from Defendant Sattler Instagram and involuntary bankruptcy case Sattler v. [Plaintiff] Russell, No. 20-60029.]

Cipriani:    He's been playing at [Resorts World] Brandon Sattler.

Tatonetti:    I saw him last night.

Cipriani:    BAD GUY. Was playing 11 pm - 3 PM.  I was sitting with him.  He held up game for 30 minutes to do a double down.  He's a criminal. Stole $10M. From one guy. He's in bankruptcy RIGHT NOW.

Tatonetti:    I remember something not good about him from Cosmo as well.

**July 10, 2021**

Cipriani:    Brandon [Sattler] was here again last night playing.  Bro, Between you and I, He's under FBI investigation.  I know that for a fact!  I saw you yesterday on the floor.  I avoided you on purpose.

Tatonetti:    Thanks man.  I am so scared around here.

Cipriani:    I got you covered.

Tatonetti:    Appreciate it!!

---

[23] Conneller, P., *Brandon Sattler, Vegas High Rolle, Serial Fraudster, Gets 51 Months*, Casino.org, December 5, 2024, available here;

Cipriani:    I saw Eddie Ting in there.  Can't believe they let him play.

**September 18, 2021**

Cipriani:    I told [Sibella] yesterday he better stop letting [Defendant Sattler] gamble at [Resorts World] because the FBI is going to arrest him for stealing millions of dollars.  I told [Defendant Sibella], "How's it going to look if the FBI arrests [Defendant Sattler] at Resorts World?"

Tatonetti:    They are [definitely] looking at him.  That's for sure.

Cipriani:    He told Donnie [Defendant Taube] to look into it.  Lol. They know he's gambling and a vendor at [Resorts World]  [Defendant Sattler's] been throwing [Defendant Sibella's] name all over [Resorts World.]  I told Defendant Sibella that.

Cipriani: "It's a joke who they let in to play.  I told [Defendant Sibella] Google him.

Tatonetti:    Sattler won't be playing there much longer in my professional opinion [emoji]"

Cipriani:    [Defendant Sattler] is friends with [Defendant Sibella for years. [Defendant Sattler] is doing electrical work at [Resorts World] and his girlfriend killed someone when she was driving her car.  The girlfriend works at Gatsbys.  Can you f  ing believe it?

Cipriani:    I told [Defendant Sibella] yesterday at Mulberry Street Pizzeria that i know FOR SURE FBI is on Defendant Sattler.

Tatonetti:    I can confirm FBI is.

Cipriani:    I literally barged into his meeting there and sat right next to him so he couldn't escape.  Hey just so you know Sattler was at blackjack tournament last weekend.  You should absolutely get that footage for the FBI. He was trolling for another victim."

Tatonetti:    [Thumbs Up emoji].

Cipriani:    Believe it or not they invited him but not me.  WTF.

Tatonetti:    Lol.

**October 7, 2021**

Cipriani:      How are you?  Did they bar Brandon Sattler yet. Can you talk.

Tatonetti:      Not sure.  I heard he's in Cali though.  Had a contact reach out to me from San Manuel.

**********************************

Cipriani:      When they arrest Sattler Krack [Krackenburg, a colleague] is going to be scared to death.

Tatonetti:      Lol, be funny if they arrested him in front of

**October 8, 2021**

Cipriani:      Good morning.  See what you can find out about Sattler's play at San Manuel. . . .

**October 29, 2021**

Cipriani:      Good morning.  Call when free.  Sattler was at Grand opening for Taco place outside of [Resorts World].  Sattler did so much dirty business with Whack Crack. You have no idea.

Tatonetti:      Shocker.  This whole town is a bunch of scum bags.  Even the governor got pulled over drunk the other day and they covered that up as well.

94.     It was not until later in 2022, that Resorts World acted on Defendant Sattler's illegal activities occurring at the casino.  In September 2021, the FBI requested photographs and other information about Sattler's gambling activities in the Resorts World casino.

95.     Aside from the above-cited dates, Plaintiff Cipriani observed Defendant Sattler gambling at the Resorts World casino on at least five (5) other occasions.  From the date of Resorts World's opening to roughly November 21, 2021, when Defendants Sibella, Chesnoff, Taube, Forbes, Tatonetti, and others retaliated against Plaintiff Cipriani by having him illegally arrested in November 2021, Plaintiff Cipriani gambled at Resorts World several days each week and often

would observe Defendant Sattler gambling at Resorts World, or working at various store locations installing audio and video equipment pursuant to contracts with various vendors designed to promote Sattler's fraudulent schemes and money laundering activities in coordination with various co-conspirators.

### (ii).    Edward Ting

96.    On or about January 21, 2014, the U.S. Attorney for the Southern District of New York announced that Edwin Ting (Ting) was sentenced, based on his guilty plea, for the felony crime of conducting an illegal gambling business. This guilty plea arose from federal charges related to him running high-stakes poker and sports book operations. Prosecutors contended that Ting "ran what was most likely the largest and most high-profile illegal poker [game] in New York City."[24]

97.    On July 10, 2021, and then again on September 18, 2021, Plaintiff advised Defendant Tatonetti that Edward Ting, a well-known known convicted felon was gambling at Resorts World . On September 18, 2021, Ting and a number of high-stakes gamblers arrived at Resorts World casino.  Initially, Resorts World compliance staff rejected Ting and his associates who were planning to gamble millions of dollars.  Defendant Sibella specifically overruled Resorts World compliance to allow Ting and his associates to gamble at Resorts World's casino.

**July 10, 2021**

Cipriani:     Brandon was here again last night playing.  Bro, Between you and I, He's under FBI investigation.  I know that for a fact!  I saw you yesterday on the floor.  I avoided you on purpose.

Tatonetti:    Thanks man.  I am so scared around here.

Cipriani:     I got you covered.

---

[24] Press Release, *Defendant [Ting] Sentenced in Manhattan Federal Court to Five Months in Prison for Role in Gambling Ring*, January 21, 2014, available here.

37

Tatonetti:    Appreciate it!!

Cipriani:    I saw Eddie Ting in there.  Can't believe they let him play.

**September 18, 2021**

Cipriani:    I can't believe Eddie Ting got through compliance and is playing at [Resorts World].  A f---ing Triad, money launderer and convicted felon!  Other than that, How are you?

Tatonetti:    Me either.  The Cage Director is really pissed about it as well.  I'm ok, hanging in there.

Cipriani: I [was sic] had a big blowup with Casino Manager about yesterday afternoon in high roller pit. Look at the footage.  They didn't want to reserve a table for me but they did for him.   [Defendant] Sibella overruled compliance and him and his friends have wired in millions and he's playing blackjack, poker, and having a birthday party too.

Tatonetti:    Lol. Shocker.

### (iii).    Robert Alexander (Deceased October 18, 2024)

98.    Robert Alexander was a well-known, high-stakes gambler and criminal fraudster who had a long-time business and personal relationship with Defendants Sibella and Chesnoff.

99.    On January 8, 2020, Alexander pleaded guilty to one count of securities and wire fraud in New York City federal court stemming from his scheme to defraud investors in Kizzang, his illegal online company.[25]  Alexander died on October 18, 2024, before he was sentenced in his criminal case.

100.    Defendant Chesnoff, who briefly represented Alexander, was a shareholder in Kizzang, and offered to assist Alexander in soliciting new investors, including contacting casino

---

[25] *See, DOJ Press Release, Founder and President of Online Gaming Company Pleads Guilty to Securities and Wire Fraud*, January 8, 2020, available here. Alexander made numerous false representations regarding his professional background, Kizzang's financial condition, expected returns on investment, and false assurances that investments would be used solely for Kizzang's business purposes.  Alexander misappropriated over $1.3 million in investor funds. and used funds for gambling excursions, entertainment and personal expenses.

executives and gamblers.  Defendant Chesnoff was never charged in the Alexander case, but was known as Alexander's attorney and business colleague, and vouched for Alexander's character.

101.    In text messages on October 1 and 4, 2021, between Plaintiff Cipriani and Defendant Tatonetti, Cipriani alerted Tatonetti about Robert Alexander who was gambling at Resorts World:

**October 1, 2021**.

Cipriani:        Hey my friend.  How are you?

Cipriani:        This guy was in Resorts World last night.  His name is Robert Alexander.  I think he was gambling. not 100% sure.

**October 4, 2021**.

Cipriani: That's the guy I told you about.

Tatonetti:        Yea, ty.

Cipriani:        I put that in just because he's a bad guy.

**October 20, 2021**

Cipriani:        Good morning.  Robert Alexander was playing again yesterday.

**October 25, 2021**

Cipriani:     Alexander in again WTF. Feds are pissed!!!

Tatonetti:    Hope they come arrest him at [Resorts World] [smiling emoji].

Cipriani:     He's there almost every day.

**October 28, 2021**

Cipriani:     Alexander there again last night.  Amazing Never wins.  I'm surprised Feds haven't subpoenaed you yet.

Tatonetti:    Maybe they have [smiling emoji]

Cipriani:     Aahhhh.

### (iv).    Joseph Angelo Bravo

102.    Joseph Angelo Bravo was convicted in federal court in 1993 for cocaine trafficking. He was linked to the Buffalo crime family active in Las Vegas in the late 1980s and 1990s.  Bravo was sentenced to 87 months' imprisonment. Bravo was represented by Defendant Chesnoff.

103.    Guiseppe Bravo, Joseph's son, and Defendant Chesnoff owned the Eight Cigar Lounge, Bravo Concierge and Bravo Tickets, three separate businesses based in the Resorts World casino and hotel complex.  Defendant Sibella had long-time ties to Joseph Angelo Bravo and approved the vendor relationships.

104.    Defendant Chesnoff was a partner with Bravo in a real estate holdings in a private airport and nearby resort in Punta Arena de la Ventana, La Paz, Baja, California Sur, Mexico. an

area known for cartel activity.[26]   Also, Defendant Chesnoff represented Bravo in litigation surrounding this resort project and private airport.[27]

**October 31, 2021**

Cipriani:



Cipriani:

Re-text of message from @MOBBuffalo

Who is Joe Bravo? He is a convicted drug trafficker who was sentenced to 87 months in 1993 for role in a cocaine importing ring with ties to the Buffalo mob.  The Niagara Falls-to-Las Vegas distribution network.  Distributed 400 kilos.

---

[26] Las Vegas Review, *Familiar Faces Show Up in HOA Prob*e, June 10, 2012, available here; Las Vegas Review, *Baja Resort Promoter's Release Comes Too Late*, June 24, 2012, available here.

[27] Smith, J.L., Las Vegas Review, *Tight Vise Closes Even Tighter on Players in HOA Indictments*, May 26, 2013, available here.



Cipriani:

Chesnoff is partnered in this and Concierge business at [Resorts World]



Cipriani:    David Chesnoff is Joe Bravo's attorney  Look at his name on court docs.

Cipriani:    F---ing joke.  Sibella doing business with drug traffickers.

Tatonetti:    Shocker. [laughing emoji]

Cipriani:    And Chesnoff.  What would [Defendant] KT Lim say about this??? They are so brazen and arrogant.

Tatonetti:    Whole town is a scam man.  Just keeping my head down trying to survive.

Cipriani:    I know you are.  This must drive you absolutely insane!

### (v).    David Stroj

105.    In December 2015, Stroj was indicted along with twenty-four (24) other defendants in the Southern District of California for running an illegal gambling operation that laundered $10 million in gambling proceeds through Chula Vista and San Diego card rooms.[28]  Stroj operated an

---

[28] DOJ Press Release, *Twenty Five People Charged as Members of $10 Million Illegal Gambling and Money Laundering Operation*, December 9, 2015, available here (Jaime Behar and Dave Stroj are included in Indictment). Defendant Chesnoff represented Arturo Diaz-Ramirez, one of the twenty-five defendants.

illegal bookmaking business that extended throughout North America. Millions of dollars in illegal proceeds from the gambling events were laundered through the Palomar and Village Club card rooms, Las Vegas casinos, various bank accounts, shell companies, and a bail bonds business. The ring also operated illegal offshore online gaming websites.

106. Stroj is a large-scale international bookmaker based in the San Diego area. He was charged with conducting an illegal bookmaking business, conducting an illegal poker and blackjack business and conspiracy to launder money. In 2018, Stroj pleaded guilty and he was sentenced to 18 months in prison. His supervised release began on March 10, 2020, the terms of which prohibited him from gambling and frequenting casinos or gaming establishments without approval from his probation officer.

107. Plaintiff Cipriani observed Stroj playing blackjack at Resorts World, and reported these observations to his federal probation officer, the FBI, and the Nevada Gaming Control Board.

108. In April 2022, Stroj admitted to violating the terms of his supervised release by gambling in Las Vegas casinos, including Resorts World. As a result, the terms of his supervised release were modified to prohibit any gambling, and his travel to Las Vegas was restricted to business only and subject to permission.

109. While Stroj was prohibited from gambling at Resorts World, Stroj was permitted to invest in and participate in the operation of the Tacos El Cabron restaurant, which was owned by him and Jamie Beher, a co-defendant in the indictment charging them with running illegal poker rooms in the Southern California. Stroj disguised his ownership interest by including his father as managing partner of the owner, Abyan Properties 2 Las Vegas LLC.

43

**E.     *Defendants Sibella, Chesnoff, Taube, Forbes, and Tatonetti Successfully Retaliate Against Plaintiff Cipriani to Silence Him and Obstruct Federal and Regulatory Investigations***

110.     For several months after the opening of the Resorts World casino and hotel, Plaintiff Cipriani regularly communicated with law enforcement, Nevada regulators and Resorts World officials, including Defendant Sibella and others about the illegal activity occurring at Resorts World.  Recognizing that Plaintiff Cipriani's whistleblower activities created a real threat of investigation and prosecution of Resorts World and others, the Defendants and other individuals jointly worked together to harass, intimidate, retaliate and bring trumped-up, fake criminal charges, against Plaintiff Cipriani to punish and silence him.  The Defendants enlisted co-conspirator, Robert Alexander, to assist in this joint effort to retaliate against and silence Cipriani.

111.     The Defendants and Alexander knew that Plaintiff Cipriani was a cooperating witness working with federal law enforcement, who regularly provided federal law enforcement with information concerning the illegal money laundering activities and investments involving the Defendants, Alexander, and other criminals at Resorts World.

i.      Cipriani's Orchestrated Arrest and False Imprisonment

112.     Beginning in or about sometime in October 2021, and continuing to the date of Cipriani's trumped up false arrest, on November 19, 2021, Robert Alexander, with the assistance and support of the Defendants, regularly harassed, intimidated and threatened Plaintiff Cipriani in the Resorts World casino. Initially, Alexander followed Cipriani in the casino and sought to record Cipriani's gambling activities on his cellphone.  After these initial steps, Alexander threatened physical harm to Cipriani, on several occasions, by warning him that he (Alexander) had people outside the casino who were waiting to attack Cipriani.  Further, Alexander coordinated with other

44

affiliated individuals to sit next to Cipriani at the blackjack tables and repeatedly threaten physical harm to Cipriani.

113.    When Cipriani complained to Resorts World security and staff, Defendants Sibella, Taube, Forbes, Koep, Tatonetti, Madurzak and other security and surveillance staff took no action or accepted Alexander's denials, false explanations that he was watching You Tube videos and other ridiculous claims. Alexander regularly engaged in this conduct whenever he and Cipriani were at the casino. Despite Cipriani's regular complaints, Resorts World security and surveillance officials failed to take action.

114.    On November 19, 2021, Defendants Sibella, Chesnoff, Taube, Forbes and Tatonetti and Alexander escalated their campaign of harassment, intimidation, and retaliation against Plaintiff Cipriani. Alexander used his mobility scooter to position himself closer to Cipriani and continued to film Cipriani using his cellphone. Alexander's brazen actions were intended to disrupt Cipriani's ability to gamble, intimidate Cipriani by recording his gambling activities, and cause Cipriani to leave Resorts World. Plaintiff Cipriani feared physical harm. Alexander's threatening conduct and repeated threats and assaults were recorded by Resorts World's internal security system and video recording, and observed by numerous employees and security personnel, but yet no one acted, no one responded, and no one enforced any basic rules and procedures surrounding safety of patrons at Resorts World.

115.    Following weeks of repeated efforts by Alexander to harass, intimidate and retaliate against Plaintiff Cipriani, who was assisted and supported by Defendants Sibella, Chesnoff, Taube, Forbes, Tatonetti and others, Cipriani was convinced that he would continue to be subjected to this illegal retaliation regime. In response, and out of frustration, on November 19, 2021, Plaintiff Cipriani acted with restraint and diplomacy in the hopes of de-escalating the situation.

45

116.    On November 19, 2021, Alexander maneuvered his mobility scooter within inches of Plaintiff Cipriani's person once again to video record him with his mobile phone. Plaintiff gently took Alexander's cellphone and walked directly to the casino cage and requested that security employees take possession of Alexander's telephone. Plaintiff Cipriani repeated again his persistent complaint about Alexander's harassment, intimidation and threats. Again, Defendants Sibella, Chesnoff, Taube, Forbes, Tatonetti and others at Resorts World made no attempt to assist Plaintiff Cipriani or even acknowledge his request for help. A Resorts World security guard took possession of Alexander's telephone. Plaintiff Cipriani remained at the casino.

117.    Later in the day, Plaintiff Cipriani met Defendant Chesnoff, who was fully aware of the details surrounding the earlier incident with Alexander. Defendant Chesnoff told Plaintiff Cipriani "not to worry" about Alexander or any "trouble" that may arise relating to Alexander's behavior and Plaintiff Cipriani's removal of Alexander's cellphone, yet the police arrived within minutes and arrested Plaintiff Cipriani and removed him and his wife from the casino.

118.    On the following day, November 20, 2021, Plaintiff Cipriani texted Defendants Sibella and Tatonetti to request that Resorts World preserve the footage of Alexander "filming and confronting" him. In an almost too perfect illustration of Defendants' failure to ensure the safety of Plaintiff, Tatonetti responded as follows: "I cannot afford to get caught up in this and lose another job." Defendant Sibella feigned ignorance when Plaintiff Cipriani contacted Sibella to alert him to preserve the security tapes.

Cipriani:

Tatonetti:     I cannot afford to get caught up in this and lose another job. Casino guests never get to make requests directly to Surveillance.  Go through your host or Scott [Sibella] or whoever you deal with directly there and make your requests.

Cipriani:     Believe me I know and I don't want to jeopardize you.  I just want to make sure YOU can get it and have it when a formal request.

ii.     The Defendants Pursue False and Fabricated Criminal Charges

119.     Defendants Resort World, Sibella, Chesnoff, Taube, Forbes, and Tatonetti pursued their ongoing campaign to retaliate against, punish and silence Plaintiff Cipriani by leveraging their long-time support of District Attorney Wolfson, to manipulate and enlist Nevada's criminal justice system to further and execute their scheme.[29]

120.     As an initial step, the District Attorney charged Plaintiff Cipriani with two criminal offenses -- Larceny and Robbery Larceny from person, property value less than $3500, and robbery of an elderly victim in violation of state statute 205.2701a and 200.380 -- without any evidentiary basis.  The felony charges against Plaintiff Cipriani lacked a key element -- Cipriani lacked the requisite intent by possessing Alexander's phone only for a fleeting moment before he turned the

---

[29] Defendants Resorts World, Sibella, Chesnoff and Resorts World's General Counsel contributed to District Attorney Stephen Wolfson's campaign and held fundraising events at Defendant Chesnoff's Eight Cigar Lounge at Resorts World.

phone over to security staff.  On November 20, 2021, Plaintiff Cipriani was released after spending the night in jail.

121.    This vindictive pursuit of charges and the complicity of the actors involved therein are more than coincidental. Steven Wolfson's public Contributions and Expenses Reports shows that Resorts World contributed $10,000 to Wolfson's reelection campaign less than one month after Plaintiff Cipriani's arrest. At the same time, Resorts World's General Counsel contributed $1,000.  Defendant Sibella contributed $5,000 in January 2022, and another $5,000 in August 2022—apparently his only political contributions since 2018.

iii.    Defendants File False Gambling Fraud Complaint Against Cipriani

122.    Shortly after his arrest, Defendants Sibella, Chesnoff, Taube, Forbes and Tatonetti took further steps to retaliate against and silence Plaintiff Cipriani by concocting a false charge of gambling fraud against Plaintiff Cipriani.  Defendant Sibella directed Defendants Taube, Forbes Tatonetti and other security and surveillance personnel to review the entirety of Resorts World's video footage of Plaintiff Cipriani to find an instance where they could allege that Plaintiff Cipriani cheated.  Defendant Tatonetti replied, "Cipriani doesn't cheat.  There's no footage of that." Defendant Sibella ordered Tatonetti and the surveillance staff to "Find anything at all that we could use to show something."  Defendant Tatonetti later resigned from Resorts World because he knew that Plaintiff Cipriani had not committed gambling fraud and that the Defendants were pursuing a fraudulent case against Cipriani.

123.    In a false and fabricated report to the Nevada Gaming Control Board, dated November 26, 2021, Defendants Sibella, Taube, and Forbes, with the assistance of other officials and employees at Resorts World alleged that Plaintiff Cipriani "past-posted" wagers while playing blackjack on November 19, 2021, the same day he was arrested.  The Defendants, under the

48

direction and control of Defendant Sibella, and acting in concert with others from Resorts World, filed the false gambling fraud complaint and District Attorney Wolfson approved the issuance of an arrest warrant against Plaintiff Cipriani for the felony count of Gambling Fraud.

124.    Over the next few weeks, Plaintiff Cipriani posted accurate comments about his ordeal on social media concerning the Defendants conspiracy to retaliate against, punish and silence him from reporting to law enforcement about the illegal activities at Resorts World.  The District Attorney sought to revoke Plaintiff Cipriani's bond based on his continuing social media and tweeting activity, in combination with the new felony gambling fraud warrant.

125.    On December 22, 2021, a status hearing was held.  Plaintiff Cipriani did not appear on the advice of his counsel. However, his attorney noticed Defendant Chesnoff presumably observing as a spectator for Plaintiff Cipriani's bond revocation and execution of the gambling fraud warrant.[30]  There was, evidently, no other reason for Defendant Chesnoff to be there -- except to monitor, reinforce and reiterate the direct and immediate threats and retaliation against Plaintiff Cipriani.

iv.    Plaintiff Cipriani is Forced to Plead Guilty to a Misdemeanor and Silenced

126.    Faced with the unusual severity of these criminal charges and threatened sentences, Plaintiff Cipriani was coerced into pleading guilty to a misdemeanor charge, disorderly conduct, and was compelled to agree to cease usage of his Twitter account during a one-year probationary period.

127.    On May 4, 2022, Plaintiff Cipriani admitted to the charge of misdemeanor disorderly conduct pursuant to a plea agreement, in exchange for dismissal of the felony count of

---

[30] Plaintiff Cipriani elevated his concerns to the Las Vegas Sheriff's Department. On February 22, 2022, Mr. Cipriani emailed Sheriff Joseph Herring and Joe Lombardo (now Governor of Nevada) to alert them to Resort World's retaliation against him through the filing of bogus criminal charges.  The Sheriff's Department never responded.

robbery with a special enhancement for Alexander's status as a claimed "vulnerable victim," a violent crime and category B felony carrying a minimum sentence of two years imprisonment. Plaintiff Cipriani was sentenced to probation and barred from using his social media account during that one year period of probation.

v.     Plaintiff Cipriani is Barred from All Casinos and Silenced

128.     Defendants Resorts World, Sibella, Chesnoff, Taube, Forbes and Robert Alexander and other individuals' plan to retaliate against, punish and silence Plaintiff Cipriani worked -- during that six month period while the criminal charges and the gambling fraud complaints were on file and for years thereafter, Plaintiff Cipriani was barred from all casinos and could not report either to law enforcement or regulators (or internally to Resorts World officials) any illegal activity that he observed or learned about.  The Defendants' conspiracy to retaliate was thus successful -- Plaintiff Cipriani was now barred from every casino in Las Vegas, destroying his livelihood; and, importantly, Plaintiff Cipriani was silenced in order to obstruct any further federal, regulatory or internal investigations.

129.     Plaintiff Cipriani's claims are timely under the applicable four-year statute of limitations governing civil RICO claims. Although certain retaliatory acts against Plaintiff Cipriani began in or about November 2021, Plaintiff Cipriani did not discover, and could not reasonably have discovered, the full scope of Defendants' racketeering enterprise, including its systemic money laundering, unlawful gambling activities, and coordinated obstruction of justice, until substantially later, including through the Nevada Gaming Control Board investigation initiated in 2023 and the public enforcement actions and settlement announced in 2025.

130.     Defendants engaged in **fraudulent concealment** of their unlawful conduct throughout the relevant period. Defendants knowingly concealed their relationships with criminal

actors, their anti-money laundering failures, and their coordinated retaliation against Plaintiff Cipriani and other whistleblowers. Defendants' concealment included, inter alia, suppressing internal reports, failing to file required Suspicious Activity Reports, misrepresenting compliance with gaming and financial regulations, and actively dissuading and preventing Plaintiff Cipriani from reporting unlawful activity to regulators and law enforcement.

131.   Defendants' wrongful conduct also had the effect of **preventing Plaintiff Cipriani from investigating or pursuing his claims**, including by falsely arresting him, barring him from all casinos in Las Vegas, damaging his reputation, and effectively silencing him, thereby obstructing his ability to communicate with regulators and law enforcement and to uncover the full extent of Defendants' unlawful scheme.

132.   In addition, Defendants' racketeering enterprise constitutes a **continuing violation**, with predicate acts occurring well within the limitations period, including but not limited to ongoing money laundering activities, continued concealment of unlawful conduct, and retaliatory actions against whistleblowers, including Plaintiff Do's termination in or about December 2024. Each such act caused new and independent injury to Plaintiffs and restarted the limitations period.

F.   *Plaintiff Cipriani Notifies Defendant KT Lim Concerning Wide-Spread Misconduct and Illegal Money Laundering at Resorts World*

133.   Weeks after he was arrested and subjected to a campaign of retaliation and obstruction, Plaintiff Cipriani decided to contact Defendants Genting and KT Lim to alert them to the corruption, fraud and illegal activity permeating Resorts World, under the direction and influence of the Defendants and criminal elements.  Rather than address the problem, Resorts World instead acted to silence Plaintiff Cipriani and any other persons. To this end, Plaintiff Cipriani was compelled to elevate his concerns to Defendant Genting and its chairman and CEO,

Defendant KT Lim, and on January 6, 2022, sent Defendant Lim a letter memorializing his concerns.

134.    In his letter to Defendant Lim, Plaintiff Cipriani wrote:

*Mr. Lim,*

*Hope you're well.*

*My name is RJ Cipriani. I've been coming to your property at Resorts World Las Vegas on a regular basis for over four months. I connected and brought my friend and business associate, Harvey Mason Jr, CEO of the Recording Academy and his two Co-Presidents, to meet with Scott Sibella and Kevin Jones on November 15th, to discuss various business opportunities at Resorts World Las Vegas, including a GRAMMYs Museum. This meeting took many months to arrange. Looking back I feel I have made a lapse in judgment for even letting that meeting take place, based on disturbing and troubling information I have witnessed as a guest of the new resort. I also feel I've put the Recording Academy in a precarious situation.*

*As the Chairman of Genting Corporation, you should be made aware of what's been going at the property since it opened.*

*I have personally witnessed criminals gambling at Resorts World Las Vegas that are not welcome to gamble anywhere else in the United States. I have seen a friend of Scott Sibella's, Alan Richardson, operate and control the private poker rooms in Crockfords that appears were built for this purpose. This same friend is given access by Scott to other property business decisions, as he and Alan have spoken about the search for a new VP of hotel operations.*

*I have spoken directly with other individuals who have told me they are partners with Scott in restaurants at the property. It's common knowledge by many guests and employees at the property that other friends of Scott's are operating 3rd party services at the resort. These services range from concierge to outsourcing the purchasing of show tickets by the concierge. I'm sure if you looked at all of your 3rd party deals you'd find more that are connected to Scott and his friends. Many of the 3rd party operators, owners or partners, are criminals or well-connected lawyers and businessman in Las Vegas. None would list their primary livelihood or career experience in the service area they are now contracted to provide to Resorts World Las Vegas.*

*These issues should be of concern to you, to Genting's investors and to gaming boards in Las Vegas, New York and Singapore.*

*I believe you're unaware of these issues and I'd like to meet to personally discuss. I want this email to prove you've been made aware of these issues and extend an opportunity to meet with me before the issues become a problem for your company in New York or Singapore where Scott is not insulated and protected.*

*No one seems to be protecting your Las Vegas investment or your*

*legacy!*

*Call me anytime.*

*RJ Cipriani*

*310 XXX-XXXX*

*EDWIN TING*

*https://www.pokernews.com/news/2014/01/edwin-ting-sentenced-17319.htm*

*ROBERT ALEXANDER*

*https://nypost.com/2020/01/16/grand-theft-auto-kingpin-pleads-guilty-to-fraud-charges/*

*BRANDEN SATTLER*

*https://www.pacermonitor.com/public/case/28664589/RUSSELL_et _al_v_SATTLER*

*UNITED STATES BUREAU OF PRISONS Name: JOSEPH ANGELO BRAVO*

*Register Number: Race: White Sex: Male*

*Released On: 07/23/1999*

135.  Defendants Genting and Mr. Lim never responded nor contacted Plaintiff Cipriani.

G.  *Plaintiff Do is Hired for Surveillance, Uncovers and Reports Widespread Criminal Activity, and is Fired in Retaliation for his Whistleblower Activitie*s

136.  Plaintiff Do was hired by Resorts World in early 2022, after Defendant Tatonetti referred him to Resorts World surveillance officials. Plaintiff Do quickly became aware of the culture at Resorts World, imposed by the Defendants, which was to earn as much money as possible and accept money from criminals, fraudsters and other criminals in violation of prevailing law, regulations and compliance policies and procedures.  In addition to permitting known

53

criminals to gamble and launder money at Resorts World, Plaintiff Do learned of other illegal conduct and activities that were fostered, promoted and pursued at Resorts World.

137.    Plaintiff Do reported to Defendants Koep and Madzurak, James Santarufo, the Surveillance Shift Manager, and collaborated with Lindsey Dever, the Manager of the Fraud Department for non-gaming areas at Resorts World.  Plaintiff Do quickly caught instances of cheating and fraud, which generated positive statistics for the surveillance department.

138.    In addition to his surveillance work, Plaintiff Do uncovered instances of fraud, theft, and other forms of illicit activity within Resorts World.  For example, Plaintiff Do learned how to use the Synkro**s** software that enabled him to analyze the reimbursement and reinvestment accounts at Resorts World. These accounts correspond to various benefits and "comps" that are given to guests and gamblers. Plaintiff Do discovered that many casino hosts were reimbursing their guests at much too high of a rate for the guests' gaming activity. Plaintiff Do knew the level of reimbursement was supposed to be 33% or lower, but he discovered some hosts reimbursed their guests at rates well over 100%. Plaintiff Do brought this information to the attention of Santarufo, Madurzak, Koep, Dever, and others, which often led to the hosts being fired.

139.    Plaintiff Do's successes brought him to the attention of Koep and led to his promotion to Surveillance Lead. It also led to Plaintiff Do and Koep developing a close working relationship, and Koep creating a work area outside his office for Plaintiff Do to use. When Plaintiff Do was promoted to Surveillance Lead, Koep gave Plaintiff Do permission to work his hours as they fit his schedule, rather than sticking to a designated shift. After this arrangement, Plaintiff Do still had to have a designated shift on paper because as an hourly employee, Resorts World's systems required him to do so. Defendant Madurzak, Santarufo and Dever became aware of Koep's permission for Plaintiff Do to work his hours contrary to his designated shift.

140.    Due to Plaintiff Do's fraud detection, Koep discussed forming a new fraud unit within the surveillance department for matters related to gaming and reimbursements. Koep discussed placing Plaintiff Do within this unit as a salaried employee with a title such as

54

Surveillance Gaming Investigator. However, this unit was never formed and DO never became a salaried employee.

141.    Despite the generally positive response to his work, not all the fraud and illicit activity uncovered by Plaintiff Do was well received or acted upon by the management at Resorts World. For example, there were conversations in the main surveillance monitor room among Santarufo, Madurzak, and Koep about people they knew to be criminals who were allowed to gamble at Resorts World, including but not limited to Edward Ting, Mathew Bowyer, Damien LeForbes, and Wayne Nix.  According to Defendants Koep, Madurzak, Santarufo and others, senior management from Sibella on down knew of criminals who were permitted to gamble illegal proceeds at Resorts World, and who were afforded authorized lines of credit.

142.    According to Plaintiff Do, Resorts World management ignored applicable AML and KYC requirements in order to permit known criminals or even unvetted criminals to obtain credit lines and gamble at Resorts World.  The Defendants and others often justified their refusal to take action against known and suspected criminals because of the need to "keep the lights on," meaning that Resorts World needed the illegal money.  In one of the more blatant examples of illicit conduct, Plaintiff Do learned that Matthew Boyer's wife, Nicole, was made a host for her husband at Resorts World as a means to funnel more comp money and benefits to Matthew Bowyer to ensure that he continued to gamble at Resorts World.  Resorts World also hosted the "Bowyer Blackjack Tournament," named in his honor. Incredibly, Nicole Bowyer was allowed to enter and then win the tournament.

143.    In another example of illicit activity, while working surveillance Plaintiff Do observed Defendant Sibella sitting with two known prostitutes in the casino who were barred from Resort World properties. While Plaintiff Do was monitoring the barred prostitutes, his supervisor, Santarufo, directed him to discontinue surveillance of the prostitutes and Defendant Sibella. Santarufo stated "See that guy, that's our President [Scott Sibella].  Get the camera off him." Under established security protocol, a barred individual on the premises is subject to arrest and removal by Las Vegas Metropolitan Police

144.    Plaintiff Do raised specific concerns about the Eight Cigar Lounge, a non-gambling area, which was owned and controlled by Defendant Chesnoff, and the illegal use of the facility to poker tournaments and other events.  Plaintiff Do questioned why there were no surveillance cameras in the lounge, which was an unauthorized location for hosting poker gambling events.

145.    In the months before his unexpected termination, Plaintiff Do uncovered a series of twelve (12) off-the-books accounts that were being used to funnel money and comp benefits.  According to his investigation, Plaintiff Do calculated that approximately $100 million of benefits, credit and chips were paid through these accounts.  Plaintiff Do brought these accounts to the attention of Defendants Koep, Madurzak, Santarufo and Dever because these accounts were not monitored and thus could be used to facilitate fraud and support unregulated and unauthorized activity, contrary to AML protocol.  As various comp amounts were handed out, the recipients (gamblers or employees) could trade these comps for cash or use the currency for any purpose, including illicit transactions, contrary to AML protocol.  Plaintiff Do brought these accounts to the attention of his supervisors who ignored the significance of these accounts and activity.  According to Plaintiff Do, no one was monitoring these accounts or tracking how the accounts were funded.  Plaintiff Do was concerned about this improper activity and the potential means for individuals to evade financial reporting of such funds, thereby reducing reportable income to the State of Nevada and the federal government for tax purposes.  Plaintiff Do raised these concerns on several separate occasions with managers in his department and in other departments.  None of the managers expressed any desire to investigate this matter; nor did anyone take any steps to determine the use of these accounts.

146.    In November 2024, Plaintiff Do raised the issue again with Defendant Koep and underscored the significance of this issue.  Shortly after raising his concerns, Plaintiff Do was terminated for no justifiable reason other than to punish him for pursuing this issue of financial misconduct. In or about November 2024, Plaintiff Do was called into a meeting with Koep, Santarufo, Madurzak, and Dever where they confronted him about his work hours. Dever accused Plaintiff Do of essentially stealing from Resorts World because she had video of Plaintiff Do

leaving the property during his designated shift hours. Even though everyone in the room knew Plaintiff Do had the permission from Defendant Koep to work his hours according to his own schedule, they acted as if they did not. Defendants Koep and Madurzak, and Santarufo refused to support Plaintiff Do. In the end, Plaintiff Do was terminated on the pretextual basis of missing hours despite Plaintiff Do's sustained compliance with weekly working hours.

147. After his termination from Resorts World in December 2024, Plaintiff Do applied for a surveillance position at another major casino. During an interview, the surveillance manager acknowledged that he knew Defendant Koep, and subsequently Plaintiff Koep was rejected for the new position.

H. *The Nevada Gaming Control Board and the Department of Justice Launch Investigations of Resorts World and Related Entities and Individuals*

148. In the Fall of 2023, the Nevada Gaming Control Board ("NGCB") initiated an investigation of Resorts World and related companies concerning criminal and regulatory violations stemming from AML failures and deficiencies in permitting known gamblers to either gamble at, or invest in Resorts World's casino and hotel complex. Shortly thereafter, Resorts World opened an internal investigation focusing on the same issues.

149. Around the same time, the U.S. Department of Justice appears to have initiated a criminal investigation, with the focus on illegal gambling businesses in California and stretching to Las Vegas casinos where the casinos and their executives encouraged and embraced illegal gamblers as patrons who intended to launder their proceeds. These relationships were beneficial to both parties -- casinos earned increased profits and individuals earned larger bonuses, and criminals were able to launder their proceeds at the casino. MGM Grand and Resorts World became two primary locations for criminal money laundering and gambling by convicted felons, fraudsters and illegal gambling moguls.

150.     The common denominator in the misconduct that was uncovered at both casinos was Defendant Sibella -- he was the President and COO at MGM Grand and the President and CEO at Resorts World.  Shortly thereafter Defendant Sibella was fired from Resorts World.  Later, in 2024, Defendant Sibella pleaded guilty to a federal felony offense for failing to file a suspicious activity report stemming from his role at MGM Grand.[31]

151.     The NGCB conducted a comprehensive investigation involving interviews and investigative hearings of executives, casino hosts, employees and other individuals, and a review of extensive documents including policies, procedures and other records.

152.     One year later, on August 15, 2024, the NGCB filed a *Complaint* before the Nevada Gaming Commission for disciplinary actions against Defendant Genting and Resorts World.[32]  *See NGC 24-04, Nevada Gaming Control Board v. Genting Berhad et al., Complaint*, August 15, 2024 ("NGCB Complaint").  The *Complaint* included twelve separate charges and was later amended as part of a *Stipulation and Settlement* to ten charges alleging "unsuitable methods of operation" and

---

[31] As noted above, Plaintiff Cipriani played a key role in supplying evidence to the DOJ and the NGCB.  Plaintiff Cipriani had established contacts with FBI, HSI and IRS agents on the west coast, at Las Vegas and in New York.  In addition, Plaintiff Cipriani had well-established contacts at the NGCB.  Plaintiff Cipriani provided information regularly over a seven- year period to law enforcement and regulators.  This information was used and appeared in various prosecutions and regulatory enforcement actions.  Consistently, Plaintiff Cipriani's information was found to be accurate, reliable and trustworthy.  Plaintiff Cipriani had an exemplary record as a reliable confidential witness who provided substantial assistance in the successful prosecution of numerous organizations and individuals in a number of criminal schemes.

[32] As a licensee, Defendant Resorts World is subject to regulation by the Nevada Gaming Commission under Title 40 of the Nevada Revised Statute and the Regulations of the Commission. Under NRS 463.0129, the Nevada Legislature has set out the need for continued growth and success of the gaming industry which depends on public confidence and trust that such "[p]ublic confidence and  trust can only be maintained by strict regulation of all  persons, locations, practices, associations and activities related to the operation of licensed gaming establishments . . . ." See NRS 463.0129.  A person approved by the Commission has an ongoing obligation to meet the standards required to obtain such approval including, without limitation, to be a person of good character, honesty and integrity and to refrain from activities and associations which may impact the interests of Nevada, the regulation of gaming, or the reputation of gaming in Nevada. Further,  failure  to  continue  to meet  such  applicable  standards  and qualifications constitutes' grounds for discipline. *See* NRS 463.170.

anti-money laundering failures tied to illegal gambling at Resorts World casinos.[33] *See NGC 24-04, Nevada Gaming Control Board v. Genting Berhad et al., Amended Complaint*, March 20, 2025 ("NGCB Amended Complaint"); *NGCB 24-04, Nevada Gaming Control Board v. Genting Berhad, et al., Stipulation for Settlement and Order,* March 27, 2025 ("NGCB Settlement").

153.    Based on its investigation, the NGCB determined that Resorts World "welcomed certain individuals to wager at its casino over a period of numerous months while Resorts World executives and employees knew, or should have known, that certain individuals were likely illegal bookmakers." *See Amended Complaint* at § 28.

154.    The NGCB also alleged that Resorts World's AML Compliance Committee ("AML Committee") and certain Resorts World executives and employees not only failed to fulfill the purpose and spirit of Resorts World's AML Program, but also failed to comply with various specific provisions of Resorts World's AML Program as well as with the Commission's regulations. *See Amended Complaint* at § 29.

155.    The NGCB's investigation further revealed that there existed an overall lack of control within Resorts World and acceptance among Resorts World executives of a culture where information of suspicious or illegal activity is, at a minimum, negligently disregarded, or, at worst, willfully ignored for financial gain given the overall pressure for Resorts World to generate revenue and that the bonuses of Resorts World's executives are directly tied to the financial success of Resorts World. *See Amended Complaint* at § 30.

---

[33] The Nevada Gaming Control Board ("NGCB") is statutorily charged with determining whether a violation of the Nevada Gaming Control Act has occurred. See NRS 463.310(1). If the NGCB is satisfied that discipline is warranted, it shall initiate disciplinary action by filing a complaint with the Commission. See NRS 463.310(2). The Board is authorized to observe the conduct of licensees to ensure that gaming operations are not being operated in an unsuitable manner or by an unqualified or unsuitable person. See NRS 463.1405(1) and Commission Regulation 5.040.

156.    The NGCB's investigation further explained that Resorts World failed to fulfill its obligations as the holder of a Nevada gaming license and caused damage to the reputation of the State of Nevada and Nevada's gaming industry. *See Amended Complaint* at §§ 30- 31.  The NGCB reserved the right to revisit the investigation against Resorts World in the event that the Justice Department brings a criminal action for violations of the BSA and AML laws. *See NGCB at § 6; Amended Complaint* at § 32.[34]

157.    On March 27, 2025, the NGCB, Genting and Resorts World reached a settlement, requiring Defendants Genting, and Resorts World to (1) pay a $10.5 million fine, along with interest; and (2) ensure compliance with conditions, which included: (a) maintenance of its anti-money laundering compliance program and procedures; (b) retention of employee AML training records and AML Committee meeting minutes; (c) training of independent agents; (d) conduct an independent audit to review, evaluate and report on Resorts World's compliance with its AML Program; and (e) maintenance of staff for AML compliance.  *See NGCB Settlement.*

158.    In the remediation portion of the settlement, Defendants Genting, Resorts World and other Respondents acknowledged that their AML Program "needed enhancements to address certain compliance risks."  To this end, Resorts World implemented "extensive changes to not only address the areas identified but also to enhance the overall AML Program and compliance function, with the aim of having industry-leading policies, procedures and practices." *NGCB Settlement* at §5

---

[34] Nevada casinos are subject to federal and state regulations relating to cash transactions, suspicious activity reporting, and anti-money laundering (AML) programs. The U.S. Bank Secrecy Act (BSA), 31 U.S.C. Chapter 53, subchapter II and specified regulations, *inter alia*, require casinos to implement a written AML compliance program reasonably designed to assure and monitor compliance with the BSA.  As part of this requirement, casinos have to implement know your customer procedures ("KYC") and inquire about the source of funds (SOF) for customers in response to a specific, risk profile.  31 C.F.R. § 1021.210.

159. Further, "[u]pon learning of allegations about certain patrons' source of funds and potential compliance concerns, Resorts World fully cooperated with NGCB investigation. Additionally, Defendant Resorts World made changes to its leadership, replacing its CEO, COO and CFO, creating a new position of Chief Compliance Officer, and appointing a new Board of Directors. *NGCB Settlement* at §5.

160. To remediate compliance and culture of compliance deficiencies, Defendants Genting, Resorts World and other Respondents completed a number of remedial actions, including: (a) conducting in-person enhanced training to over 1,100 employees; (b) revising its governance documents and decision-making for its AML Committee; (c) executive and key team members attendance of an AML seminar; (d) engaging the UNLV International Center for Gaming Regulation to create and host a customized gaming compliance program; (e) hiring additional compliance staff; (f) requesting vendors to provide software enhancements to help automate and streamline AML functions; (g) adopting in an August 2023 a policy to ban patrons identified as having criminal convictions related to an illegal gambling or money laundering crime. *NGCB Settlement* at §5.

161. As outlined in the *NGCB Amended Complaint at §28*, Resorts World "welcomed certain individuals to wager at its casino over a period of numerous months while executives and employees knew, or should have known, that certain individuals were likely illegal bookmakers." In addition, the *Amended Complaint* cites certain executives and employees who not only failed to comply with Resort World's AML Program but violated Nevada Gaming Commission regulations. *NGCB Amended Complaint at §29*.

162.    The NGCB noted that Resorts World originally adopted in 2021 an AML program that was approved by executive management and applied to its officers and employees. As to its AML Program, the NGCB quoted, at *Amended Complaint at §34*:

> *[Resorts World] is committed to maintaining a risk-based AML program that includes effective internal controls and procedures  to comply with Title 31 requirements and regulatory guidance and measures reasonably designed to prevent its casinos from being used for money laundering or other criminal activity.*
>
> *Legal compliance and ethical business practices are at the core of our  business. The Company regards attempts at money laundering as a threat to the integrity of the company, the gaming "industry, and on the entire financial system.   The Company will not enter into any business relationship or engage in any activity if it knows or suspects that business relationship or activity is, in any way, connect [sic] with or facilitates money laundering, or the funding of terrorist or criminal activities. No business opportunity is worth the potential risk of becoming involved in money laundering. The Company and its executive management are strongly committed to compliance with all laws and regulations designed to combat money laundering including those  rules  and regulations requiring the reporting of transactions involving currency, certain money instruments, and suspicious activity.*
>
> *The Company is committed to the education and training of its employees in money laundering prevention. In turn, it is the responsibility of every· Company employee to protect the Company from exploitation by money launderers*

163.    Resorts World's AML Program requires its employees to internally report unusual and suspicious activity and violations of the AML Program to their supervisor or the AML Compliance Officer.  Resorts World's AML Compliance Officer was responsible for its AML Program. including ensuring the filing of Suspicious Activity Reports ("SARs") with FinCEN. *NGCB Amended Complaint at §§ 35-36.*

164.    Resorts World's AML Committee was responsible for coordination and implementation of the AML Program and to advise the AML Compliance Officer on matters, including the filing of SARs with FinCEN, and making recommendations on terminating or restricting customer relationships. The AML Committee was comprised of the following executives

and included the AML Officer, President (Defendant Sibella), Chief Financial Officer, General Counsel, Senior Vice President of Operations (Defendant Taube), Vice President of Player Development, Director of Surveillance (Defendant Forbes), and Director of Compliance (Defendant Henderson). Each AML Committee member had access to, copies of the minutes and/or comments related to all AML Committee meetings. *NGCB Amended Complaint at § 37.*

165. Resorts World's AML Program describes different types of suspicious activities specified by Title 31 and it includes suspicions regarding a patron's source of funds. Under the AML Program, a patron "with incomplete BSA information will be considered barred ... [and] will be restricted from gaming activity until the required information is obtained." Further, if the patron "poses a significant AML risk, the Company may ban the patron from further activities with the Company." *NGCB Amended Complaint at §§ 40-41.*

166. To support its conclusions and the allegations in its *Complaint* and *Amended Complaint,* the NGCB detailed Resorts World's AML failures, deficiencies in executive and staff misconduct related to several significant criminals who laundered proceeds at Resorts World: (1) Matthew Bowyer; (2) Damien LeForbes; and (3) Edward Ting. The NGCB's *Complaint* describes detailed events surrounding these three illegal gamblers and criminals who should not have been permitted to gamble at Resorts World's casino.

### (a).   Matthew Bowyer Federal Criminal Prosecution

167. The Bowyer federal criminal prosecution was part of a broad investigation into illegal sports gambling operations across Southern California and connections to Las Vegas casinos.

168. On August 9, 2024, Matthew Bowyer pleaded guilty to three federal criminal charges for running an illegal gambling business that took in unlawful sports bets, including from

then-current and former professional athletes as well as Ippei Mizuhara, a former Japanese-language interpreter and *de facto* manager of Major League Baseball superstar Shohei Ohtani.[35] Bowyer plead guilty to a three-count information charging him with operating an unlawful gambling business, money laundering, and subscribing to a false tax return. *See United States v. Bowyer*, 8:24-cr-00080 (C.D. CA August 2024).[36]

169.    Bowyer operated an unlicensed and illegal bookmaking business that focused on sports betting and remained in operation for at least five years until October 2023 and had more than 700 bettors. He operated this business out of various locations in Los Angeles and Orange counties as well as at Resorts World casino and hotel complex in Las Vegas.

170.    Bowyer also employed agents and sub-agents – including two Resorts World casino hosts – who worked for his illegal gambling business and who referred to Bowyer four individual betting clients.  The Resorts World hosts were paid a portion of the losses that bettors incurred and paid.

---

[35] Ippei Mizuhara pleaded guilty to one count of bank fraud and one count of subscribing to a false tax return. Mizuhara admitted to stealing nearly $17 million from Ohtani to pay off gambling debts and failing to pay tax on his gambling income. From September 2021 to January 2024, Mizuhara placed at least 19,000 bets with Bowyer's illegal gambling business through one of the betting websites Bowyer used for it. During this period, Mizuhara had total winning bets of at least $142,256,769, and total losing bets of at least $182,935,206, leaving Mizuhara owing approximately $40,678,436. On a regular basis during this period, Bowyer would increase Mizuhara's betting limits. DOJ Press Release, *Former Interpreter Sentenced to Nearly 5 Years in Prison for Illegally Transferring Nearly $17 Million from Baseball Star's Bank Account*, February 6, 2025, available here.

[36] Bowyer admitted in his plea agreement to knowingly and willfully falsely reporting his taxable income to the IRS on his tax return for the year 2022. On that year's tax return, Bowyer reported $607,897 in total income. His unreported income for that year was $4,030,938, which was income from his illegal gambling business, including $3.8 million in wire transfers into one of his bank accounts, which he did not declare on his tax return. As a result of the false information Bowyer provided, he owes additional taxes of $1,613,280 for the tax year 2022, not including interest and penalties. Upon pleading guilty, Bowyer will face a statutory maximum sentence of 10 years in federal prison on the money laundering count, up to five years in federal prison for the unlawful gambling business count, and up to three years in federal prison for the false tax return count. As part of his plea agreement, Bowyer will forfeit $257,923 in U.S. currency and $14,830 in Resorts World casino chips seized by law enforcement in October 2023. He also has agreed to fully cooperate with federal prosecutors and investigators. DOJ Press Release, *Orange County Man Sentenced to One Year in Federal Prison for Running Illegal Sports-Betting Business and Cheating on Taxes*, August 29, 2025, available here.

171.    At times, Bowyer operated his illegal sports gambling business while gambling in private salons and the sports book in Resorts World. Bowyer would adjust credit lines and discuss payments and bets with clients of his illegal gambling business by phone while gambling in Resorts World. At times, Resorts World staff would stop play at a table game while Bowyer took calls and discussed his illegal gambling business. At other times, Bowyer would collect payments of proceeds of his illegal gambling business while gambling at Resorts World, including receiving and making payments in casino chips or in cash in envelopes or bags.

172.    Bowyer would bring agents, bettors, and associates of his illegal gambling business to Resorts World with him to gamble as a group, some of which were referred to by Resorts World employees as the "Bowyer Group." In addition, Resorts World sports book would at times reach out to Bowyer and invite Bowyer to make large bets, to offset the sports book's risk.

173.    From February 2022 to January 2024, Bowyer directed Mizuhara to make payments of at least $16.25 million to Bowyer-controlled bank accounts, from which Bowyer transferred or directed the transfer of least $9.3 million to Resorts World in the form of wire transfers as payment for markers for Bowyer and his associates.

174.    During this period, Bowyer lost at least $4,164,299 at Resorts World, and one of his associates lost at least $1,585,960 at Resorts World.

175.    Under his plea agreement, Bowyer agreed to cooperate with federal prosecutors and investigators.  In light of his cooperation, Bowyer was sentenced to 12 months' imprisonment  and restitution to the IRS of approximately $1.6 million.[37]

---

[37] Plea Agreement for Defendant Mathew Bowyer, United States v. Mathew Bowyer, Cr. No. 24-80 (HDV), filed June 25, 2024, available here.

**(b)**   **Matthew Bowyer NGCB Amended Complaint**

176.   *NGCB's Amended Complaint* sets out a number of AML failures and deliberate misconduct committed by Resorts World, executives and senior management and employees.  For a period of approximately twenty months from February 2022 to October 2023, when Resorts World finally banned Bowyer, Resorts World failed to substantiate Bowyer's source of funds and/or that his source of funds was consistent with his level of play.  By failing to adhere to the legal requirements under the Bank Secrecy Act and its AML Program, Defendants Genting, Resorts World, KT Lim, Scott Sibella, Doni Taube, Matthew Forbes, Joseph Tatonetti, David Chesnoff, Tonya Henderson, Elie Samarani, and others conducted, facilitated, caused and aided numerous transactions in violation of money derived from illegal bookmaking business, fraud or other illegal activities. *See Amended Complaint at §§ 42-119.*

177.   On or about December 18, 2021, Bowyer submitted to Resorts World a $5,000 credit application, which was later converted to a $1 million front-money loan application. The application listed his personal information, including his bank account information and claimed that he was self-employed as a real estate investor.

178.   On or about December 18, 2021, Resorts World conducted a source of funds review on Bowyer which identified a California real estate investment business owned by Bowyer, but it did not include any information regarding the number of employees for the business, a date the business was established, its annual sales, or its legitimacy.

179.   On or about December 22, 2021, Resorts World prepared a due diligence report in relation to Bowyer's $1 million front-money application. There was limited information available regarding Bowyer's business or income and the report indicates Bowyer had a previous bankruptcy

66

and foreclosure. Bowyer was categorized as "medium risk", and the comments indicate "[u]nable to confirm SOF. Applicant owns his own home but no other assets."

180. Bowyer first visited Resorts World in February 2022. He made a $1 million front-money deposit and was allowed to wager even though Resorts World had not established his source of funds.

181. Sometime in 2022, Resorts World, at the request of Bowyer, changed Bowyer's casino host to Nicole Bowyer. Specifically, on or about April 14, 2022, Resorts World entered into an Independent Agent Agreement with Nicole Bowyer. Matthew Bowyer's spouse. Resorts World approved this request and used its relationship with Bowyer's spouse to funnel money to Bowyer as a further incentive for Bowyer to gamble at Resorts World and continue to launder his illegal proceeds.

182. The AML Committee reviewed Bowyer's casino and financial activity on four separate occasions: (a) July 19, 2022[38]; (b) August 17, 2022[39]; (c) February 21, 2023[40]; and (d)

---

[38] Documentation provided to NGCB by Resorts World related to the AML Committee meeting on July 19, 2023 reflects, in part, the following regarding Bowyer: a. June Total In: $5,178,804; b. June F/M Deposit: $2,513,000; c. June Loss: $642,434; d. Average wager: $31,815; e. "Unable to confirm SOF. Patron owns his home valued at $2,203,200 and a condominium valued at $679,173"; (f) "Bowyer was listed as a partner for Pick Enterprises, LLC - No information was found online for the business"; (g) "Patron's spouse, Nicole Bowyer (Sandoval) is an Independent Agent and owns a clothing line ... with an annual revenue of $75,000 2021"; and (h) "Director of Cage stated that patron is a known 'bookie' and is using his spouse's Independent Host business as a cover."

[39] Documentation provided to NGCB by Resorts World related to the AML Committee meeting on that date reflects, in part, the following regarding Bowyer: a. July Total In: $1,420,013; (b) July F/M Deposit: $565,000; (c) July Loss: $551,843; (d) Average wager: $17,854; (e) Reiterated information from prior AML committee meeting, including "[u]nable to confirm SOF"; (f) Mr. Bowyer's possible spouse is a registered independent agent under Coco Gaming, LLC and its annual revenue cannot be determined; and (g) "VP Compliance requested further review by Director of Casino Operations and SVP of Casino Operations, for possible sports betting business affiliation."

[40] Documentation provided to NGCB by Resorts World related to the AML Committee meeting on that date reflects, in part, the following regarding Bowyer: (a) January Total In: $1,170,000; (b) January Loss: $298,408; (c) Average wager: $13,433; (d) "Mr. Bowyer has been previously reviewed by the Committee in June 2022 for CTR analytics. Allegedly, according to the Director of the Cage patron is a known 'bookie' and is using his spouse's business as a cover." And (e) "Patron SOF not established other than spouse's income."

March 21, 2023[41]. At each of these meetings, the AML Committee was obligated to make recommendations to bar, ban, or otherwise restrict patrons from Resorts World in accordance with the AML Program. However, despite the information available as of July 19, 2022, August 17, 2022, February 21, 2023, and March 21, 2023, the AML Committee did not fulfill its duty to make such a recommendation to bar, ban, or otherwise restrict Bowyer and, instead, Bowyer was allowed to continue to wager millions of dollars at Resorts World.

183. At the March 21, 2023, AML Committee meeting, the AML Committee, including Defendants Sibella, Forbes and Henderson agreed to Defendant Taube's request that the word 'bookie' be stricken from the January 2023 agenda. The NGCB flagged this as an instance of internal governance failure: the minute-taking and agenda-setting practices allowed for the cover-up of documented risk.

184. Defendants Sibella, Taube, Forbes, Tatonetti and others had the unilateral authority to bar, ban, or otherwise restrict patrons from Resorts World. However, despite the information available at the time of each AML Committee meeting on July 19, 2022, August 17, 2022, February 21, 2023, and March 21, 2023, Resorts World executives did not exercise their authority to bar, ban, or otherwise restrict Bowyer from Resorts World and he was allowed to continue to play and wager millions of dollars.

185. Throughout this timeframe of approximately one year, Bowyer lost millions, while Resorts World failed to verify his source of funds and furthermore knew that Bowyer was involved

---

[41] Documentation provided to NGCB by Resorts World related to the AML Committee meeting on that date reflects, in part, the following regarding Bowyer: (a) Mr. Bowyer was discussed at the previous meeting for CTR and Sports Book analytics." Doni Taub "also requested that the word 'bookie' be stricken from the January 2023 agenda as that was one person's opinion and there was no evidence of such behavior; (b) "Mr. Bowyer's host is now reported as Nicole Bowyer on the agenda and the word 'bookie' has been stricken from January 2023 agenda"; (c) February Totals In: $3,779,600; (d) February Loss: $426,151; (e) Average wager: $31,017; (f) "Patron has been previously reviewed by the Committee on June 2022" and "again last month; (g) "Patron SOF established but inconsistent with the level of play.

in illegal bookmaking. Yet, Bowyer was allowed to play at Resorts World for approximately 20 months without establishing his source of funds and/or that his level of play was consistent with a legitimate source of funds.

186. During the NGCB investigation, AML Committee members acknowledged that Bowyer's source of funds did not justify his level of play and/or that Bowyer should have been barred. Resorts World and its AML Committee failed to exercise proper due diligence and follow-up to establish Bowyer's source of funds.

187. Aside from failures by the AML Committee and others to fulfill their obligations under Resorts World's AML Program, two casino hosts failed to comply with the AML Program upon learning that Bowyer may be an illegal bookmaker.[42] In addition to the two casino hosts, Resorts World permitted Bowyer's spouse to serve as an independent agent for Resorts World with her husband as her client. Bowyer's spouse earned substantial commissions that were derived, in part, from Bowyer's losses at Resorts World that were derived from an illegal bookmaking business.

188. A federal search warrant was executed at Bowyer's home in October 2023. On or about October 6, 2023, Bowyer was banned from Resorts World.

---

[42] The *Amended Complaint* listed the following incidents: (a) On or about October 1, 2023, RESORTS WORLD Host 1 and Bowyer, amongst others, were on a Resorts World arranged marketing trip to an NFL football game in Dallas, Texas; (b) On or about October 1, 2023, Bowyer informed RESORTS WORLD Host 1 that Bowyer "runs a book" and asked RESORTS WORLD Host 1 to refer clients to Bowyer. Bowyer offered RESORTS WORLD Host 1 money in return for referring clients to Bowyer. RESORTS WORLD Host understood that Bowyer was an illegal bookmaker; (c) On or about October 1, 2023, RESORTS WORLD Host 1 provided the name of one of his Resorts World clients to Bowyer through a text message; (d) RESORTS WORLD Host 1 felt "uneasy" about referring his Resorts World client to Bowyer and subsequently sent a text message to the client telling him to stay away from Bowyer. (e) RESORTS WORLD Host 1 did not report to Resorts World that Bowyer informed RESORTS WORLD Host 1 that Bowyer "runs a book." (f) At some point while Damien LaForbes was playing at Resorts World, he informed RESORTS WORLD Host 2, his casino host, that Bowyer was "taking action" and was an apparent illegal bookmaker; (g) RESORTS WORLD Host 2 did not report to Resorts World that Bowyer may be an illegal bookmaker. NGCB Amended Complaint ¶ 65.

189.    At no time prior to October 6, 2023, did Resorts World did not bar, ban or restrict Bowyer. Further, at no time between February 2022 and October 2023, did Resorts World did not substantiate Bowyer's source of funds or conduct a proper Know Your Customer ("KYC") review.

190.    Resorts World allowed Bowyer to play 80 separate days between approximately February 2022 and October 2023. During that period, Resorts World extended numerous benefits to Bowyer to encourage him to play at Resorts World including comps, promo chips, gifts, discounts and flights on Resorts World's jet. Over the entire time Bowyer was a patron of Resorts World, Bowyer lost over $7.9 million.

191.    Resorts World's violated its AML Program requirements by failing to confirm Bowyer's source of funds for over 20 months. The Defendants and others knew, or should have known, from at least February 2022, that Bowyer was engaged in an illegal bookmaking business. Resorts World and that Bowyer did not have a legitimate source of income that would justify his gambling activities.

### (c).    Damien LeForbes Federal Criminal Prosecution

192.    The federal prosecution of Damien LeForbes was part of the broad investigation into illegal sports gambling operations across Southern California and their connections to Las Vegas casinos.

193.    On August 26, 2024, LeForbes, a professional poker play, pleaded guilty to charges for operating an illegal gambling business and money laundering. During the period from January 2022 through December 15, 2023, LeForbes wagered $148 million at Resorts World casino. LeForbes also recruited Resorts World hosts to act as agents in referring bettors to his illegal sports betting business.

194.    During the period of October 1, 2021 through December 22, 2023, LeForbes executed at least 17 personal or cashier's checks to Resorts World, totaling at least $9,105,000,

including one check for $1,000,000 executed on April 14, 2023. LeForbes knew that these personal and cashiers' checks to Resorts World involved illegal proceeds generated from his gambling business.

195.    LeForbes also presented illicit cash proceeds from LeForbes illegal gambling business to Resorts World. Specifically, between January 28, 2022 and December 15, 2023, LeForbes  presented at least $2,815,070 in cash to Resorts World, which represented proceeds from LeForbes illegal gambling business . During this same period, LeForbes wagered more than $148 million at Resorts World.

196.    LeForbes or his agents would also pay or accept payment from bettors in Resorts World casino chips.  For example, on or about November 16, 2022, LeForbes messaged another illegal bookmaker, stating "[Resorts World] is most important because the chips are so versatile for me."[43]

**(d)    Damien LeForbes NGCB Amended Complaint**

197.    Damien LeForbes became a patron of Resorts World when the casino opened in June 2021.

198.    From September 1, 2022 to December 16, 2023, LeForbes wagered a total of 150 separate days. During that period, Resorts World extended numerous benefits to LeForbes to encourage him to play there including comps, promo chips, and gifts. Ultimately, over that period, LeForbes lost in excess of $10 million at Resorts World.

199.    Host 2 was LeForbes' casino host at Resorts World.  In early 2022, LeForbes informed Host 2 that LeForbes "takes action." Host 2 understood that LeForbes was an illegal bookmaker but did not report the information to his supervisors or the AML Compliance Officer

[43] Gentry, D., *Another Resorts World Gambler Pleads Guilty to Money Laundering, Bookmaking*, Nevada Current, August 28, 2024, available here.

at Resorts World.  Host 2 testified to the NGCB agents that he did not tell his supervisors because he "thought that [he] was not the only one that kind of knew and it was kind of looked over."

200.    According to Host 2, LeForbes "marketed aggressively" and asked Host 2 to refer clients to him. Host 2 referred at least one prospective customer to LeForbes to wager with LeForbes.

201.    LeForbes was not banned until on or about March 12, 2024, when, as a result of a Resorts World internal investigation, Host 2 acknowledged that LeForbes was an illegal bookmaker. On May 9, 2024, Host 2 resigned from Resorts World.

202.    At no time from early 2022, until March 2024, did Resorts World bar, ban, or otherwise restrict LeForbes from Resorts World.

### (e)    Edward Ting Criminal Background

203.    Edward Ting was a long-time criminal involved in illegal gambling.  In September 2013, Ting plead guilty to conducting an illegal gambling business by operating high-stakes underground poker games.  On January 21, 2014, Ting was sentenced **to** five months in prison**,** and ordered to forfeit $2 million.

204.    Ting was originally charged in April 2013 in a 34-defendant indictment charging members and associates of two Russian-American organized crime enterprises with various crimes including racketeering, money laundering, extortion, and various gambling offenses. Ting ran high-stakes poker and sportsbook operations, respectively, that handled many millions of dollars in illegal gambling. From 2010 to 2013, Ting ran a high-stakes illegal poker game in New York City. At these games, the pots frequently reached tens of thousands of dollars or more. The operators of these games, including Ting, collected percentages of the pots known as "rakes."

### (f)    Edward Ting NGCB Complaint

205.    Ting became a patron of Resorts World at the time, or soon after, Resorts World opened in 2021. In or about July 2021, Resorts World extended a $300,000 credit to Ting. Subsequently, in 2021, Ting requested that Resorts World increase his credit to $1 million.

206.    From on or about June 24, 2021 to July 9, 2023, Ting wagered a total of 21 separate days and lost over $800,000 at Resorts World. During this same time period, Ting's average wager at Resorts World was approximately $9,000 and he had a total buy-in of more than $8 million.

207.    On or about December 16, 2021, the AML Committee evaluated Ting. Documentation provided to the AML Committee meeting on that date reflects that Ting was "denied credit/FM on 9/13/2021" The credit denial was based on Ting's negative criminal history and reputation related to him "conducting an illegal gambling business connected to organized crime in 2014."

208.    The AML Committee, as part of its duties, was obligated to make recommendations to bar, ban, or otherwise restrict patrons from Resorts World in accordance with the AML Program. However, despite the information available as of December 16, 2021, the AML Committee did not fulfill its duty to make such a recommendation to bar, ban, or otherwise restrict Ting.

209.    Defendants Resorts World, Sibella, Taube, Forbes, Tatonetti and other executives had the unilateral authority to bar, ban, or otherwise restrict patrons from Resorts World. However, despite the information available as of December 16, 2021, Resorts World's executives did not exercise their authority to bar, ban, or otherwise restrict Ting from Resorts World and he was allowed to continue to play.

210.    On or about March 13, 2023, Ting again requested credit, in the amount of $500,000, which was approved by Resorts World through its compliance department. Ting was not banned from Resorts World until August 23, 2023 as a result of an internal review.

211.    Resorts World knew, or should have known, of Ting's readily available criminal convictions, reputation related to illegal gambling business and ties to organized crime.  However, Resorts World ignored its obligations as a Nevada gaming licensee by allowing Ting to wager at Resorts World and extending him credit.

### V.    Plaintiffs' Claims

**Count One: Participation in a Racketeer Influenced and Corrupt Organization 18 USC 1962(c)**

### A.    RICO Overview

212.    Plaintiffs Cipriani, Russell and Do reallege and incorporate by reference Paragraphs 34 to 211 as if fully set forth herein.

213.    Between sometime in at least 2019 and continuing until sometime in 2025, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Matthew Forbes, Doni Taube, Zachary Koep, Joseph Tatonetti, Daniel Madurzak, Tonya Henderson**, **Elie Samarani**, **and Brandon Sattler** violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and in particular 18 U.S.C §1962(c), which provides, in pertinent part:

> "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

214.    Plaintiffs specifically allege, with respect to each Defendant, and will prove by a preponderance of the evidence, the following five elements, which establish a violation of 18

U.S.C. §1962(c): (1) conduct[44], (2) of an enterprise[45], (3) through a pattern[46], (4) of racketeering activity (known as "predicate acts")[47], (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation.[48]

215.   As members of the alleged Association-in-Fact Enterprise, the Defendants shared a common purpose[49] and maintained relationships among the members of the enterprise for a

---

[44] The conduct element of § 1962(c) requires that the defendant have some part in directing the affairs of the enterprise. Liability is not limited to those with primary responsibility for the enterprise's affairs, nor is a formal position within the enterprise required. However, the defendant is not liable under § 1962(c) unless the defendant has participated in the operation or management of the enterprise itself. *See Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that accountants hired to perform audit of cooperative's records did not participate in "operation or management" of cooperative's affairs by failing to inform cooperative's board of directors that cooperative was arguably insolvent). In determining whether the conduct element has been satisfied, relevant questions include whether the defendant "occup[ies] a position in the 'chain of command'," "knowingly implement[s] [the enterprise's] decisions," or is "indispensable to achievement of the enterprise's goal." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (holding that attorney's performance of services for alleged associated-in-fact enterprise was not sufficient to satisfy § 1962(c)'s conduct element). *See Ninth Circuit Pattern Jury Instructions, Civil Cases*, 2017, at 118.

[45] 18 U.S.C. § 1961(4) defines an "enterprise" to include what is commonly referred to as an "Association-in-Fact Enterprise," which is not a legal entity, but an informal association of individuals and entities. An "enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The "definition is not very demanding." *Odom*, 486 F.3d at 548. RICO does not require that either the racketeering enterprise or the predicate acts of racketeering be motivated by an economic purpose. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262 (1994).

[46] A pattern is defined as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Proving two predicate acts is a necessary condition for finding a violation but may not be sufficient. *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). To establish a "pattern of racketeering activity," the predicate acts must be both "related" and "continuous." *Id*.; *Sever*, 978 F.2d at 1529.

[47] To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. *Sedima, S.P.R.L. v. Imrex Co., Inc*., 473 U.S. 479, 495 (1985) (noting that "racketeering activity' consists of no more and no less than commission of a predicate act"). Predicate acts must be proved by a preponderance of the evidence. *See Wilcox v. First Interstate Bank*, 815 F.2d 522, 531-32 (9th Cir. 1987).

[48] *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).

[49] Related conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc*., 492 U.S. at 240. Relatedness of the alleged or proven predicate acts is rarely an issue. *See Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*, 833 F.2d 1360, 1363 (9th Cir. 1987) (finding alleged predicate acts to be related when all were directed toward inducing plaintiff to enter into joint venture and provide funds to obtain certain rights). However, merely alleging that the predicate acts share the same participants is insufficient to establish that they are related. *See Howard v. Am. Online Inc*., 208 F.3d 741, 749 (9th Cir. 2000) (finding that when the purpose, result, victim and method of one set of predicate acts were "strikingly different" from those of the other set of alleged predicate acts, fact that both sets implicated same participants was not enough to establish relatedness).

significant duration of time beginning in or around in June 2021, and continuing until sometime in March 2025.

216.  Each Defendant engaged in a "pattern of racketeering activity" by committing at least two distinct Predicate Acts. In defining how "the predicate acts must relate to each other," the Ninth Circuit[50] has held that the predicate acts must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."[51]

217.  Plaintiffs Cipriani, Russell and Do each have standing to bring this action because they each were injured "by reason of the violation(s) of section 1962(c)" as set forth herein.  To establish standing, Plaintiffs need only show that ***at least one Predicate Act*** of the pattern of

---

[50] The continuity requirement reflects Congress's concern in RICO with long-term criminal conduct.  *See H.J., Inc.*, 492 U.S. at 242.  Plaintiffs must prove either "open-ended" or "closed-ended" continuity—that is, a plaintiff must either prove a series of related predicate acts committed over a substantial period of time (known as closed-ended continuity) or show past conduct that by its nature projects into the future with a threat of repetition (known as open-ended continuity).  *See id.* at 241-42; *Howard*, 208 F.3d at 750.  There is no bright line rule for what period of time the pattern of activity must extend to establish closed-ended continuity, though activity spanning only several months is unlikely to satisfy the requirement.  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995) (noting that it would be "misguided" to state as  "hard and fast rule" that to establish closed-ended continuity, pattern of activity must extend more than year, but also stating that activity spanning only several months without threatening any future criminal conduct does not meet continuity requirement); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) ("[T]he alleged activity continued for six months at most . . . . We have found no case in which a court has held the [closed-ended continuity] requirement to be satisfied by a pattern of activity lasting less than a year.").  Open-ended continuity is shown through "predicate acts that specifically threaten repetition or that become a regular way of doing business."  *Allwaste*, 65 F.3d at 1528; *see, e.g.*, *Ikuno v. Yip*, 912 F.2d 306, 308 (9th Cir. 1990) (finding open-ended continuity based on two filings of false annual trading reports for phantom commodity trading company and no evidence that defendant would have stopped filing false annual reports if company had continued to do business); *Medallion*, 833 F.2d at 1364 (finding continuity requirement not satisfied because fraud engaged in posed no threat of future activity).

[51] *Ninth Circuit Pattern Jury Instructions, Civil Cases.*

Racketeering Activity resulted in injury to the Plaintiffs;[52] Plaintiffs need not demonstrate an injury caused by every alleged Predicate Act in order to establish standing.[53]

218.    Plaintiffs' RICO injuries flow directly from the Defendants' Predicate Acts of Money Laundering, Willful Failure to File Suspicious Activity Reports, Witness Tampering, Witness Retaliation, which are set forth and specifically alleged below, either one of which alone is sufficient to establish Plaintiff's standing to bring this action.[54] Loss of money, loss of livelihood or other business opportunities constitute an "injury to business or property."

**B.    The Association-in-Fact Enterprise.**

219.    Defendants Genting and Resorts World, acting individually and collectively with the individual Defendants, and others listed herein, did form an association-in-fact for the common and continuing purpose described herein that constituted an "enterprise" within the meaning of 18 U.S. 1961(4), and engaged in the conduct of their affairs through a pattern of racketeering activity.[55]   The members of the enterprise functioned as a continuing unit with an ascertainable

---

[52] A civil RICO plaintiff must demonstrate a (1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury.  As to the element of causation, a plaintiff must prove that the defendant's unlawful conduct was the proximate cause of the plaintiff's injury.  *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019).

[53] *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)); see also *Eleventh Circuit Pattern Jury Instructions, Civil Cases*, § 7.3 at 6, March 10, 2022 ("*[i]t isn't necessary that every predicate act caused damage to [Plaintiffs]*") (emphasis added); *Cf. Deppe v. Tripp*, 863 F.2d 1356, 1366 (7th Cir. 1988) ("no requirement exists that the plaintiff must suffer an injury from two or more predicate acts"); *Town of Kearny v. Hudson Meadows Urban Renewal*, 829 F.2d 1263, 1268 (3d Cir. 1987) ("[requiring] injury from the entire pattern rather than from any predicate act would . . . be inconsistent with the core Congressional purpose behind [RICO's] enactment"); *Shea v. Best Buy Homes*, 533 F. Supp. 1321, 1336 (N.D. Ga. Mar. 30, 2021) ("[i]t is the pattern which must be shown, not that the plaintiff was injured by each incident of which the pattern was comprised").

[54] As to the element of causation, a plaintiff must prove that the defendant's unlawful conduct was the proximate cause of the plaintiff's injury.  *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019).

[55] An "association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). To plead an association-in-fact enterprise, the Supreme Court has held that a plaintiff must allege that a group of persons shares three structural features: "(1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Id*. at 944, 946.

77

structure separate and distinct from that of the conduct of the pattern of racketeering activity.[56] The Association-in-Fact Enterprise engaged in, and its activities have affected, domestic and foreign commerce.

220.     The "Association-in-Fact Enterprise" consisted of Genting, Resorts World, and associated individuals and agents, functioning as an ongoing organization with a common purpose of maximizing profits by facilitating illegal gambling and laundering proceeds, and protecting that scheme through retaliation and obstruction.

221.     The "Association-in-Fact Enterprise"[57] was an informal and continuing organization among: (a) Defendants Genting Berhad, Resorts World, Scott Sibella, David Chesnoff,  Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti, Daniel Madurzak, Tonya Henderson, Elie Samarani, and Brandon Sattler; (b) Matthew Bowyer, Damien LeForbes, Edward Ting, Robert Alexander, who is deceased, Joseph Angelo Bravo, and David Stroj; and (c)

---

[56] A RICO enterprise must be an entity separate and distinct from any individual defendant—a person cannot conspire with itself. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("to establish liability under §1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name"). For purposes of § 1962(c), a single individual or entity cannot be both the RICO enterprise and an individual defendant. *See Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (holding that plaintiff could not assert RICO claim against defendant bank because bank was also alleged to be RICO enterprise). However, "the inability of a corporation to operate except through its officers is not an impediment to section 1962(c) suits." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992) (holding that individual officers of corporation could be named as defendants even though corporation was alleged to be enterprise and could not act without its officers); *see United States v. Benny*, 786 F.2d 1410, 1416 (9th Cir. 1986) (stating that corporate form is "sort of legal shield for illegal activity that Congress intended RICO to pierce").

[57] Defendants in RICO actions must have had "some knowledge of the nature of the enterprise . . . to avoid an unjust association of the defendant[s] with the crimes of others," but the requirement of a common purpose may be met so long as the defendants were "each aware of the essential nature and scope of [the] enterprise and intended to participate in it." *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 828 F.3d 763 (9th Cir. 2015). A RICO enterprise is not defeated even when some of the enterprise's participants lack detailed knowledge of all of the other participants or their activities. Instead, "it is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *Id*. (quoting *United States v. Eufrasio*, 935 F.2d 553, 557 n. 29 (3rd Cir. 1991). In particular cases, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise" may overlap. *Boyle*, 556 U.S. at 947. However, "enterprise" and "conduct" are two separate and necessary elements of a civil RICO claim. *Odom*, 486 F.3d at 549 ("The 'enterprise' is the actor, and the 'pattern of racketeering activity' is an activity in which that actor engages.")

other criminals engaged in illegal gambling, fraud, money laundering, drug trafficking and other crimes.[58]

### C.      Purposes of the Association-in-Fact Enterprise.

222.    Genting Berhad, a Malaysian conglomerate and Resorts World are significant players in the casino and resort industry.  Genting Berhad invested almost $4.3 billion to construct and open the Resorts World complex.  Resorts World is the crown jewel of Genting Berhad's presence in the casino and resort industry, and annual revenues are approaching $700- $800 million.  The casino industry in Las Vegas is estimated to earn approximately $9 billion annually.

223.    Resorts World opened in 2021 and earned revenues from its casino, its large hotel complex with over 3500 rooms, retail stores in a 70,000 square foot space, restaurants and entertainment including a 5000-seat theater.

224.    The purposes of the Association-in-Fact Enterprise included:

(a) to maximize strong financial performance of Genting Berhad and Resorts World and the Resorts World casino and hotel complex by (1) encouraging and welcoming criminals (1) to gamble with illegal proceeds generated from illegal gambling, wire fraud, and money laundering schemes; (2) to invest in, participate in, and operate stores, restaurants and other businesses at the Resorts World complex as a means to maximize and facilitate illegal money laundering activities, which would benefit Genting Berhad and Resorts World, individual executives, and criminal patrons of Resorts World.

---

[58] An organizational defendant can be a member of a larger associated-in-fact enterprise.  *See Living Designs*, 431 F.3d at 361 (finding associated-in-fact enterprise could be formed between defendant corporation, law firms employed by it and expert witnesses retained by law firm).  An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."  *Boyle v. United States*, 556 U.S. 938, 945-46 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)).  Its existence is proven through evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit.  No particular organizational structure, separate or otherwise, is necessary for an associated-in-fact enterprise.  *Odom*, 486 F.3d at 551 (finding that plaintiffs had sufficiently alleged associated-in-fact enterprise between defendant software manufacturer and co-defendant retailer wherein defendants established cross-marketing scheme for transferring plaintiffs' personal information from retailer to manufacturer in order to allow manufacturer to improperly charge plaintiffs for services); *see also Boyle*, 556 U.S. at 946 ("It is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.").

(b) to knowingly and deliberately permit criminals to gamble at Resorts World casino and spend money at the Resorts World complex as a means to ensure Genting Berhad and Resorts World's investment in the construction of a significant new casino and hotel complex was financially lucrative and recognized for its overall success as the newest casino and hotel complex in Las Vegas in 2021.

(c) to knowingly and deliberately ignore basic anti-money laundering rules, policies and procedures to increase the presence of the criminal element at Resorts World so that revenues will increase from the use of illegal proceeds from illegal gambling, fraud and money laundering activities.  To execute this strategy, Resorts World implemented on paper the elements needed to appear as if it was maintaining an effective AML program and was in compliance with Nevada Gambling Commission regulations, while in practice, many of the AML program requirements and Nevada Gaming Commission regulations and best practices were ignored or overruled.

(d) to promote financial success and loyalty among members of the enterprise by ensuring that each member earns financial benefits from: (1) lucrative salaries, commissions and benefits for Genting and Resorts World executives, senior managers and employees, including but not limited to, Scott Sibella, Doni Taube, Matthew Forbes, Joseph Taonetti, Tonya Henderson, Elie Samarani and others; (2) lucrative investment opportunities and financial benefits which members can offer to patrons, clients and criminals who would otherwise be barred from such financial investments in Resorts World; and (3) gambling and money laundering of illegal proceeds earned by criminal patrons who desire access to casinos as an effective and easy means to launder the illegal proceeds.

(e) to prevent whistleblowers and individuals, who either who work at Resorts World or are patrons of the casino and hotel complex, from reporting illegal activities occurring at the Resorts World complex to federal and state law enforcement, and Nevada Gaming Commission regulators.  The Defendants each recognized that the success of their illegal scheme and financial benefits depended on preventing law enforcement or regulators from initiating an investigation that could have a disastrous impact on Genting Berhad and Resorts World and affiliated individuals.  To that end, the Defendants and other members of the enterprise would engage in intimidation, harassment, threats and make false reports against whistleblowers to have them illegal arrested, barred from Resorts World's casino and punish them to silence whistleblowers and protect the Enterprise's ongoing illegal activities, which benefited all of the members of the enterprise.

(f) to deliberately and willfully ignore basic AML governance structures and procedures to conduct effective oversight and monitoring of Resorts World business to present an image as a compliant casino but in reality is dedicated to promoting illegal activity.

**D.   Pattern of Racketeering Activity**

225.   The Defendants, each of whom are persons or a legal entity associated with, or employed by, the Association-in-Fact Enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1)(3) and 1962(c).  The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the Association-in-Fact Enterprise.

**RICO Predicates Summary**

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani Sattler | Money Laundering | 1-12 | 18 USC 1956 | June 2021-October 2021 | **Sattler** Gambling Criminal Proceeds 12 |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani Sattler | Money Laundering<br><br>**Sattler** Stroj Gambling Criminal Proceeds | 13 | 18 USC 1956 | October, 2021 - April 2022 | **Sattler** Gambling Criminal Proceeds 1 |
|  |  |  |  |  |  |
| Genting Resorts World (RW) | Money Laundering | 14-17 | 18 USC 1956 | June 2021 to | **Alexander (Deceased)** |

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| KT Sibella Taube Forbes Tatonetti Henderson Samarani | | | | November 2021 | Gambling Criminal Proceeds 4 |
| | | | | | |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Money Laundering | 18-42 | 18 USC 1956 | June 2021-July 2023 | **Ting** Gambling Criminal Proceeds 25 |
| | | | | | |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Money Laundering | 43-45 | 18 USC 1956 | June 2021-2025 (1) Eight Cigar Lounge; (2) Bravo Tickets; (3) Bravo Concierge | Chesnoff & Bravo Businesses 3 |
| | | | | | |
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Money Laundering | 46-130 | 18 USC 1956 | February 2022-October 2023 | **Bowyer** Gambling Criminal Proceeds 85 |
| | | | | | |

82

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| Genting Resorts World (RW) KT Sibella Taube Forbes Tatonetti Henderson Samarani | Money Laundering | 131-297 | 18 USC 1956 | October 2021 - December 2023 | LeForbes Gambling Criminal Proceeds 167 |
| | | | | | |
| Genting RW KT Sibella Chesnoff Taube Forbes Koep Tatonetti Madurzak | Witness Tampering | 298-300 | 18 USC 1512(a)(2)(A)(C); 1512(b)(1)(2)(3) 1512(c) 1512(d) 1512(k) | October 2021 - May 2022 | Witness Tampering 3 |
| Genting RW KT Sibella Chesnoff Taube Forbes Koep Madurzak | Retaliating Against a Witness | 301-303 | 18 USC 1513(e) | October 2021 - May 2022 | Retaliating Against a Witness 3 |
| Genting RW KT Sibella Chesnoff Taube Forbes Koep Tatonetti Madurzak | NRS 199.240 | 304-306 | NRS 199.240 | October 2021 - May 2022 | Harassing a Witness 3 |

| Defendant(s) | Predicate Crime | Act Nos. | Statute(s) | Time Period | Violations |
|---|---|---|---|---|---|
| Genting RW | Failure to Maintain Effective AML Program | 307 | 31 USC 5318(h) 31 USC 5322(a) | June 2021 - March 2025 | Failure to Maintain AML Program 1 |
| | | | | | |
| Genting RW KT Sibella Forbes Koep Madurzak | Witness Tampering | 308 | 18 USC 1512(a)(2)(A)(C); 1512(b)(1)(2)(3) 1512(c) 1512(d) 1512(k) | Early 2022 to December 2024 | Witness Tampering 1 |
| Genting RW KT Sibella Forbes Koep Madurzak | Retaliating Against a Witness | 309 | 18 USC 1513(e) | Early 2022 to December 2024 | Retaliating against a Witness |
| Genting RW KT Sibella Forbes Koep Madurzak | NRS 199.240 | 310 | NRS 199.240 | Early 2022 to December 2024 | Harassing a Witness |

**E.    Predicate Acts 1-12: Money Laundering and Conspiracy**
**(Sattler** Gambling and Criminal  Fraud Proceeds)
**(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**

226.    Beginning in or about June 2021, and continuing until in or about sometime i in October 2021, and occurring on twelve separate days in that period, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, **Tonya Henderson, Elie Samarani, and Brandon Sattler**, together with others known and

unknown to the Plaintiffs, did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the **proceeds of specified unlawful activity**, that is: (a) the operation of an **illegal gambling business**, in violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

227.    The Defendants knew that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and **knew that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds** of said specified unlawful activity.

228.    The financial transactions included, among others: (1) the deposit of gambling and wire fraud proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing their illicit origin.

F.    **Predicate Act 13: Money Laundering and Conspiracy**
**(Sattler** Gambling and Fraud Criminal  Proceeds)
**(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**

229.    Beginning in or about sometime in June 2021 and continuing to in or about June 2022, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti, Daniel Madurzak, Tonya Henderson, Elie Samarani, and Brandon Sattler**, together with others known and unknown to the Plaintiffs, did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the **proceeds of specified unlawful activity**, that is: (a) the operation of an **illegal**

**gambling business**, in violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

230.    The Defendants knew that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and **knew that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds** of said specified unlawful activity.

231.    The financial transactions included, among others: (1) the investment of illegal gambling and fraud proceeds into the restaurant business known as Tacos El Cabron, located on the premises of Resorts World Las Vegas; (2) the purchase pf restaurant equipment, supplies, and leasehold improvements, including Defendant Sattler's SattCom Video LLC audio and video equipment which was installed at the restaurant, with funds derived from illegal gambling and fraud schemes; (c) the deposit of cash proceeds from unlawful wagering and wire fraud into business accounts held in the name of Tacos El Cabron LLC; and (d) the transfer of funds from those business accounts to other accounts controlled by the Defendants and their associates, to make the proceeds appear legitimate.

G.    **Predicate Acts 14-17: Money Laundering and Conspiracy
(Robert Alexander (deceased)** Gambling Criminal  Proceeds)
**(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**

232.    Beginning in or around sometime in June 2021, and continuing until sometime in 2022, and occurring on at least four separate occasions during this time period, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim , Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, **Tonya Henderson, and Elie Samarani,** together with Robert Alexander, who is now deceased, and others known and unknown to the Plaintiffs, did knowingly conduct and attempt to

conduct financial transactions affecting interstate and foreign commerce, which transactions involved the **proceeds of specified unlawful activity**, that is: (a) the operation of an **illegal gambling business**, in violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

233.    The Defendants knew that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and **knew that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds** of said specified unlawful activity.

234.    The financial transactions included, among others: (1) the deposit of gambling proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing their illicit origin..

H.    **Predicate Acts 18-42: Money Laundering and Conspiracy**
**(Ting Gambling** Criminal  Proceeds)
**(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**

235.    Beginning in or around sometime in June 2021 and continuing until sometime in July 2023, and occurring on at least twenty-five (25) separate occasions, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, **Tonya Henderson, and Elie Samarani,** did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the **proceeds of specified unlawful activity**, that is: (a) the operation of an **illegal**

87

**gambling business**, in violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

236.    The Defendants knew that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and **knew that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds** of said specified unlawful activity.

237.    The financial transactions included, among others: (1) the deposit of gambling proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing their illicit origin.

        **I.**      **Predicate Acts 43-45: Money Laundering and Conspiracy**
              **(Chesnoff & Bravo** Criminal Proceeds)
              **(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**

238.    Beginning in or around sometime in June 2021 and continuing until sometime in and around March 2025, and occurring with respect to three separate businesses jointly owned by Joseph  Angelo Bravo and Defendant David Chesnoff, doing business under the names of Eight Cigar Loungs, Bravo Tickets and Bravo Concierge, respectively, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, **Tonya Henderson, and Elie Samarani**, did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the **proceeds**

**of specified unlawful activity**, that is: (a) the operation of an **illegal gambling business**, in violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

239.    The Defendants knew that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and **knew that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds** of said specified unlawful activity.

240.    The financial transactions included, among others: (1) the deposit of gambling and fraud proceeds into (a) the cigar lounge business known as (a) Eight Cigar Lounge; (b) the deposit of gambling and fraud proceeds into (b) the entertainment and event business known as Bravo Tickets; and (c) the concierge service at the Resorts World casino and hotel complex known as Bravo Concierge; (2) the purchase of lounge furniture and equipment, supplies, and leasehold improvements, with funds derived from illegal gambling and fraud schemes; (c) the deposit of cash proceeds from unlawful wagering into business accounts held in the names of businesses 1(a)-1(c) above; and (d) the transfer of funds from those business accounts to other accounts controlled by the Defendants and their associates, to make the proceeds appear legitimate.

**J.      Predicate Acts 46-130: Money Laundering and Conspiracy**
**(Matthew Bowyer Gambling** Criminal  Proceeds)
**(18 U.S.C. §1956(a)(1)(B)(ii) and (h))**

241.    Beginning in or around sometime in February 2022 and continuing until sometime in October 2023, and occurring on eighty-five (85) separate days within this time period, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, **Tonya Henderson, and Elie Samarani,** did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which

transactions involved the **proceeds of specified unlawful activity**, that is: (a) the operation of an **illegal gambling business**, in violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

242.    The Defendants knew that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and **knew that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds** of said specified unlawful activity.

243.    The financial transactions included, among others: (1) the deposit of gambling proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing their illicit origin.

### K.    Predicate Acts 131-297: Money Laundering and Conspiracy
(**LeForbes Gambling** Criminal  Proceeds)
(**18 U.S.C. §1956(a)(1)(B)(ii) and (h)**)

244.    Beginning in or around sometime in October 2021 and continuing until sometime in December 2023, and occurring on at least one hundred sixty seven (167) days during that period, within the District of Nevada and elsewhere, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, **Tonya Henderson, and Elie Samarani**, did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the **proceeds of specified unlawful activity**, that is: (a) the operation of an

**illegal gambling business**, in violation of **18 U.S.C. § 1955**, and (b) **wire fraud**, in violation of **18 U.S.C. § 1343.**

245.    The Defendants knew that the property involved in these financial transactions represented the proceeds of some form of unlawful activity, and **knew that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds** of said specified unlawful activity.

246.    The financial transactions included, among others: (1) the deposit of gambling proceeds into casino accounts at **Resorts World Las Vegas**; (2) the purchase of high-value gaming chips and markers using fraud-derived funds; (3) the redemption of casino chips and wire transfer of funds through financial institutions in Nevada, California, and elsewhere; and (4) the transfer of said funds to accounts controlled by the Defendants and associates, for the purpose of concealing their illicit origin.

### L.    Predicate Acts 298-300: Tampering with a Witness
### (Plaintiff Cipriani)

247.    In or about sometime between October 2021 and continuing until May 4, 2022, and occurring on three separate occasions during this time period, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, and Robert Alexander, who is now deceased**,** acting individually and in concert, within the District of Nevada, did knowingly and intentionally use intimidation, threats or corrupt persuasion , or attempts to do so, with intent to: (1) influence, delay or prevent the testimony of Plaintiff Cipriani in an official proceeding, in violation of 18 U.S.C. § 1512(b)(2)(A) and (k); (2) cause or induce Plaintiff Cipriani to withhold testimony from an official proceeding, in violation of 18 U.S.C. § 1512(b)(2)(B) and (k); and/or (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United

States of information relating to the commission or possible commission of a Federal offense, in violation of 18 U.S.C. § 1512(b)(3) and (k).

### M.    Predicate Acts 301-303: Retaliation Against a Witness
### (Plaintiff Cipriani)

248.    In or about sometime between October 2021 and continuing until May 4, 2022, and occurring on three separate occasions during this time period, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, **and** Robert Alexander, who is now deceased**,** acting individually and in concert, within the District of Nevada, knowingly and intentionally harassed, intimidated, falsely arrested and prosecuted Plaintiff Cipriani for alleged criminal offenses, which the Defendants knew were false, i.e., larceny, robbery, gambling fraud with the intent to: retaliate against and interfere with the lawful gambling activities and livelihood of Plaintiff Cipriani, and thereafter ensure that Resorts World banned Plaintiff Cipriani from Resorts World casino and hotel complex, in order to prevent and retaliate against Plaintiff Cipriani for providing, or attempting to provide, to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, in violation of 18 U.S.C. §1513(e) and (f).

### N.    Predicate Acts: 304-306, Retaliation Against Witness or Informant
### (Plaintiff Cipriani)
### NRS 199.240

249.    In or about sometime between October 2021 and continuing until May 4, 2022, and occurring on three separate occasions during this time period, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, and Robert Alexander, who is now deceased**,** acting individually and in concert, within Clark County, Nevada, did knowingly and

maliciously engage in acts of harassment, intimidation and economic retaliation against Plaintiff Cipriani, a person who had provided information and evidence to federal law enforcement authorities and the Nevada Gaming Control Board concerning illegal gambling, fraud and money laundering activities occurring at Resorts World Las Vegas, in retaliation for the witness having and continuing to cooperate with said authorities and for having given truthful statements and evidence in connection with those investigations.

250. Such retaliatory acts included, but were not limited to: (a) causing the witness to be falsely detained and ejected from the casino premises; (b) preparing false statements and affidavits to support an allegation of Gambling Fraud against Plaintiff Cipriani; (c) revoking or interfering with the witness's player account and gaming privileges; (d) threatening loss of livelihood, employment opportunities, and financial harm; and (e) publicly defaming the witness to discourage further cooperation with law enforcement. These acts were intended to punish, harass, and injure the witness for his or her cooperation with federal and state law-enforcement officers and agencies, in violation of NRS 199.240.

251. Defendants' acts of witness retaliation were undertaken to facilitate, conceal, and continue unlawful gambling-related activity, and therefore constitute acts "involving gambling" within the meaning of 18 U.S.C. § 1961(1)(A).

**O.    Predicate Act 307: Willful Failure to Maintain an Effective AML Program**
**(Genting Berhad and Resorts World)**
**(31 U.S.C. §§ 5318(h) and 5322(a))**

252.    At all times material to this Racketeering Act, **Genting Berhad**, a Malaysian holding company, owned and controlled the subsidiary **Resorts World Las Vegas**, a licensed gaming establishment and financial institution within the meaning of 31 U.S.C. § 5312(a)(2).

253.    From on or about **June 24, 2021**, the date of Resorts World Las Vegas's opening, and continuing through on or about March 2025, in the District of Nevada and elsewhere, the defendants **Genting Berhad** and **Resorts World Las Vegas LLC** being financial institutions subject to the Bank Secrecy Act ("BSA"), **knowingly and willfully failed to develop, implement, and maintain an effective anti–money-laundering program**, as required by 31 U.S.C. § 5318(h) and its implementing regulations, including 31 C.F.R. § 1021.210.

254.    The Defendants' AML program was required to include: (a) internal controls to assure ongoing compliance with the BSA; (b) independent testing for compliance; (c) designation of qualified AML compliance officers; and (d) ongoing training of personnel in recognition and reporting of suspicious transactions.

255.    The Defendants **willfully failed** to establish and enforce those measures by, among other things: (a) permitting high-value cash transactions and chip redemptions without appropriate customer-due-diligence or Source of Funds confirmation; (b) ignoring red-flag activity involving illegal bookmaking and fraud proceeds channeled through casino accounts and concession operations; (c) failing to designate qualified personnel to oversee AML compliance; and (d) omitting to file required Suspicious Activity Reports with the Financial Crimes Enforcement Network ("FinCEN"), in violation of Title 31, United States Code, Sections 5318(h) and 5322(a).

**P.   Predicate Act 308: Tampering with a Witness**
**(Plaintiff Do)**

256.   In or about sometime between early 2022 and continuing until early December 2024, **Defendants Genting Berhad, Resorts World, Scott Sibella, Matthew Forbes, Zachary Koep, and Daniel Madurzak,** acting individually and in concert, within the District of Nevada, did knowingly and intentionally use intimidation, threats or corrupt persuasion, or attempts to do so, by directing Plaintiff Do to cease any investigation or surveillance activities, ultimately resulting in Plaintiff Do's employment termination at Resorts World, with intent to: (1) influence, delay or prevent the testimony of Plaintiff Do in an official proceeding, in violation of 18 U.S.C. § 1512(b)(2)(A) and (k); (2) cause or induce Plaintiff Do to withhold testimony from an official proceeding, in violation of 18 U.S.C. § 1512(b)(2)(B) and (k); and/or (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense, in violation of 18 U.S.C. § 1512(b)(3) and (k).

**Q.   Predicate Act 309: Retaliation Against a Witness**
**(Plaintiff Do)**

257.   In or about sometime in early 2023 and continuing until early December 2024, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, Matthew Forbes, Zachary Koep, and Daniel Madurzak,,** acting individually and in concert, within the District of Nevada, knowingly and intentionally harassed, and intimidated Plaintiff Do to cease any investigation or surveillance activities, ultimately resulting in Plaintiff Do's employment termination at Resorts World, with intent to: retaliate against and interfere with the lawful activities and livelihood of Plaintiff Do, in order to prevent and retaliate against Plaintiff Do for providing, or attempting to provide, to a law enforcement officer any truthful information relating to the

commission or possible commission of any Federal offense, in violation of 18 U.S.C. §1513(e) and (f).

**R.   Predicate Act 310: Retaliation Against Witness or Informant**
**(Plaintiff Do)**
**NRS 199.240**

258.   In or about early 2024 and continuing until early December 2024, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, Matthew Forbes, Zachary Koep**, and **Daniel Madurzak**, acting individually and in concert, within the District of Nevada, Clark County, Nevada, did knowingly and maliciously engage in acts of harassment, intimidation and economic retaliation against Plaintiff Do, a person who had provided information and evidence to federal law enforcement authorities and the Nevada Gaming Control Board concerning illegal gambling, fraud and money laundering activities occurring at Resorts World Las Vegas, in retaliation for the witness having reported evidence of illegal activities at Resorts World.

259.   Such retaliatory acts included, but were not limited to: (a) causing the witness to be terminated from his employment to ensure loss of livelihood, employment opportunities, and financial harm; and (b) defaming Plaintiff Do to discourage cooperation with law enforcement. These acts were intended to punish, harass, and injure Plaintiff Do to deter and prevent Plaintiff Do from cooperation with federal and state law-enforcement officers and agencies, in violation of NRS 199.240.

260.   Defendants' acts of witness retaliation were undertaken to facilitate, conceal, and continue unlawful gambling-related activity, and therefore constitute acts "involving gambling" within the meaning of 18 U.S.C. § 1961(1)(A).

## Count Two: RICO Conspiracy 18 USC 1962(d)
### (Against all Defendants)

261.    Plaintiffs Cipriani, Russell and Do reallege and incorporate by reference Paragraphs 34 to 260 as if fully set forth herein.

262.    Between sometime in at least June 2021 and continuing until sometime in 2025, **Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti**, **Daniel Madurzak**, **Tonya Henderson, Elie Samarani and Brandon Sattler** did combine, conspire, confederate, and agree to conduct or participate, directly or indirectly, in the conduct of an enterprise, as defined above, through a pattern of racketeering activity as alleged in Count One of this Complaint, in violation of 18 U.S.C. § 1962(d).[59]

---

[59] A RICO conspiracy under § 1962(d) may be established by proof of an agreement to commit a substantive violation of RICO. *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 774-75 (9th Cir. 2002) ("It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy.") (citation omitted). The conspirator need not have agreed to commit or facilitate each and every part of the substantive offense. *Howard*, 208 F.3d 741, 751 (9th Cir. 2000) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997)). However, the conspirator must have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Id*. (citing *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)). The "agreement need not be express as long as its existence can be inferred from words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co.*, 298 F.3d at 775. If a RICO conspiracy is demonstrated, "[a]ll conspirators are liable for the acts of their co-conspirators." *Id*. (citation omitted).A defendant can be held liable for a RICO conspiracy if the evidence shows that he or she "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *United States v. Fernandez*, 388 F.3d 1199, 1229-30 (9th Cir. 2004) (citation omitted). There is no requirement that the defendant have actually conspired to operate or manage the enterprise himself or herself. *Id*. (affirming conviction under § 1962(d) of defendant who collected money on behalf of member of enterprise, facilitated communications between conspirators and accepted payment for drugs sold through enterprise)

263.   Each Plaintiff has been injured and continues to be injured in his business and property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d).

**Count Three: Retaliation and Witness Intimidation**
**42 U.S.C. 1985(2) Obstructing Justice; Intimidating Party, Witness or Juror**

264.   Plaintiffs Cipriani, Russell and Do reallege and incorporate by reference Paragraphs 34 to 211 as if fully set forth herein.

265.   At all relevant times, Plaintiff Cipriani was a known cooperating witness and source of information for federal law enforcement agencies, including the Federal Bureau of Investigation ("FBI"), Internal Revenue Service – Criminal Investigation ("IRS-CI"), and Homeland Security Investigations ("HSI"), concerning illegal gambling operations, money laundering, and related criminal conduct connected to Defendants.

266.   Plaintiff Cipriani's information and cooperation were provided in connection with **ongoing and contemplated federal criminal investigations and proceedings**, including investigations that ultimately resulted in federal prosecutions of individuals engaged in illegal gambling and money laundering activities associated with casinos in Las Vegas and elsewhere.

267.   At all relevant times, Defendants were aware that Plaintiff Cipriani was cooperating with federal authorities and was likely to serve as a witness in **federal grand jury proceedings, criminal prosecutions, and related judicial proceedings** arising from such investigations.

268.   Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti, Dan Madurzak, Robert Alexander, and others knowingly and willfully **conspired and agreed** to deter, intimidate, and retaliate against Plaintiff Cipriani for his cooperation with federal authorities.

269.   The purpose of the conspiracy was to: (a) prevent Plaintiff Cipriani from continuing to provide information to federal investigators; (b) deter Plaintiff Cipriani from testifying or

otherwise participating in federal proceedings; and (c) punish Plaintiff Cipriani for his past cooperation with law enforcement.

270. In furtherance of this conspiracy, Defendants engaged in overt acts including, but not limited to: (a) orchestrating the false arrest and prosecution of Plaintiff Cipriani; (b) disseminating false and defamatory information about Plaintiff Cipriani; (c) barring Plaintiff Cipriani from casinos and thereby cutting off his access to information and sources; (d) threatening Plaintiff Cipriani's livelihood and reputation; and (e) otherwise intimidating and coercing Plaintiff Cipriani to cease his cooperation with federal authorities.

271. Defendants' actions were intended to, and did, **impede, hinder, obstruct, and defeat the due course of justice in the United States**, including federal investigations and proceedings concerning illegal gambling and money laundering activities.

272. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Cipriani was deterred, delayed, and hindered in his ability to communicate with federal investigators and to participate fully and freely in federal proceedings.

273. Plaintiff Cipriani suffered injury as a result of Defendants' conduct, including but not limited to loss of liberty, reputational harm, emotional distress, loss of business opportunities, and other economic damages.

274. Plaintiff Cipriani is entitled to recover compensatory damages, punitive damages, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**Count Four: Civil Rights and False Arrest/Unreasonable Seizure**
**42 U.S.C. §1983; US Const. Amends. IV & XIV**

275.    Plaintiffs Cipriani, Russell and Do reallege and incorporate by reference Paragraphs 34 to 211 as if fully set forth herein.

276.    At all relevant times, Defendants Genting Berhad, Resorts World Las Vegas LLC, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti, Robert Madurzak, and Robert Alexander (collectively, the "Private Defendants") acted **under color of state law** by willfully participating in joint activity with, and conspiring with, state officials, including Clark County District Attorney Steven Wolfson.

277.    The Private Defendants and District Attorney Wolfson shared a common objective to **silence, retaliate against, and discredit Plaintiff Cipriani** for reporting illegal gambling, money laundering, and related criminal conduct occurring at Resorts World.

278.    In furtherance of this objective, the Private Defendants knowingly and intentionally: (a) provided false, misleading, and/or materially incomplete information to law enforcement and prosecutorial authorities; (b) concealed exculpatory information demonstrating that Plaintiff Cipriani had engaged in lawful conduct;  (c) urged, encouraged, and influenced the initiation and continuation of criminal proceedings against Plaintiff Cipriani without probable cause; and (d) coordinated with prosecutorial authorities to ensure that Plaintiff Cipriani would be arrested, charged, and prosecuted.

279.    District Attorney Wolfson, acting under color of state law, knowingly accepted and acted upon the information and influence provided by the Private Defendants, and agreed—

100

explicitly or tacitly—to pursue criminal charges against Plaintiff Cipriani in furtherance of the shared objective.

280. The relationship between the Private Defendants and District Attorney Wolfson was further evidenced by, inter alia, the timing and circumstances of political contributions made by Resorts World and its executives to District Attorney Wolfson's campaign, including contributions made shortly after Plaintiff Cipriani's arrest and during the pendency of the prosecution.

281. Through the foregoing conduct, the Private Defendants and District Attorney Wolfson were **willful participants in joint activity**, creating a sufficiently close nexus between the State and the challenged conduct such that the Private Defendants' actions are fairly attributable to the State for purposes of 42 U.S.C. § 1983

282. Plaintiff Cipriani is entitled to recover compensatory damages, punitive damages against the individual Defendants, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

**Count Five: False Arrest of Plaintiff Cipriani**
**November 19, 2021**
**NRS 200.460; NRS 171.235**

283.   Plaintiffs Cipriani, Russell and Do reallege and incorporate by reference Paragraphs 34 to 211 as if fully set forth herein.

284.   On or about November 19, 2021, Plaintiff Cipriani was **detained, arrested, and restrained of his liberty** at or near Resorts World Las Vegas in Clark County, Nevada.

285.   The detention and arrest of Plaintiff Cipriani were **unlawful and without legal authority**, in that they were not supported by probable cause or any reasonable basis to believe that Plaintiff Cipriani had committed a criminal offense.

286.   Defendants Genting Berhad, Resorts World, KT Lim, Scott Sibella, David Chesnoff, Doni Taube, Matthew Forbes, Zachary Koep, Joseph Tatonetti, Robert Alexander, and others **instigated, directed, encouraged, and/or actively participated** in the arrest of Plaintiff Cipriani.

287.   Defendants' conduct included, but was not limited to: (a) providing false, misleading, and/or incomplete information to law enforcement; (b) omitting material exculpatory information; (c) urging and encouraging law enforcement to detain and arrest Plaintiff Cipriani; and (d) acting with the intent to retaliate against Plaintiff Cipriani and silence his reporting of illegal activity.

288.   Law enforcement authorities relied upon the information and influence provided by Defendants in effecting the arrest of Plaintiff Cipriani. As a direct and proximate result of

Defendants' conduct, Plaintiff Cipriani was unlawfully deprived of his liberty, subjected to criminal charges, and suffered damages.

289. Defendants acted **maliciously, oppressively, and with conscious disregard** for Plaintiff Cipriani's rights, entitling Plaintiff to an award of punitive damages under Nevada law.

290. Plaintiff Cipriani seeks compensatory damages, punitive damages, attorneys' fees where permitted, costs of suit, and such other relief as the Court deems just and proper.

**Count Six: Nevada Whistleblower Retaliation**
**(NRS 613.340–613.435)**
**(Defendants Genting, Resorts World, Sibella, Forbes, Koep, and Madurzak)**

291. Plaintiff Do realleges and incorporates Paragraphs 34 to 211 as though fully set forth herein.

292. At all relevant times, Plaintiff Do was an employee within the meaning of NRS 613.340, and Defendants were his employer and/or persons acting on behalf of the employer.

293. Shortly after joining Resorts World, Plaintiff Do raised concerns internally about illegal and improper activity occurring at Resorts World. During the period from 2022 to December 2024, Plaintiff Do raised issues of concern on numerous occasions. The Defendants ignored or failed to respond to Do's concerns. Plaintiff Do continued to engage in in protected activity by disclosing and reporting, in good faith, information regarding violations or suspected violations of state and federal law, including but not limited to fraud, theft, misuse of financial accounts, improper extension of credit, and conduct consistent with money laundering and tax evasion.

294. Plaintiff Do made such disclosures to his supervisors and other management personnel at Resorts World, including Defendants Koep, Madurzak, and colleagues Santarufo, and Dever, and reasonably believed that the reported conduct constituted violations of law.

103

295.   Defendants were aware, directly or indirectly, of Plaintiff Do's protected activity.

296.   After Plaintiff Do continued to raise concerns regarding unlawful conduct, Defendants took adverse action against Plaintiff Do and terminated his employment citing only pretextual reason to justify such termination.

297.   Defendants' stated reason for Plaintiff Do's termination—alleged timekeeping violations—was pretextual and was used to conceal retaliatory intent.

298.   Plaintiff Do's protected activity was a substantial and motivating factor in Defendants' decision to terminate his employment.

299.   As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff Do has suffered damages, including lost wages, lost benefits, emotional distress, reputational harm, and other consequential damages.

300.   Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff Do's rights, entitling him to punitive damages.

**Count Seven: Wrongful Termination in Violation of Public Policy**
**(Nevada Common Law)**
**(Defendants Genting, Resorts World, Sibella, Koep, and Madurzak)**

301.   Plaintiff Do realleges and incorporates Paragraphs 34 to 211 as though fully set forth herein.

302.   Nevada law recognizes a cause of action for wrongful termination where an employee is discharged in violation of strong and compelling public policy.

303.   At all relevant times, clear public policies existed under federal and Nevada law prohibiting money laundering, fraud, tax evasion, and the concealment of financial transactions,

104

and requiring regulated gaming establishments to comply with anti-money laundering ("AML"), know-your-customer ("KYC"), and financial reporting obligations..

304.    Additional public policies prohibit retaliation against employees who report unlawful conduct and encourage the reporting and prevention of criminal activity.

305.    Plaintiff Do engaged in conduct protected by these public policies by reporting suspected illegal activity, including fraudulent financial practices, misuse of comp and reimbursement systems, unmonitored financial accounts, and conduct consistent with money laundering and tax violations.

306.    Defendants terminated Plaintiff Do in retaliation for engaging in such protected conduct.

307.    Defendants' termination of Plaintiff Do was wrongful and violated established public policy.

308.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Do has suffered damages, including lost wages, lost benefits, emotional distress, and other consequential damages.

309.    Defendants acted with oppression, fraud, and malice, entitling Plaintiff Do to an award of punitive damages.

### Prayer for Relief as to RICO Counts One and Two

**WHEREFORE**, Plaintiffs Cipriani, Russell and Do pray that the Court enter judgment in their favor and against the RICO Defendants, containing the following relief:

    a.    Treble the amount of all injuries, including investment loss, deprivation of livelihood, and any other injury suffered as a result of Defendants' unlawful conduct, including and pre-judgment interest;

    b.    Compensatory damages in an amount to be determined at trial to compensate Plaintiffs for the damages caused by the RICO Defendants' unlawful conduct;

    c.    Treble and/or punitive damages as allowed by law;

d. An award of reasonable attorneys' fees, costs, and litigation expenses pursuant to 18 U.S.C. § 1964(c) and all other applicable statutes; and

e. Such other relief as the Court may deem just or equitable.

## **JURY DEMAND**

Plaintiffs Cipriani, Russell and Do hereby demand a trial by jury on all issues of fact and damages stated herein.  \\

Respectfully submitted,

By:    _____/s/_____
Kathleen Bliss
Kathleen Bliss Law PLLC
170 South Green Valley Parkway
Suite 300
Henderson, NV 89012
(702) 318-7375
kb@kathleenblisslaw.com


_____/s/_____
Michael Volkov (DC 367348)
*Pro Hac Vice (pending)*
The Volkov Law Group PC
1015 15th Street, N.W., 6th Floor.
Washington, D.C. 20005
(240) 505-1992
mvolkov@volkovlaw.com

106

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of March, 2026, I electronically filed the foregoing **First Amended Complaint** with the Clerk of the Court for the United States District Court for the District of Nevada by using the Court's CM/ECF system.

I further certify that all participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

Service on newly added defendants will be completed in accordance with Rule 4 of the Federal Rules of Civil Procedure.

Respectfully submitted,

By:      /s/_____

Kathleen Bliss
Kathleen Bliss Law PLLC
170 South Green Valley Parkway
Suite 300
Henderson, NV 89012
(702) 318-7375
kb@kathleenblisslaw.com

/s/_____

Michael Volkov (DC 367348)
*Pro Hac Vice (pending)*
The Volkov Law Group PC
1015 15th Street, N.W., 6th Floor.
Washington, D.C. 20005
(240) 505-1992
mvolkov@volkovlaw.com

107